**Affidavit of Eugene Casole**

I, Eugene Casole, am a staff officer with the Evaluation and Enforcement Division (EED), Office of Program Evaluation, Enforcement and Review (OPEER), Food Safety and Inspection Service (FSIS), United States Department of Agriculture.

I am responding to a Personnel inquiry, at the request of Ms. Kristie Kelm, Supervisory Employee Relations Specialist, Labor and Employee Relations Division (LERD), Human Resources Division (HRD), regarding an incident that I was involved in and occurred on January 27, 2004.

Before I explain in detail what happened and what was said, I want to advise that prior to this incident, I and several of the staff officers in EED, more notably, Messrs. Frank Busch, Gary Hazel, Carlos Torres, and perhaps others had an informal working relationship with Mss. Vella Kay Holmes and Roslyn Brogdon. In other words, informality existed within this small clique of people, topics of discussion varied and ranged across the spectrum. I and Messrs. Busch, Hazel, and Torres, actively participated with Mss. Holmes and Brogdon and/or witnessed these discussions.

Last Tuesday afternoon, January 27, 2004, I stretched my legs and walked over to Room 314 of our office building, West End Court (WEC), to speak with Ms. Vella Kaye Holmes, Compliance Specialist, and Mr. Gary Hazel, acting Program Manager, Criminal/Civil Branch.

I found Ms. Holmes and Mr. Hazel behind their desks. Ms. Holmes and Mr. Hazel share a large office. Ms. Holmes was speaking to someone on the telephone. Mr. Hazel was working on his laptop. I sat in the chair next to Mr. Hazel's desk.

I initiated a conversation with Mr. Hazel regarding the vacant deputy director position in the Compliance and Investigations Division (CID). The job had been announced on the internet approximately two weeks ago. I asked Mr. Hazel if he knew who had applied. Together, we began mentioning names of individuals we believed had applied. As I recall, six names were mentioned: Mr. Vincent Marquez, Supervisory Compliance Officer, Fresno, California; Mr. Luis Zamora, Supervisory Compliance Officer, Boulder, Colorado; Mr. Pedro Bobea, Supervisory Compliance Officer, Guaynabo, Puerto Rico; Mr. Frank Busch, Compliance Specialist, Evaluation and Enforcement Division (EED), Administrative Branch, Washington, D.C.; Mr. Mike Miller, Compliance Specialist, (CID); Washington, D.C.; and Mr. Ajibade Ogundipe, Compliance Specialist, (EED).

I recall asking Mr. Hazel if he knew how long Messrs. Marquez and Zamora had held their supervisory positions. Mr. Hazel stated that it was approximately two years. He stated that he was sure of this fact because he had competed for both jobs, but had lost them to Messrs. Marquez and Zamora.

EXHIBIT 2
Page 22 of 66 Pages

000073

I remember reviewing each of the candidates' credentials and qualifications very quickly in my head and making an assessment. One-by-one, I looked at each of the applicants' work experience, work complexity, if the candidate worked or developed any high-profile cases, length of supervisory experience, if any, Washington experience, if any, and geographic work experience. I then compared each applicant's qualifications against each candidate, made an overall assessment and verbalized this to Mr. Hazel as to who I thought was the most qualified applicant for the deputy position. I stated to Mr. Hazel that based on my program knowledge (extensive Compliance background) and diverse work experience, I appeared to be the most qualified. Mr. Hazel did not disagree, but he thought that Mr. Busch may have a chance because he was well liked.

In my opinion, how much the selecting officer likes you should not be a criteria, and it's not a criteria in the Merit Promotion Program. Promotion should be based on merit alone.

As I recall, Mr. Zamora's name then came up. Apparently, Mr. Zygmunt Sala, Director, CID, was in Artesia, New Mexico on a training exercise. Mr. Zamora, who was also taking the Compliance training, was going to pick Mr. Sala up at the airport. I told Mr. Hazel that I knew about it and commented that I thought Mr. Zamora was an opportunist for various reasons, including being a "yes man," that is, a person that is in constant agreement with management, regardless of the situation or circumstances. I also stated that Mr. Zamora was a nice guy, well liked by management, that he actively participated, in some capacity, with ATSP (Association of Technical and Supervisory Professionals), a professional association of FSIS employees that are not unionized, and that FSIS management likes that. In other words, Mr. Zamora was doing all the right things and obtaining some exposure.

I am not a "yes man." I think for myself and always try to do the right thing all the time. Personal integrity, truthfulness, honesty, and credibility mean everything to me. And, I will always speak out when I believe that we, the division, program, or Agency are off target in its thinking, methodology, or objective.

As I explained earlier, when I walked in, Ms. Holmes and Mr. Hazel's office, Ms. Holmes was on the telephone, but as I ended my discussion with Mr. Hazel, I noted that Ms. Holmes was no longer talking on the telephone and was listening to my conversation with Mr. Hazel.

I then teased Ms. Holmes, stating I thought she was an opportunist. I did this in a kidding manner and with a smile. Ms. Holmes, apparently, had been off the telephone some time because she understood what I said and explained that Mr. David Green, former District Manager, Chicago District had explained to her that the staff officer position that she was offered in EED last March was an opportunity, and that she should take it.

Ms. Holmes and I then got into a discussion about how long she had been in Washington, when she actually reported, and when her promotion became effective. According to

EXHIBIT 2
Page 2 of 6 Pages
000074

Ms. Holmes, her promotion became effective while she was still in Chicago. She explained that OPEER management made the promotion effective immediately, despite the fact that she had not physically reported to Washington until much later. She stated that OPEER management did that because she was still working on the LaGrou Cold Storage case. My response to Ms. Holmes was that management did that because they liked her.

I then turned to Mr. Hazel and jokingly asked him, "What do you call an opportunist from your neck of the woods?" Before Mr. Hazel replied, I said, "I think they call them vamps?" Mr. Hazel's response was, "Not in my neck of the woods." Both Mr. Hazel and Ms. Holmes were perplexed. They didn't know where I was coming from. I guess most people think that the word "vamp" only means seductress. What I really was saying was that the word "vamp" also meant an unscrupulous woman or unprincipled person, and that an unprincipled person was also an opportunist. When I saw that my comments didn't go over well—that neither Ms. Holmes or Mr. Hazel weren't smiling or saying anything, I returned to my office, reached for my dictionary, WEBSTER'S II, New Riverside University Dictionary (Property of the U.S. Government), The Riverside Publishing Company, and returned to Room 314.

When I returned, I found Ms. Roslyn Brogdon, Compliance Specialist, EED, sitting in the chair next to Mr. Hazel's desk. Mss. Holmes and Brogdon and Mr. Hazel were having a conversation. I didn't capture what they were talking about. I positioned myself in front of Ms. Holmes desk, opened the dictionary to the word "vamp," and read the definition: "vamp (vamp) [Short for Vampire] Informal. -n. An unscrupulous woman who seduces or exploits men." As I read the sentence aloud, I paused, edited and commented on portions of the definition, accepting some language and qualifying it with a comment and dismissing other language and commenting on it. Specifically, I read "An unscrupulous woman" and facetiously stated, "You're like that." When I read aloud, "...who seduces..." I stated, "I don't know about this stuff," and waived my left hand over the dictionary in a gesture to dismiss this fragment, but then commented on the later part, "...or exploits men," again, in a kidding manner, "Yeah, you're kind-of like that, too."

Ms. Brogdon, who was not present during the earlier discussion I had with Ms. Holmes, stated something to the effect that I should be careful about what I say. I then explained to Ms. Brogden that I just didn't say "vamp," but that I also stated that I thought Ms. Holmes was an opportunist. I didn't elaborate any further—I just let it go.

The incident ended when Ms. Holmes said to me, "You're lucky I have a sense of humor." It appeared that my remarks, which were intended to be nothing more than facetious, did not go over well. As I was near the doorway entrance of the office, I gave Ms. Holmes a thumbs-up and stated, "You're alright Vel." At that point, I wasn't pleased with the outcome, but I considered the matter closed.

When I went back to my office, I picked up my thesaurus. As a noun, Merriam-Webster's Collegiate Thesaurus (Property of U.S. Government), defines the word "vamp" as a flirt, coquette. As a verb, the thesaurus defines "vamp" as a charmer.

In fact, it's the first definition. This definition is more in tune with the word as I recognize and have used it in the past. Basically, what I was trying to say and explain was that I looked at Mr. Zamora, for example, as a "yes man" and Ms. Holmes, as somewhat unscrupulous and as "a charmer," and both as opportunists.

Funk & Wagnalls New Comprehensive International Dictionary of the English Language, Deluxe Edition, definition of "unscrupulous" is: " 'unscrupulous' adj. Not scrupulous; having no scruples; unprincipled." It defines the word "exploit" as: " 'exploit' n. To use for one's own advantage; take advantage of …." And, it defines "vamp" as: " 'vamp' v.t. To seduce or prey upon (a man) by utilizing one's feminine charms." Further, as: "An unscrupulous flirt or coquette." Copies of these excerpts have been provided.

*Background*
*Why do I look at Ms. Holmes like this? About a year ago, I had a conversation with Messrs. Busch and Hazel outside the front entrance of West End Court (WEC) building. The conversation was about a recent incident involving Ms. Holmes and Mr. Hazel. Apparently, Mr. David Lavers, (former program manager of the criminal/civil branch) gave Ms. Holmes and Hazel each a criminal case to review, comment, and then to brief him at a later time. Ms. Holmes came up with the idea that she and Mr. Hazel should review both case files, discuss them with each other, and then provide Mr. Lavers with a briefing of their own cases. What actually occurred was that Ms. Holmes took Mr. Hazel's comments about her case and represented them as her thoughts and comments. Mr. Hazel was mad. He felt used. I advised him not to help her anymore, and he said he wouldn't. Mr. Busch was also aware of this incident. Does that not sound unethical, unscrupulous, exploitive?*

My concern is that I appeared to have been misunderstood, but, based on my thought process, beginning with Mr. Zamora and concluding with Ms. Holmes, the word "vamp" was used appropriately. My thought process and rationale, as explained above, makes sense.

Later that day, just before 4:30 P.M., I ran into Mr. Hazel in the restroom on the 3rd floor of WEC. When he saw me, he began laughing about the incident, stating that I had "pissed her (Ms. Holmes) off." I don't believe I responded.

The following day, Wednesday, January 28, 2004, at approximately 7:30 A.M., after using the 1st floor restroom and while returning to my office through the exit door, I heard some loud talking and laughter to my right—at the far end of the corridor. There were a couple of staff officers from the division near Room 314, and they were talking and laughing about yesterday's incident regarding Ms. Holmes. I didn't say anything. I just went to my office and closed the door.

Approximately thirty minutes later, Messrs. Busch, Hazel, and Carlos Torres, Compliance Specialist, Criminal/Civil Branch, all came into my office, each holding a dictionary (WEBSTER'S II, New Riverside University Dictionary). They were playing a gag on me. Someone stated, "What's the word of the day?" I didn't say anything—I just

listened. And then someone else said, "We all know that's true about Vella Kay, but you didn't have to tell her." Mr. Busch then played a joke on me, telling me that Ms. Holmes had called in sick today because I had upset her. I believed it, and I, too, became upset. Mr. Hazel then stated that Mr. Busch was only kidding me, that Ms. Holmes was really sick. Mr. Busch then confirmed this, stating that Ms. Holmes stated that she was sick because of a cold and would be in tomorrow.

I believe it was early afternoon when I heard a rumor that someone from EED related the incident with Ms. Holmes to Mr. Mike Miller, Compliance Specialist, CID, and that Mr. Miller allegedly approached Mr. David Langley, Program Manager about the incident. Allegedly, Mr. Langley turned Mr. Miller away, stating he was not my supervisor. According to what I heard, Mr. Miller then allegedly contacted Mr. Sala, Director, CID, who was in Artesia, New Mexico about the incident, and that Mr. Sala then contacted Mr. Safian. According to the rumor, Mr. Miller allegedly initiated these contacts because we were both competing for the deputy position in CID, and that Mr. Miller was feeling the pressure.

Shortly thereafter, Mr. Busch came to my office and advised that he and Mr. Hazel telephoned Ms. Holmes at her home, that she had been sleeping, that they woke her and had a discussion about my comments to her. According to Mr. Busch, when he and Mr. Hazel asked Ms. Holmes if she was going to pursue the incident by filing a complaint, she emphatically said no, that she, too, had made inappropriate comments to me. When asked if she would mind it if I apologized to her the following day (Thursday, January 29th), she stated that she would love for me to do that, that she liked me and liked kidding with me, and that she simply wanted to work together.

*Background (Ms. Vella Holmes comments)*
*Most recently, on January 5, 2004, and on another occasion, Ms. Holmes made inappropriate comments to me, which she acknowledged doing so to Messrs. Busch and Hazel on January 28, 2004.*

*Specifically, on January 5th Mr. Busch and I were in Ms. Holmes and Mr. Hazel's office talking to Ms. Holmes. Mr. Hazel was not working that day. I was sitting behind Mr. Hazel's desk and Mr. Busch was sitting in a chair near Mr. Hazel's desk. It was a casual conversation, often humorous. There was some discussion about women, dating, and marriage. I am still single—never married. As I recall, Mr. Busch was teasing me about my personal values, stating that I wouldn't live with a woman, that I didn't want a divorced woman, etc. It was then that Ms. Holmes stated that I wanted a twelve year-old virgin.*

*Really, was that appropriate? I am forty-eight years old. I have nieces and nephews that are twelve years of age. A twelve year-old girl is a child. That was more than an inappropriate remark—it was suggestive, disgusting, and vulgar. Moreover, Ms. Holmes made the same remark on another occasion. I was speechless and embarrassed when Ms. Holmes made the remarks.*

EXHIBIT 2
Page 2 of 6 Pages

000077

Late Wednesday afternoon, at approximately 3:30 P.M., after an EED meeting on the Criminal, Civil, and Administrative Tracking System (CCATS) Data Dictionary, with all the management analysts, staff officers, and program managers in the criminal/civil and administrative branch, Mr. Hazel, approached me in my office and stated that he knew I was worried about the incident with Ms. Holmes, that he didn't want me to worry about it, that he thought the incident would be resolved, and that it wouldn't hurt if I apologized to Ms. Holmes the following morning.

On Thursday morning, January 29, 2004, I went to Room 314 and saw Ms. Holmes behind her desk. Mr. Busch was also there. I approached Ms. Holmes and stated, "I hurt you" and gave her a peck on the check. She stated, "Eugene, what really hurt the most is that you believe those things about me." Apparently, Mr. Busch was there the entire time and heard everything. Mr. Busch later told me that Ms. Holmes was very concerned that Mr. Busch saw me give Ms. Holmes a peck on the check, that Mr. Busch would tell someone, and that it would be misinterpreted. Accordingly to Mr. Busch, she was concerned about it and warned him not to say anything to anyone. I ended my apology to Ms. Holmes, which only lasted three minutes, by stating to her, "But, that's what people are saying. We can talk about it later, if you want."

Later in the day, I was speaking with Mr. Ajibade Ogundipe in his office. I had not mentioned this incident to him, but, judging from his reaction to me, he appeared to have knowledge of the incident. When I asked him what he knew, he told me that someone in the division told him about it. Mr. Ogundipe's concern was that the incident could be construed as sexual harassment. I disagreed at first, but then I decided to approach and speak to only those individuals that were in the room the day the incident occurred.

I briefly met with Ms. Brogdon in her office and asked her if she thought the incident could be construed as sexual harassment. Ms. Brogdan didn't know, and she said that several times to me.

I briefly met with Mr. Hazel in my office and asked him if the incident could be construed as sexual harassment. His response was no.

I then went to see Ms. Holmes in her office in Room 314. She was speaking with Mr. Miguel Figarella, Compliance Specialist, EED, so I left. A couple of minutes later I returned to see if she was available, but she wasn't—she was still speaking with Mr. Figarella. I was very anxious to speak to her about this issue. I waited a couple of minutes and then went again to Room 314. When I arrived, I noticed that Mr. Figarella was just leaving. I walked in the office and asked if I could speak with her. She motioned to me to sit down, and I did. Moments later, Mr. Hazel got up from his desk and left the room. I asked her pointblank if she felt that I had sexually harassed her. She said no and motioned with her right hand in a negative gesture.

I then asked Ms. Holmes if she knew why I used those words, "unscrupulous, exploitive, etc." I explained that that was what I was hearing and what people were saying. I posed several indirect questions to her. I asked her if it was ethical to have someone write your

application for promotion, and if it was ethical to say that you wrote a case if you didn't. She stated that she wrote her own application and side-stepped the question about the case (LaGrou), stating that it was a team effort. She also said she couldn't stop people from talking. I reminded her of the incident (case-swapping) with Mr. Hazel in a vague way and told her that I was purposely being vague because I didn't want there to be any more hard feelings among us at Headquarters. She simply shook her head and gestured that she didn't know what I was talking about. I told Ms. Holmes that she didn't have to do that—that I would teach her how to review cases, that I would help anyone, and that I helped train Michele Long, Compliance Specialist, EED, when Ms. Carol Seymour wanted to make her an Assistant District Manager for Enforcement (ADME). I also told her that I wanted to approach her earlier, but that I didn't. Ms. Holmes explained that she came to Washington to learn something, that she thought she was smart and could learn how to review cases, and I agreed. I told her that I wouldn't "bother her anymore" (about the issue). Nothing else was said. I then left and haven't spoken to Ms. Holmes since the incident, other than to greet her.

On Friday, January 30, 2004, I briefly saw Ms. Holmes as I was exiting and she was entering the exit doorway near my office. It was approximately 11:30 A.M. and she had her lunch in her hands. I said, "Hey!" and she did the same. I saw Ms. Holmes again at approximately 4:30 P.M. as she was approaching the third elevator car on the 3rd floor. I was in the elevator car, near the control panel. As I held the door open, I said, "Hi, Vel." She said nothing and went to the rear of the car. We did not speak. I left the elevator car when it stopped on the 2nd floor.

On Wednesday, February 4, 2004, I had a lengthy discussion with Mr. Hazel. It was early morning, and he was in the corridor, near the doorway entrance of my office. I approached him and asked if we could talk. He came into my office, seated himself, and we had a long discussion. I asked him why he had ignored me and Mr. Busch for the last couple of days, and that I and Mr. Busch both noticed it. He stated that he was neither ignoring me nor Mr. Busch; but, rather, that Mr. Busch was ignoring him.

Mr. Hazel's comment appeared to be partially true. In a conversation, shortly after the incident, Mr. Busch did mention that he intentionally stayed away from Room 314 on Friday, January 30th because the door was observed almost entirely closed and he heard Ms. Holmes and Mr. Hazel arguing.

I asked Mr. Hazel what was going on with Ms. Holmes—I heard that she complained. Mr. Hazel then explained what occurred over the later part of last week, beginning with late Thursday afternoon, January 29, 2004, when I re-approached Ms. Holmes, up to Monday, February 2, 2004, when Ms. Holmes, accompanied by Mr. Hazel, supposedly elected to complain to Mr. Safian. I asked Mr. Hazel what that was about. He said he didn't know, that he only accompanied Ms. Holmes to Mr. Safian's office because he was the acting branch chief.

EXHIBIT 2
Page 28 of 66 Pages

7000079

When I asked him if he wanted to know what I said to Ms. Holmes on Thursday afternoon, January 29th, his response was that he didn't want to get involved. Get involved? I told Mr. Hazel that he was already involved.

We briefly talked about the day of the incident, January 27, 2004. When Mr. Hazel explained that he didn't understand where I was coming from and that he was mortified when I made those remarks to Ms. Holmes, I advised Mr. Hazel that the word "vamp" has many synonyms, including the word "charmer," and can be used many ways. Mr. Hazel didn't say anything. In regard to his comment that he was "mortified," I reminded Mr. Hazel that I ran into him shortly before 4:30 P.M. that afternoon in the 3rd floor restroom at WEC, and that when he saw me, he was still laughing about the incident and telling me how I "pissed-off" Ms. Holmes; that the following day, January 28th, I heard him talking and laughing loudly with two other staff officers in the corridor, near Room 314, about the incident; and that approximately thirty minutes later, he and Messrs. Busch and Torres ran into my office holding dictionaries and played a gag on me. After I stated this to Mr. Hazel, he stated, "Yeah, it was funny." Then I advised him of the events that led me to re-approach and what transpired during my conversation with Ms. Holmes.

Specifically, I advised Mr. Hazel of my earlier conversation with Mr. Ogundipe, who believed that the incident may be construed as sexual harassment. Consequently, I explained, I approached everyone that was in Room 314 when this occurred, including Mss. Holmes and Brogdan and him and specifically asked if they believed it was sexual harassment. I asked Mr. Hazel if he remembered when I approached him on this matter in my office. He stated that he did. I then reminded him of his response and advised that Ms. Brogdon was indecisive, and that Ms. Holmes had said no.

I then explained in detail my conversation with Ms. Holmes, omitting nothing. I advised that I tried to explain to Ms. Holmes why I used those words, unscrupulous, exploitive, etc., namely, because people were talking about her. I advised Mr. Hazel that I indirectly asked Ms. Holmes if it was ethical to have someone write your application for promotion or to take credit for a case that you didn't write, and Ms. Holmes' response to my indirect questions. Mr. Hazel's response was that it wasn't my business—that if Ms. Holmes wanted to be that way, I should let her. When I explained to Mr. Hazel that I also commented to Ms. Holmes about the case-swapping incident that occurred approximately one year ago between him and Ms. Holmes, his response was that he didn't tell me that. When I told him that he did and reminded him that it occurred outside the 2nd floor overhang at WEC and that Mr. Busch was also there, he acknowledged the fact, stating, "Yeah, I did." When I reminded Mr. Hazel how mad he was about the whole incident, he again conceded.

In order to provide a better understanding of how informal the relationships were within this small clique of people, I thought I would provide a small glimpse.

EXHIBIT 2
Page 29 of 66 Pages

000080

I was seated at a chair in front of Mr. Busch and Ms. Brogdan's desk in Room 318 at WEC. Ms. Brogan was not present. Mr. Torres was standing to my right. Mr. Busch allegedly explained an incident which described Ms. Holmes sitting in a chair in Mr. Busch and Ms. Brogdan's office, actually the very same chair that I was seated as I listened to this story, in which Ms. Holmes allegedly wanted to show Mr. Busch what a good contortionist she was by lifting her leg over her head. I don't recall my reaction. I think I just smiled or shook my head.

On a different occasion, I walked down the corridor to Mr. Busch and Ms. Brogdon's office. I saw Mr. Busch near the entrance of Room 314, Ms. Holmes and Mr. Hazel's office. Mr. Busch allegedly leaned over to me and stated that Ms. Holmes had showed Mr. Hazel the spider veins on her legs. I then asked Mr. Hazel if that was true. Mr. Hazel, paused for a second and then allegedly stated, "Yes, she did." Mr. Busch and I just laughed.

Again, on a different day, I went to see Mr. Busch in Room 318. Ms. Brogdon was sitting behind her desk. Mr. Busch allegedly was explaining to me that Mr. Torres allegedly liked to play with Ms. Brogdon's dolls. These were little female figurines that had a solid torso and head, but had flimsy cloth legs and plastic shoes. Allegedly, Mr. Torres liked to lift the doll's legs over the doll's torso. Everyone laughed, including Ms. Brogdan, who allegedly stated, "I told Carlos to leave my girls (dolls) alone."

And, there are many more incidents of this kind, which, in my opinion, demonstrates that informality existed within this small clique of individuals.

This statement consists of nine (9) pages and I hereby solemnly swear and affirm that it is true and complete to the best of my knowledge and belief.

_[signature]_
Eugene Casole

_[signature]_

Dieynaba Diene
Notary Public, District of Columbia
My Commission Expires 2-28-2008

EXHIBIT 2
Page 30 of 60 Pages