## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| EUGENE CASOLE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 05-1459 (CKK) |
| | ) | |
| MIKE JOHANNS, | ) | |
| Secretary of the Department of Agriculture, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S THIRD AMENDED COMPLAINT OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 12(b)(6), defendant Mike Johanns, in his official capacity as Secretary of the Department of Agriculture, respectfully requests that this Court dismiss plaintiff's third amended complaint for failure to state a claim. Alternatively, summary judgment is appropriate in defendant's favor. In support of this motion, defendant respectfully refers the Court to the memorandum in support of this motion, filed together with the motion.

November 21, 2006                    Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC BAR #434122
Assistant United States Attorney


_____/s/_____
JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
555 Fourth Street, N.W. - Civil Division
Washington, D.C.  20530
(202) 307-1249

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EUGENE CASOLE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 05-1459 (CKK) |
| | ) |
| MIKE JOHANNS, | ) |
| Secretary of the Department of Agriculture, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

**DEFENDANT'S STATEMENT OF MATERIAL FACTS NOT IN DISPUTE**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 7(h), defendant respectfully files this statement of material facts not in dispute.

1.  Plaintiff is employed as a GS-13 Compliance Specialist, in the Department of Agriculture's Office of Program Evaluation and Enforcement and Review ("OPEER"), Evaluation and Enforcement Division ("EED"), Food Safety and Inspection Service ("FSIS").

**September 20, 2004 Suspension**

2.  On January 27, 2004, plaintiff entered an office jointly shared by Ms. Vella Holmes and Mr. Gray Hazel.  Decl. of Eugene Casole p.2 (attached as Exhibit 1).  After entering the office, plaintiff "teased" Ms. Holmes by telling her that he believed she was an "opportunist." Id.  Plaintiff then told Ms. Holmes that management promoted her because they liked her.  Id. at p.3.

3.  Following these comments, plaintiff turned to Mr. Hazel, who was also in the office, and asked, "What do they call an opportunist from your neck of the woods."  Id.  Before Mr. Hazel could respond, however, plaintiff stated, "I think they call them Vamps."  Id.  In response to plaintiff's comments, plaintiff thought Ms. Holmes and Mr. Hazel looked "perplexed."  Id.  In

using the term "vamp," plaintiff meant to imply that Ms. Holmes was "an unscrupulous woman or unprincipled person, and that an unprincipled person was also an opportunist." Id.

4. After seeing that his calling Ms. Holmes a "vamp" was not well received, plaintiff returned to his office, retrieved his dictionary, and returned to the office of Ms. Holmes and Mr. Hazel. Id. Plaintiff then "positioned [himself] in front of Ms. Holmes desk, opened the dictionary to the word 'vamp,' and read the definition: 'vamp (vamp) [Short for Vampire] Informal. -n. An unscrupulous woman who seduces or exploits men.'" Id. As plaintiff read the sentence aloud, he paused, edited, and commented on the definition, accepting some language and qualifying it with a comment and dismissing other language and commenting on it. "Specifically, [when plaintiff] read, '. . . who seduces . . .' [he] stated, 'I don't know about this stuff,' and waived [his] hand over the dictionary in a gesture to dismiss this fragment, but then commented on the later part, '. . . or exploits men,' again, in a kidding manner, 'Yeah, you're kind-of like that.'" Id. Prior to leaving Ms. Holmes' office, it was apparent to plaintiff that his remarks "did not go over well." Id.

5. After hearing a rumor that supervisory personnel had been made aware of his comments to Ms. Holmes, plaintiff decided to apologize to Ms. Holmes. Id. pp. 5-6. To that end, on January 29, 2004, he entered Ms. Holmes' office, approached Ms. Holmes and stated, "I hurt you." Id. at p.6. Plaintiff then kissed Ms. Holmes on the cheek. Id. In response, Ms. Holmes said to plaintiff, "Eugene, what really hurt the most is that you believe those things about me." Id. Plaintiff then stated to Ms. Holmes, "[b]ut, that's what people are saying. We can talk about it later, if you want." Id. Plaintiff then left Ms. Holmes' office.

6. In response to her treatment by plaintiff, Ms. Holmes filed a complaint against plaintiff. Declaration of Vella Kay Holmes at p.4 (attached as Exhibit 2). Ms. Holmes filed the complaint because she felt plaintiff's calling her a "vamp" was inappropriate and constituted sexual harassment, particularly because she believed he was inferring that the only reason she has her position is because she is a woman and does not have the ability to do the work required by the position. Id. p.5. Additionally, Ms. Holmes felt that it was inappropriate for plaintiff to kiss her on the cheek and that he had no right to touch her in any form or fashion other than what would be appropriate in a professional office, i.e., a handshake. Id.

7. Following its receipt of the written complaint by Ms. Holmes, and an investigation of the incident, the Labor & Employee Relations Division proposed that plaintiff be suspended for five days for improper conduct. Exhibit 3 (July 7, 2004 Proposed Suspension Letter). Plaintiff received the proposed suspension letter on July 27, 2004, but refused to sign the letter. Id. at p.4.

8. Two specifications supported the proposed suspension: (1) "On January 27, 2004 you called Ms. Holmes a 'vamp' and then left her office. You returned to her office with a dictionary and proceeded to read the definition of the word" and (2) "On January 29, 2004, after apologizing to Ms. Holmes for the January 27th incident, you leaned over and kissed her on the cheek." Id. The proposed suspension letter also detailed several "aggregating factors" that supported the proposed suspension. Specifically, the letter detailed a prior incident in which plaintiff was cautioned after making inappropriate comments during a meeting with other OPEER employees and another incident for which plaintiff was reprimanded after making offensive and discriminatory comments in a meeting with FSIS personnel and establishment

management officials.  Id.  The proposed suspension then detailed plaintiff's right to submit a

reply to the proposed suspension, and to have a representative throughout the process.  Id.

9.    Although the proposed suspension letter provided plaintiff an opportunity to respond

to the charges, on July 30, 2004, plaintiff hand delivered a letter to Ms. Kristie Kelm, Chief of

the Employee Relations Branch stating that he "will have to decline" to respond to the proposed

suspension.  Exhibit 4 (July 30 Letter from Plaintiff to Ms. Kristie Kelm).  The reasons set forth

in plaintiff's letter for his declination to respond was that he did not believe he would receive a

fair and impartial conference and that he had previously filed an EEO complaint against the

Employee Relations Branch.  Id.

10.    On August 30, 2004, Ms. Kristie Kelm, the deciding official for the proposed

suspension, issued her Decision Letter.  See Exhibit 5 (August 30, 2004 Letter from Kristie

Kelm to Eugene Casole).  Plaintiff received this Decision Letter on September 2, 2004.  Id.  In

her decision letter, Ms. Kelm found that the evidence supports the specifications set forth in the

proposed suspension.  Id.  Mr. Kelm also stated that plaintiff had "not responded to the

Specifications or offer[ed] any defense for your actions.  In the absence of any credible evidence

to refute the Specifications, I must find that both Specifications are proven by a preponderance

of the evidence and is, therefore, sustained."  Id.  Ms. Kelm explained in her decision letter that,

although she considered plaintiff's length of service as a mitigating factor, his "misconduct [was]

of an extremely serious nature, and strikes at the very core of the agency policy on expectations

of employee conduct."  Id.  Ms. Kelm also considered plaintiff's prior incidents of inappropriate

and offensive conduct for which he was cautioned and reprimanded.  Id.  Ultimately, Ms. Kelm

found that plaintiff's "derogatory, discourteous and inappropriate behavior towards Ms. Holmes

was unwelcome, unprofessional, wholly inappropriate, and inconsistent with Agency policy on expectations of employee conduct" and upheld the proposed suspension of plaintiff for five days. Id. Finally, the decision letter advised plaintiff of his rights to grieve the decision to suspend him for five days. Id.

**Plaintiff's Three-Week Detail to Omaha, Nebraska**

11. On February 9, 2004, the Deputy Assistant Administrator for OPEER advised plaintiff that effective February 17, 2004, he was to report to the Agency's Omaha, Nebraska office for a three week detail. Exhibit 6 (Letter from R. Van Blargan to E. Casole (2/9/04)). The letter advising plaintiff of the detail expressly advised plaintiff that he would retain his current position title, grade and step during the detail. Id. The letter further advised plaintiff that, because the detail was not within commuting distance of his Maryland home, he would also receive payment of appropriate authorized transportation and per diem expenses associated with the detail. Id.

12. Regarding the reason for the detail, the letter expressly informed plaintiff that he was being detailed while the Agency investigated his alleged sexual harassment of Ms. Holmes. Specifically, the February 9 letter stated, "pending the results of the LERD investigation, it is in the best interests of the Agency to direct your detail assignment as specified." Id.

**Plaintiff's March 5, 2004 Non-Selection**

13. On January 9, 2004, the Department advertised a GS-1801-14 position for Deputy Director of the Compliance and Investigation Division ("CID"). See Exhibit 7 (USAJOBS Announcement W-CID-2004-0001).

5

14. Plaintiff, who was a GS-13 Program Analyst, filed a timely application for the GS-14 Deputy Director position. See Exhibit 8 (Plaintiff's QuickHire Application). Martin Hickman, a GS-14 Special Assistant, also filed a timely application for the Deputy Director position. See Exhibit 9 (Hickman QuickHire Application).

15. On January 29, 2004, Karen Bridges, Human Resources Specialist, forwarded to Mr. Zygmunt Sala, the Acting Director of CID, two Promotion Certificates for the Deputy Director position, a Competitive Certificate and a Noncompetitive Certificate. See Exhibit 10 (January 29, 2004 Letter from Karen Bridges, Human Resources Specialist, to Mr. Zygmunt Sala, the Acting Director of CID). Mr. Sala was the selecting official for the GS-1801-14 Deputy Director position. See Declaration of Zygmunt Sala p. 2 ("Sala Decl.") (Exhibit 11). The Competitive Certificate contained six candidates, including plaintiff. Sala Decl. The Noncompetitive Certificate contained two candidates, including Mr. Hickman. Id.

16. Following his receipt of the materials from Ms. Bridges, Mr. Sala reviewed the two lists of candidates for consideration for the Deputy Director position. Id. To facilitate his decision making process, Mr. Sala created a handwritten chart for evaluating the candidates using the responses of the applicants to the position description-based questions. Id. & Exhibit 12 (Chart of Mr. Sala). For this chart, Mr. Sala ranked each candidate in nine categories, including supervisory experience, national projects and criminal investigation. Sala Decl. & Exhibit 12. Based on his review, Mr. Sala assigned each of the applicants a numerical letter rating, using W (weak), M (moderate) or S (strong). Sala Decl. & Exhibit 12.

17. Using his chart and rating method, Mr. Sala rated Mr. Hickman as S (strong) in all nine categories. Sala Decl. & Exhibit 12. Plaintiff, however, received a S (strong) in two

6

categories, a M (moderate) in one category, and a W (weak) in six categories.  Sala Decl. &

Exhibit 12.

18.  Mr. Sala did not conduct interviews with any of the candidates, as the Interview

Policy stated that interviewing candidates is not mandatory.  See Exhibit 13 (FSIS Directive

4335 Revision I (Nov. 11, 2002)).  On March 3, 2004, based solely upon his rating of the

applications, and because he believed that Mr. Hickman's application showed that Mr. Hickman

had "far more experience" than the other candidates, including plaintiff, Mr. Sala selected Mr.

Hickman for the Deputy Director of CID position.  See Sala Decl.; Exhibit 10 (January 29, 2004

Letter from Karen Bridges, Human Resources Specialist, to Mr. Zygmunt Sala, the Acting

Director of CID).

19.  Mr. Sala was not influenced in his consideration of the candidates by Mr. Van

Blargan, whom he advised of the selection and who verbally concurred.  Sala Decl.  The decision

on which of the applicants to select was left to Mr. Sala alone.  Id.

**June 26, 2003 Letter of Reprimand**

20.  On May 21, 2003, plaintiff participated in a meeting between representatives of the

Department of Agriculture and representatives of Salem Packing Company regarding a Consent

Order being entered against Salem Packing.  See Exhibit 15 (April 14, 2004 Affidavit of Eugene

Casole).

21.  At this meeting, plaintiff stated to one of the Salem Packing representatives that,

"when I was an inspector, I shut down his cousin's establishment."  Exhibit 15 at p. 6 of 9.

Plaintiff made this comment to "tease" the Salem packing representative.  Exhibit 15 at p. 6 of 9

("I told Messrs. Safian and Bossler that I knew Mr. Anthony Bonaccurso's brother and cousin and that I was going to tease him about shutting down his cousin's business.").

22.  During this meeting, plaintiff also remarked to the Salem Packing representatives that he believed plant officials do not write well.  Exhibit 15 at p. 7 of 9.  Plaintiff made this statement because he personally believes that, in general, plant officials do not write well and "struggle with the task" then become frustrated and annoyed when asked to make revisions. Exhibit 15 at p. 7 of 9.  Mr. Casole also remarked to one of the representatives that this representative should move to Florida.

23.  Following the meeting, Charles Geraci, one of other USDA representatives who attended the meeting, informed his supervisor about plaintiff's inappropriate comments.  Exhibit 16 (May 3, 2004 Affidavit of Charles Geraci).   See also Exhibit 17 (June 4, 2003 Statement of Charles Geraci).

24.  As is common practice at the USDA, the accusations regarding plaintiff's inappropriate conduct at the meeting were sent to Marcelle Castillo, a Senior Employee Relations Specialist in the Office of Labor and Employee Relations Division.  Exhibit 18 (April 6, 2004 Affidavit of Marcelle Castillo).  In compliance with the normal practice at the USDA, Ms. Castillo reviewed the allegations and determined that the appropriate sanction of plaintiff based upon his conduct would be a letter of reprimand.  Exhibit 18 at p. 2 of 3.

25.  After determining that the appropriate action based upon plaintiff's conduct would be a letter of reprimand, Ms. Castillo prepared and signed the letter of reprimand and forwarded it to plaintiff's manager for delivery to plaintiff.  Exhibit 18 at p. 2 of 3.

26.  When Ms. Castillo reviewed the allegations relating to plaintiff's conduct and determined that a letter of reprimand was the appropriate sanction, and then subsequently drafted and signed the letter of reprimand, she had no knowledge of plaintiff's prior EEO activity. Exhibit 18 at p. 2 of 3.

27.  In the June 26, 2003 Letter of Reprimand, Ms. Castillo set forth the allegations regarding plaintiff's inappropriate conduct and comments at the meeting, set forth the applicable provisions of the Agency's Equal Employment Opportunity Policy Statement and the Standards of Ethical Conduct, and explained that the Agency will not tolerate offensive and discriminatory remarks.  Exhibit 19 (June 26, 2003 Letter of Reprimand).  The Letter also advised plaintiff that the letter would be maintained in his official personnel file for a period not to exceed two years. Exhibit 19.

November 21, 2006                           Respectfully submitted,


                                            _____/s/_____
                                            JEFFREY A. TAYLOR, D.C. Bar # 498610
                                            United States Attorney


                                            _____/s/_____
                                            RUDOLPH CONTRERAS, DC BAR #434122
                                            Assistant United States Attorney


                                            _____/s/_____
                                            JOHN F. HENAULT, D.C. Bar # 472590
                                            Assistant United States Attorney
                                            555 Fourth Street, N.W. - Civil Division
                                            Washington, D.C.  20530
                                            (202) 307-1249

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EUGENE CASOLE, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 05-1459 (CKK) |
| | ) |
| MIKE JOHANNS, | ) |
| Secretary of the Department of Agriculture, | ) |
| | ) |
| Defendant. | ) |
| _____ | ) |

## **DEFENDANT'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS**

Plaintiff's third amended complaint is a legally and factually deficient attempt to hold defendant responsible for plaintiff's own wrongdoings and the natural consequences of that wrongdoing. Thus, as set forth in detail below, the complaint should be dismissed in its entirety.

## **FACTS**

Defendant incorporates its Statement of Material Facts Not in Dispute, filed together with this motion and memorandum, for consideration in the Summary Judgment portion of this motion. To the extent that any factual discussion is necessary for the 12(b)(6) portion of this motion, those facts are discussed in the appropriate section and are drawn ***only*** from the pleadings or other materials that are proper for consideration in a 12(b)(6) motion.

<u>**ARGUMENT**</u>

**I.     LEGAL STANDARDS**

    **A.     12(b)(6) Standard**

A Rule 12(b)(6) motion tests the legal sufficiency of a complaint and dismissal is appropriate where the "plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Browning v. Clinton</u>, 292 F.3d 235, 241 (D.C. Cir. 2002) (quoting <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957)). The Court is to treat the complaint's factual allegations as true, <u>see</u> <u>Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit</u>, 507 U.S. 163, 164 (1993), and must grant plaintiff "the benefit of all inferences that can be derived from the facts alleged," <u>Schuler v. United States</u>, 617 F.2d 605, 608 (D.C. Cir.1979). However, "the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by the facts alleged in the complaint, nor must the Court accept the plaintiff's legal conclusions." <u>Akintomide v. United States</u>, 99-MS-0055 (PLF), 2000 WL 1693739, at *1 (D.D.C. Oct. 31, 2000) (citing <u>National Treasury Employees Union v. United States</u>, 101 F.3d 1423, 1430 (D.C. Cir. 1996) and <u>Kowal v. MCI Communication Corp.</u>, 16 F.3d 1271, 1276 (D.C. Cir. 1994)).

    **B.     Summary Judgment Standard**

A party is entitled to summary judgment if the pleadings, depositions, and affidavits demonstrate that there is no genuine issue of material fact in dispute and that the moving party is entitled to judgment as a matter of law. <u>See</u> Fed. R. Civ. P. 56(c); <u>Tao v. Freeh</u>, 27 F.3d 635, 638 (D.C. Cir. 1994). Under the summary judgment standard, defendant, as the moving party, bears the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and

admissions on file, together with the affidavits which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Plaintiff, in response to defendant's motion, must "go beyond the pleadings and by [their] own affidavits, or depositions, answers to interrogatories, and admissions on file, 'designate' specific facts showing that there is a genuine issue for trial." Id. at 324 (internal citations omitted).

Although a court should draw all inferences from the supporting records submitted by the nonmoving party, the mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). To be material, the factual assertion must be capable of affecting the substantive outcome of the litigation; to be genuine, the issue must be supported by sufficient admissible evidence that a reasonable trier-of-fact could find for the nonmoving party. Laningham v. U.S. Navy, 813 F.2d 1236, 1242-43 (D.C. Cir. 1987); Liberty Lobby, 477 U.S. at 251 (the court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law"). "If the evidence is merely colorable, or is not sufficiently probative, summary judgment may be granted." Liberty Lobby, 477 U.S. at 249-50 (internal citations omitted). "Mere allegations or denials in the adverse party's pleadings are insufficient to defeat an otherwise proper motion for summary judgment." Williams v. Callaghan, 938 F. Supp. 46, 49 (D.D.C. 1996). The adverse party must do more than simply "show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). Instead, while the movant bears the initial responsibility of identifying those portions of the record that demonstrate the absence of a genuine issue of material fact, the burden shifts to the non-movant

to "come forward with 'specific facts showing that there is a *genuine issue for trial*.'" Id. at 587 (citing Fed. R. Civ. P. 56(e)) (emphasis in original).

Importantly, "[w]hile summary judgment must be approached with specific caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." Morgan v. Fed. Home Loan Mortgage Corp., 172 F. Supp. 2d 98, 104 (D.D.C. 2001) (quoting Calhoun v. Johnson, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998) (internal citation omitted), aff'd, No. 99-5126, 1999 WL 825425, at *1 (D.C. Cir. Sept. 27, 2000)); see also Marshall v. James, 276 F. Supp. 2d 41, 47 (D.D.C. 2003) (special caution "does not eliminate the use of summary judgment in discrimination cases") (citing cases). "Summary judgment is not a 'disfavored procedural shortcut,' but is an integral procedural tool which promotes the speedy and inexpensive resolution of every case." Marshall, 276 F. Supp. 2d at 47 (quoting Celotex Corp., 477 U.S. at 327).

### C.    Evaluating Discrimination And Retaliation Claims At The Summary Judgment Stage

The procedure for resolving claims of discrimination such as the instant claims is well-established.  In the absence of direct evidence of discrimination, a plaintiff may rely on inferential evidence under McDonnell-Douglas Corp. v. Green, 411 U.S. 792 (1973).  The plaintiff must first, by a preponderance of the evidence, establish a prima facie case of discrimination.  See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 506 (1993).  To establish a prima facie case of discrimination in a Title VII case, plaintiff must show that (1) he is a member of a protected class; (2) he suffered an adverse personnel action; (3) under circumstances giving

rise to an inference of discrimination.  See Stella v. Mineta, 284 F.3d 135, 144-45 (D.C. Cir.

2002) (citing Brown v. Brody, 199 F.3d 446, 452 (D.C. Cir.1999)).

    A plaintiff establishes a prima facie case of retaliation or reprisal by demonstrating that

(1) he engaged in protected behavior; (2) the employer took a materially adverse action against

plaintiff that a reasonable employee would believe was designed to dissuade a reasonable worker

from making or supporting a charge of discrimination; and (3) there is a causal link between the

adverse action and the protected activity.[1]  Rochon v. Gonzales, 438 F.3d 1211, 1219-20 (D.C.

Cir. 2006).  The Supreme Court recently clarified that Title VII's anti-retaliation provision

pertains *only* to those employer actions that are materially adverse to a reasonable employee or

applicant.  Id.  Therefore, a plaintiff must demonstrate "materially adverse consequences . . .

such that a reasonable trier of fact could conclude that the plaintiff has suffered objectively

tangible harm" which would have dissuaded a reasonable employee from making or supporting a

charge of discrimination.  Id. at 1219 (citing Brown, 199 F.3d at 457).

    If the employee succeeds in establishing a prima facie case, the burden shifts to the

employer to articulate some legitimate, nondiscriminatory reason for its action.[2]  See McDonnell

Douglas, 411 U.S. at 802, 804.  Even if the Court suspects that a job applicant "was victimized

---

[1]  Prior to Burlington N. & Santa Fe Ry. Co. v. White, 126 S. Ct. 2405 (2006), and
Rochon, a plaintiff was required to establish an adverse employment action to meet the second
prong of the prima facie case test.  See Mitchell v. Baldrige, 759 F.2d 80. 86 (D.C. Cir. 1985).

[2]  Defendant's burden is a "relatively light burden," Fuentes v. Perskie, 32 F.3d 759, 763
(3d Cir. 1994), and it "need not persuade the Court that it was actually motivated by the
proffered reasons."  Texas Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 254 (1981).  See
also St. Mary's, 509 U.S. at 509 ("[T]he determination that a defendant has met its burden of
production (and has thus rebutted any legal presumption of intentional discrimination) can
involve no credibility assessment.").

by [ ] poor selection procedures" it may not "second-guess an employer's personnel decision absent demonstrably discriminatory motive." Milton v. Weinberger, 696 F.2d 94, 100 (D.C. Cir. 1982). Thus, "[o]nce the employer has articulated a non-discriminatory explanation for its action, the issue is not 'the correctness or desirability of [the] reasons offered ... [but] whether the employer honestly believes in the reasons it offers.'" Fischbach v. District of Columbia Dept. of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citing McCoy v. WGN Continental Broadcasting Co., 957 F.2d 368, 373 (7th Cir.1992); Pignato v. American Trans Air, Inc., 14 F.3d 342, 349 (7th Cir. 1994) ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a phony reason.")).

Once both parties meet their respective burdens of production, the burden shifting scheme becomes irrelevant. Hicks, 509 U.S. at 510. Then, the plaintiff **must** establish that the employer's "proffered reason was not the true reason for the employment decision," and that the plaintiff's membership in a protected class was a reason for the employment action. Id. at 508; see also Aka v. Washington Hosp. Center, 156 F.3d 1284, 1292-93 (D.C. Cir. 1998) (en banc); Mungin v. Katten Muchin & Zavis, 116 F.3d 1549, 1554 (D.C. Cir. 1997). See also St. Mary's, 509 U.S. at 515-516 ("But a reason cannot be proved to be 'a pretext **for discrimination**' unless it is shown **both** that the reason was false, **and** that discrimination was the real reason.") (Emphasis in original))

A plaintiff must present **substantial** and **credible** evidence of discrimination to survive a motion for summary judgment. See Greene v. Dalton, 164 F.3d 671, 675 (D.C. Cir. 1999) ("Accepting [some] conclusory allegations as true, therefore, would defeat the central purpose of

the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of a jury trial."); Carpenter v. Federal Nat'l Mortgage Ass'n, 165 F.3d 69, 72 (D.C. Cir. 1999) (if plaintiff merely shows that the legitimate nondiscriminatory reason offered by the employer is a pretext to cover up a decision made for an unsavory reason, the plaintiff is not entitled to try issues of fact, and summary judgment for the employer is appropriate.); Hastie v. Henderson, 121 F. Supp.2d, 72, 77 (D.D.C. 2000) aff'd, No. 00-5423, 2001 WL 793715 (D.C. Cir. 2001) ("To defeat a motion for summary judgment, a plaintiff cannot create a factual issue of pretext with mere allegations or personal speculation, but rather must point to 'genuine issues of material fact in the record.'"); Woodruff v. DiMario, 164 F. Supp. 2d 1, 5 (D.D.C. 2001).  Additionally, there will be "instances where, although the plaintiff has established a prima facie case and set forth sufficient evidence to reject the defendant's explanation, no rational factfinder could conclude that the action was discriminatory."  Weigert v. Georgetown University, 120 F. Supp. 2d 1, 22 (D.D.C. 2000) (quoting Reeves v. Sanderson Plumbing Co., 530 U.S. 133 (2000)).

**II.    COUNT I FAILS TO STATE A RETALIATION CLAIM FOR THE NOVEMBER 26, 2002 NON-SELECTION – PLAINTIFF'S PRIOR PROTECTED ACTIVITY WAS MORE THAN FIVE YEARS BEFORE THE ADVERSE EMPLOYMENT ACTION AT ISSUE**

Plaintiff alleges in Count I that his November 26, 2002 non-selection for a Supervisory Compliance Officer position was the result of retaliation for his August 7, 1997 EEO complaint. Third Am. Compl. ¶¶ 11 & 12 (establishing that the only protected activity by plaintiff prior to the November 2002 non-selection was in August 1997).  As a matter of law, plaintiff can prove no set of fact to establish a retaliation claim based upon his August 1997 EEO complaint – that complaint was more than *five years prior* to his non-selection.

As set forth previously, a plaintiff establishes a prima facie case of retaliation or reprisal by demonstrating that (1) he engaged in protected behavior; (2) the employer took a materially adverse action against plaintiff that a reasonable employee would believe was designed to dissuade a reasonable worker from making or supporting a charge of discrimination; and (3) there is a causal link between the adverse action and the protected activity.[3] Rochon, 438 F.3d at 1219-20. To prove a causal connection – the third element of a retaliation claim – plaintiff must show that the responsible officials had knowledge of the protected activity and that the adverse action occurred "*shortly after*" the protected activity. Holbrook v. Reno, 196 F.3d 255, 263 (D.C. Cir. 1999) (quoting Mitchell, 759 F.2d at 86).

The only protected activity that plaintiff relies upon to support his claim of retaliation for the November 26, 2002 non-selection is his August 7, 1997 EEO complaint. See Third Am. Compl. at ¶ 11. As a matter of law, there is no causation – the more than five years and three months between his prior EEO complaint request and the non selection is too great to establish causation. See also Clark County School District v. Breeden, 532 U.S. 268, 273 (2001) (finding that 20-month lag suggests no causality at all) (quoting with approval cases finding 4-month and 3-month lags insufficient to establish causality); Ball v. Tanoue, 133 F. Supp. 2d 84, 92 (D.D.C. 2001) (finding that one-year time lag between protected activity and adverse employment action is too great to establish prima facie case of retaliation); Hastie v. Henderson, 121 F. Supp.2d 72,

---

[3] Although plaintiff is not required to plead a prima facie case, and dismissal is not appropriate based upon plaintiff's failure to do so, see Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1114-15 (D.C. Cir. 2000), the amended complaint makes clear that the causal connection element is non-existent and that he can prove no set of facts in support of his retaliation claim. Conley v. Gibson, 355 U.S. 41, 45-46 (1957) (complaint may be dismissed where "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief").

80 (D.D.C. 2000) (passage of nearly two years between events prevents finding of a causal

connection); Saunders v. DiMario, 1998 WL 525798 at *5 (D.D.C. 1998), aff'd,194 F.3d 175

(D.C. Cir 1999) ("The greater the time that elapses between the protected activity and the alleged

acts of retaliation . . . the more difficult it is to demonstrate any causal connection and, absent

any other evidence, where the gap is sufficiently great it is appropriate to grant judgment for the

defendant as a matter of law."); Devera v. Adams, 874 F. Supp. 17, 21 (D.D.C. 1995) (eight

months does not strongly suggest causal link); Garrett v. Lujan, 799 F. Supp. 198, 202 (D.D.C.

1992) (lapse of one year too long to infer retaliation).  Thus, Count I must be dismissed for

failure to state a claim.

## III.    PLAINTIFF'S AMENDED COMPLAINT FAILS TO STATE A HOSTILE WORK ENVIRONMENT CLAIM BASED ON RETALIATION

In Count II, plaintiff purports to allege a hostile work environment claim based upon

retaliation for his prior protected activity.  Specifically, plaintiff alleges the following incidents

comprise a hostile work environment: an investigation into plaintiff's use of sick leave; criticism

of plaintiff's work in a conference call; a memo admonishing plaintiff for conduct at a meeting; a

question to another of plaintiff's supervisors about his location; a direction to forward a work

project to another section; a request that plaintiff ask two other individuals to modify their leave

requests; a detail of plaintiff to Nebraska while an investigation into his conduct was ongoing; an

email to plaintiff admonishing him for taking leave prior to completing a work project; a

supervisor entering plaintiff's office and "angrily" asking for a case file; plaintiff choosing not to

serve as acting Program Manager; a proposal by Labor Employee Relations to suspend plaintiff

for five days; plaintiff being non-selected for two positions; a letter of reprimand; a suspension

for inappropriate conduct; various other work-related criticism of plaintiff's work; an alleged

9

refusal to convene a "reprisal panel"; a request for conflict of interest information; and not transferring plaintiff to a different section.  See Third Am. Compl. ¶¶ 29(a) - (s).

In looking at the contours of the conduct alleged in plaintiff's third amended complaint, defendant begins by calling to the Court's attention language from a decision by Judge Huvelle of this District:

> Plaintiff argues that every perceived slight, imagined or real, is retaliation by Mr. Cherry.  But "[t]he federal courts cannot be wheeled into action for every workplace slight, even one that was possibly based on protected conduct."  Taylor v. FDIC, 132 F.3d 753, 765 (D.C. Cir. 1997).  Mr. Cherry was plaintiff's supervisor.  **The essence of plaintiff's complaint is that he did not appreciate Mr. Cherry's method of supervision.  However plaintiff's personal preference or unhappiness alone is utterly insufficient to establish an adverse action**.  Not only do these actions not rise to the level of adverse actions, they are precisely the kind of "minor and even trivial employment actions" that are not properly the subject of Title VII discrimination suits.

Forkkio v. Tanoue, 131 F. Supp.2d 36, 45 (D.D.C. 2001), aff'd, 306 F.3d 1127 (D.C. Cir. 2002) (emphasis added).  By simply substituting the name of "Mr. Safian" for that of "Mr. Cherry," the instant case is captured in a nutshell.

Hostile work environment claims are *fundamentally different* from claims challenging discrete adverse personnel actions, in that they involve repeated discriminatory intimidation, ridicule, and insult in the workplace.  National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115-16 (2002).  To prevail on such a retaliatory hostile work environment claim, a plaintiff must show that the employer, in retaliation for plaintiff's protected activity, subjected him to "discriminatory intimidation, ridicule, and insult of such 'severity or pervasiveness [as] to alter the conditions of [her] employment and create an abusive working environment.'"  Hussain v. Nicholson, 435 F.3d at 366 (quoting Harris v. Forklift Sys., 10 U.S. at 21-22).  A workplace environment becomes "hostile" for purposes of Title VII *only* when the offensive conduct

10

"permeate[s] [the workplace] with discriminatory intimidation, ridicule, and insult that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

abusive working environment." Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 81

(1998); accord Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993); see also Pa. State Police v.

Suders, 542 U.S. 129 (2004); Clark Cty. School Dist., 532 U.S. at 270-271; Holbrook v. Reno,

196 F.3d at 262.

 The key terms, then, are "severe," "pervasive," and "abusive," as not just any offensive

or discriminatory conduct constitutes an actionable hostile work environment.  To determine

whether a work environment is sufficiently hostile to be actionable under Title VII, a court

should consider: (1) the frequency of the discriminatory conduct; (2) the severity of the conduct;

(3) whether the conduct is physically threatening or merely offensive; and (4) whether the

conduct reasonably interferes with the employees performance.  See Faragher v. Boca Raton,

524 U.S. 775, 787-88 (1998).  These standards for judging hostility are sufficiently demanding to

ensure that Title VII does not become a "general civility code."  Properly applied, this will filter

out complaints attacking "the ordinary tribulations of the workplace, such as the sporadic use of

abusive language, gender-related jokes, and occasional teasing."  Id. at 787 (citations omitted).

 Moreover, it must be clear that the hostile work environment was the ***result*** of

discrimination based on a protected status.  As the Second Circuit has explained:

> Everyone can be characterized by sex, race, ethnicity, or (real or perceived)
> disability; and many bosses are harsh, unjust, and rude. It is therefore important in
> hostile work environment cases to exclude from consideration personnel
> decisions that lack a linkage of correlation to the claimed ground of
> discrimination. Otherwise, the federal courts will become a court of personnel
> appeals.

Alfano v. Costello, 294 F.3d 365, 377 (2d Cir. 2002). Thus "to sustain a hostile work environment claim . . . [plaintiff] must produce evidence that she was discriminated against because of her [status]." Richardson v. New York State Dep't of Corr. Serv., 180 F.3d 426, 440 (2d Cir. 1999) (claim for hostile work environment failed where only three of fifteen alleged incidents had racial overtones); see also Hardin v. S.C. Johnson & Son, Inc., 167 F.3d 340, 345-46 (7th Cir.1999) (hostile work environment claim failed where insufficient evidence that alleged harassing behavior was motivated by discrimination); Jones, 12 F. Supp. 2d at 12 (hostile work environment claim failed where plaintiff had "not demonstrated that any of the conduct of which he complains was related to his race, or that his workplace was permeated with racially discriminatory behavior").

It is clear from the facts alleged in plaintiff's amended complaint that he can prove no set of facts to support his hostile work environment claim – even when accepting plaintiff's factual allegations as true, the factual allegations set forth in the amended complaint ***do not*** constitute a hostile work environment. Morgan, 536 U.S. at 115-16 (workplace must be permeated with "discriminatory intimidation, ridicule, and insult"). First, plaintiff alleges that he was investigated regarding his use of sick leave and that his supervisor was questioned about his location. See Third Am. Compl. ¶ 29(a). The problem with these allegation is that plaintiff's allegation regarding this investigation or questioning fail to point to any objective intimidation, ridicule, or insult directed toward plaintiff, nor has he alleged any material impact on his working environment. Moreover, an investigation, without more, is not a discriminatory act. See, e.g., Velikonja v. Mueller 315 F. Supp.2d 66, 75 (D.D.C. 2004) (investigation into employee's conduct does not itself constitute adverse action; therefore allegation of

discriminatory investigation must be dismissed); see also, e.g., Taylor v. FDIC, 132 F.3d 753

(D.C. Cir. 1997) (court should focus on ultimate employment decisions, not on intermediate

decisions having no immediate effect upon employment decisions).

       Second, plaintiff alleges that his work performance was criticized in a March 4, 2003

meeting, that he received a memo admonishing him for his conduct during the March 4, 2003

meeting, that he received an email dated April 23, 2004 "admonishing" him for not completing

an expedited project prior to taking leave, and that plaintiff's supervisor "angrily" asked for a

case file relating to the expedited project so he could assign it to someone else.  See Third Am.

Compl. ¶¶ 29(b), (c), (d), (h), (i) & (m).  Plaintiff also alleges that his supervisor requested that

he send a work project to another department and that his supervisor requested he ask two other

employees to alter their leave requests.  Id. at ¶¶ 6(e) & (f).  Once again, these allegations neither

involve objective intimidation, ridicule, or insult directed toward plaintiff, nor any material

impact on his working environment.  Quite simply, they are "the ordinary tribulations of the

workplace" that have repeatedly been held not to form a hostile work environment.  Faragher,

524 U.S. at 787  Brooks-Miller v. England, No. Civ.02-0888 (RJL), 2004 WL 1874998 (D.D.C.

Aug. 18, 2004).  In fact, this Court has rejected the notion that the incidents about which, or

similar to which, plaintiff complains support a hostile work environment.  See Singh v. U.S.

House of Representatives, 300 F. Supp. 2d 48, 56 -57 (D.D.C. 2004) (rejecting a hostile work

environment claim based on (1) supervisors criticism of  work; (2) supervisor's manner of

addressing plaintiff; and (3) the nature of the work assignments and opportunities afforded to

plaintiff).

Third, plaintiff alleges that his supervisor's harassment "prevented Mr. Casole from being able to serve as acting Program Manager for his unit." Am. Compl. ¶26(j). For plaintiff to make this allegation is simply disingenuous. As set forth in paragraph 16(e) of plaintiff's third amended complaint, it was ***plaintiff's own decision*** not to serve as acting Program Manager, allegedly due to criticism of his work. Thus, plaintiff may not use his own decision to not serve as acting Program Manager to support his hostile work environment claim.

Fourth, plaintiff alleges that his detail to Nebraska, a suspension for inappropriate conduct and two non-selections also establish a hostile work environment claim based on retaliation.[4] The Supreme Court has emphasized that claims involving such discrete employment actions are separate and distinct causes of action from claims based on creation of a discriminatory hostile work environment. National Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113-14 (2002); Coleman-Adebayo v. Leavitt, 326 F. Supp. 2d 132 (D.D.C. 2004). Thus, to the extent plaintiff seeks to challenge these discrete acts, he may do so only in the context of stand-alone Title VII claims for which plaintiff has exhausted his administrative remedies, and not use them to bolster his deficient hostile work environment claim.

Fifth, plaintiff alleges that he received a lower performance appraisal in July 2005, and was not transferred to a new position. Neither of these things establish a hostile work

---

[4] Although plaintiff also seeks to include the proposal for his suspension as an independent allegation, a proposal itself is not a personnel decision with negative consequences and, therefore, is not actionable. Dobbs v. Roche, 329 F. Supp. 2d 33, 41 (D.D.C. 2004) (alteration in original) (quoting Walker v. Wash. Metro. Area Transit Auth., 102 F. Supp. 2d 24, 28 (D.D.C. 2000)) ("courts have consistently focused on ultimate employment decisions such as hiring, granting leave, promoting, and compensating . . . [and not] interlocutory or intermediate decisions having no immediate effect upon employment decisions"). Thus, plaintiff may only challenge the suspension itself, not the proposal to suspend.

14

environment.  First, a single incident involving his performance appraisal is pervasive.  Second, not only does a failure to transfer not involve ridicule or harassment, plaintiff does not allege that the Agency transferred another employee who had not participated in protected activity.

Finally, to the extent plaintiff alleges a cause of action based upon the failure of the Agency to convene a "reprisal panel," there is no cause of action for improperly processing a complaint of discrimination.

In sum, plaintiff's allegations do not rise to the level of the "severe," "pervasive," and "abusive" required for a hostile work environment claim and should be dismissed for failure to state a claim.

## IV.    COUNT VI FAILS TO STATE A DISCRIMINATION CLAIM BASED UPON NATIONAL ORIGIN – PLAINTIFF NEVER EXHAUSTED THIS CLAIM

In Count VI, plaintiff alleges that his September 20, 2004 suspension was discriminatory based upon his Italian national origin.  Plaintiff's complaint in Federal Court, however, was the *first time* he alleged national origin discrimination.  In the administrative phase of his complaint, he alleged only retaliation and sex discrimination; he never exhausted a national origin discrimination claim.

Federal employees may only file a civil action after exhausting their administrative remedies before the concerned Federal agency.  42 U.S.C. § 2000e-16(c).  Under rulemaking authority delegated by Title VII, see 42 U.S.C. § 2000e-16(b), the EEOC has "established detailed procedures for the administrative resolution of discrimination complaints, including a series of time limits for seeking informal adjustment of complaints, filing formal charges, and appealing agency decisions to the Commission."  Bowden v. United States, 106 F.3d 433, 437 (D.C. Cir. 1997); 29 C.F.R. Part 1614 (Federal Sector Equal Employment Opportunity).  The

EEOC's regulations provide that "aggrieved" employees or applicants for employment who allege they have been discriminated against must first consult an agency EEO counselor before filing a complaint of discrimination and must do so within 45 days of the "matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action."  29 C.F.R. § 1614.105(a)(1).

If the matter is not resolved through informal counseling, the aggrieved employee must, within 15 days, file a written complaint with the agency that allegedly discriminated against him. 29 C.F.R. § 1614.106(a)-(c).  The agency must investigate the matter within 180 days or reject the complaint and issue a final dismissal.  Id. at § 1614.106(d)(2).  At the conclusion of the agency's investigation, the complainant may request a hearing before an EEOC administrative judge or an immediate final decision by the agency.  Id. at § 1614.108(f).  If the employee chooses the former, the EEOC administrative judge will conduct a hearing and make factual and legal findings, which will be transmitted to the agency as a recommended decision.  The agency then issues a final decision.  Id. at §§ 1614.109(g) and .110.

A complainant who receives a final adverse decision from his agency may appeal that decision to the EEOC within 30 days, or may file a civil action with 90 days.  If the complainant appeals to the EEOC, he must file a civil action within 90 days of receiving the EEOC's decision.  42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.408; see also  Wilson v. Pena, 79 F.3d 154 (D.C. Cir. 1996); Holly v. Secretary of Veterans Affairs, 165 F.3d 244, 246 (3d Cir. 1999).  A complainant also may file a civil action at any time after his complaint has been pending before the agency or the EEOC for at least 180 days.  42 U.S.C. § 2000e-16(c); 29 C.F.R. § 1614.408.

Compliance with these procedures and time lines is mandatory.  "Complainants ***must***

timely exhaust these administrative remedies before bringing their claims to court."  Bowden,

106 F.3d at 437; Battle v. Rubin, 121 F. Supp. 2d 4, 7 (D.D.C. 2000) ("a party must timely file

all applicable administrative complaints and appeals in order to bring a claim in federal court");

Williams v. Munoz, 106 F. Supp. 2d 40, 42 (D.D.C. 2000) ("timely administrative charge is a

prerequisite to initiation of a Title VII action").  As the U.S. Supreme Court recently reiterated in

Morgan, supra, "'strict adherence to the procedural requirements specified by the legislature is

the best guarantee of evenhanded administration of the law.'"  122 S. Ct. at 2070 (quoting

Mohasco Corp. v. Silver, 447 U.S. 807, 826 (1980)).

As stated by the D.C. Circuit, "the requirement of some specificity in a charge is not a

'mere technicality.'"  Park v. Howard University, 71 F.3d 904, 908 (D.C. Cir. 1995), cert. denied,

117 S. Ct. 57 (1996) (quoting Rush v. McDonald's Corp., 966 F.2d 1104, 1111 (7th Cir. 1992)).

The enforcement procedures of Title VII represent "a careful blend of administrative and judicial

enforcement powers" in which the federal agency plays "a crucial administrative role . . . in the

eradication of employment discrimination."  Brown v. General Servs. Admin., 425 U.S. 820, 833

(1976).  Exhaustion of administrative remedies is required "in order to give federal agencies an

opportunity to handle matters internally whenever possible and to ensure that the federal courts

are burdened only when reasonably necessary."  Brown v. Marsh, 777 F.2d 8, 14 (D.C. Cir.

1985).  Accordingly, the administrative complaint must be sufficiently specific to allow the

agency to perform its statutory duty.  Park, supra, 71 F.3d at 908.  "The administrative charge

requirement serves the important purposes of giving the charged party notice of the claim and

'narrow[ing] the issues for prompt adjudication and decision.'" Id. at 907 (quoting Laffey v.

Northwest Airlines, Inc., 567 F.2d 429, 472 n. 325 (D.C. Cir. 1976)).

Consistent with these purposes, an employment discrimination lawsuit is "limited in

scope to claims that are 'like or reasonably related to the allegations of the charge *and* growing

out of such allegations.'" Park, supra, 71 F.3d at 907 (quoting Chisholm v. U.S. Postal Service,

665 F.2d 482, 491 (4th Cir. 1981)) (emphasis added).  Put another way, "claims within a Title

VII suit must be such as could reasonably be expected to be encompassed within an

administrative investigation if one did follow the charge." Id., n.1.

A claim that plaintiff was discriminated against on the basis of his National Origin could

not reasonably be expected to have been encompassed within the Department of Agriculture's

investigation because his administrative complaint alleged only retaliation and gender as the

basis for discrimination.  Nowhere in his administrative complaint or in the materials he

submitted in connection therewith did plaintiff allege that he had been discriminated against on

that basis.  See Exhibit 14 (Plaintiff's Administrative Complaint).

Further, while courts have allowed the inclusion of previously un-referenced acts of

discrimination that "fall[] within the scope of a prior EEO complaint," Waiters v. Parsons, 729

F.2d 233, 235 (3d Cir. 1984), they have not allowed the resurrection or inclusion of abandoned

or never-before-raised theories of discrimination.  Compare President v. Vance, 627 F.2d 353

(D.C. Cir. 1980) (Court considered race-discrimination promotion claim where EEO complaint

had alleged only race discrimination in an employment evaluation) with Anthony v. Bowen, 674

F. Supp. 876, 879 (D.D.C. 1986), aff'd in part and rev'd in part 812 F.2d 13 (D.C. Cir. 1987)

(holding that complainant should not be indulged to point of allowing him to resurrect claim he

deliberately abandoned in earlier stage of administrative process) and Siegel v. Kreps, 654 F.2d

773, 778 (D.C. Cir. 1981) (where EEO complaint alleged retaliation, judicial complaint could

not be expanded to include allegations of religion and age discrimination).  In fact, such attempts

have expressly been rejected.  Sisay v. Greyhound Lines, Inc., 34 F. Supp. 2d 59, 64 (D.D.C.

1998) (because plaintiff only alleged race discrimination in the administrative complaint, "the

plaintiff's claim of national origin discrimination, raised for the first time in the complaint before

this court, must be dismissed for failure to exhaust administrative remedies").  Under the

reasoning of Sisay and Siegel, plaintiff's allegation that he was discriminated against on the

basis of his National Origin clearly is a theory of discrimination, which cannot be raised for the

first time in this Court.

## V.    SUMMARY JUDGMENT COUNT III, PLAINTIFF'S MARCH 5, 2004 NON-SELECTION RETALIATION CLAIM, IS PROPER

Plaintiff alleges in Count III that his non-selection for a Deputy Director position on

March 15, 2004 was based upon retaliation for his prior protected activity.  Regarding this

selection, plaintiff alleges that he was the best qualified for the position, but "the Agency

arbitrarily selected Mr. Martin Hickman for the position."  Am. Compl. ¶ 31.  Specifically,

plaintiff alleges that the non-selection was retaliatory because (1) the selection process was

arbitrary, biased and irregular; (2) no interviews were conducted and no selection panel

convened; (3) no one from USDA Human Resources advised the selecting official; (4) the

selecting official devised his own arbitrary system for evaluating the candidates; (5) the selecting

official allegedly ignored directives relating to performance appraisals and merit pay; and (6) the

selectee had allegedly been disciplined in the past for sexual harassment.  Am. Compl. ¶¶14(c)-

(e).

Although defendant does not dispute plaintiff's prima facie case at this point, defendant had legitimate, non-discriminatory reasons for the selection of Mr. Hickman for the Deputy Director position and plaintiff cannot establish pretext. McDonnell Douglas, 411 U.S. at 802, 804. Specifically, after receiving and reviewing the materials for all candidates, the selecting official, Mr. Sala, believed that Mr. Hickman was the most qualified for the position.

Following his receipt of the application materials from Ms. Bridges, Mr. Sala reviewed the two lists of candidates for consideration for the Deputy Director position. Sala Decl. To facilitate his decision making process, Mr. Sala created a handwritten chart for evaluating the candidates using the responses of the applicants to the position description-based questions. Id. & Exhibit 12 (Chart of Mr. Sala). For this chart, Mr. Sala ranked each candidate in nine categories, including supervisory experience, national projects and criminal investigation. Sala Decl. & Exhibit 12. Based on his review, Mr. Sala assigned each of the applicants a numerical letter rating, using W (weak), M (moderate) or S (strong). Sala Decl. & Exhibit 12.

Using his chart and rating method, Mr. Sala rated Mr. Hickman as S (strong) in all nine categories. Sala Decl. & Exhibit 12. Plaintiff, however, received a S (strong) in two categories, a M (moderate) in one category, and a W (weak) in six categories. Sala Decl. & Exhibit 12. On March 3, 2004, based solely upon his rating of the applications, and because he believed that Mr. Hickman's application showed that Mr. Hickman had "far more experience" than the other candidates, including plaintiff, Mr. Sala selected Mr. Hickman for the Deputy Director of CID position. See Sala Decl.; Exhibit 10 (January 29, 2004 Letter from Karen Bridges, Human Resources Specialist, to Mr. Zygmunt Sala, the Acting Director of CID).

## VI.    SUMMARY JUDGMENT ON COUNT IV REGARDING THE JUNE 26, 2003 LETTER OF REPRIMAND IS APPROPRIATE

20

In Count IV, plaintiff alleges that his June 26, 2003 letter of reprimand constitutes retaliation for his protected activity. Plaintiff's claim fails for two reasons. First, notwithstanding plaintiff's allegations that the letter of reprimand constitutes reprisal, the Labor and Employee Relations Specialist who determined that the allegations warranted a letter of reprimand, and who subsequently prepared and signed the letter, had no knowledge of plaintiff's prior protected activity. Second, plaintiff's own undisputed testimony supports the issuance of the letter for his inappropriate conduct and comments.

On May 21, 2003, plaintiff participated in a meeting between representatives of the Department of Agriculture and representatives of Salem Packing Company regarding a Consent Order being entered against Salem Packing. Stmt. of Facts ¶ 20. At this meeting, plaintiff stated to one of the Salem Packing representatives that, "when I was an inspector, I shut down his cousin's establishment." Stmt. of Facts. ¶ 21. Plaintiff made this comment to "tease" the Salem packing representative. Id. During this meeting, plaintiff also remarked to the Salem Packing representatives that he believed plant officials do not write well. Stmt. of Facts ¶ 22. Plaintiff made this statement because he personally believes that, in general, plant officials do not write well and "struggle with the task" then become frustrated and annoyed when asked to make revisions. Id. Mr. Casole also remarked to one of the representatives that this representative should move to Florida. Id.

Following the meeting, Charles Geraci, one of other USDA representatives who attended the meeting, informed his supervisor about plaintiff's inappropriate comments. Stmt. of Facts ¶ 23. As is common practice at the USDA, the accusations regarding plaintiff's inappropriate conduct at the meeting were sent to Marcelle Castillo, a Senior Employee Relations Specialist in

the Office of Labor and Employee Relations Division.  Stmt. of Facts ¶ 24.  In compliance with

the normal practice at the USDA, Ms. Castillo reviewed the allegations and determined that the

appropriate sanction of plaintiff based upon his conduct would be a letter of reprimand.  Id.  After

determining that the appropriate action based upon plaintiff's conduct would be a letter of

reprimand, Ms. Castillo prepared and signed the letter of reprimand and forwarded it to

plaintiff's manager for delivery to plaintiff.  Stmt. of Facts ¶ 25.

When Ms. Castillo reviewed the allegations relating to plaintiff's conduct and determined

that a letter of reprimand was the appropriate sanction, and then subsequently drafted and signed

the letter of reprimand, she had no knowledge of plaintiff's prior EEO activity.  Stmt. of Facts ¶

26.

In the June 26, 2003 Letter of Reprimand, Ms. Castillo set forth the allegations regarding

plaintiff's inappropriate conduct and comments at the meeting, set forth the applicable

provisions of the Agency's Equal Employment Opportunity Policy Statement and the Standards

of Ethical Conduct, and explained that the Agency will not tolerate offensive and discriminatory

remarks.  Stmt. of Facts ¶ 27.  The Letter also advised plaintiff that the letter would be

maintained in his official personnel file for a period not to exceed two years.  Id.

As explained by Ms. Castillo, she was the person who reviewed the allegations relating to

plaintiff's inappropriate comments and conduct.  After reviewing the allegations, she determined

that a letter of reprimand was appropriate, and subsequently prepared and signed the letter of

reprimand.  When she did this, she had *no* knowledge of plaintiff's prior protected activity.  This

fact is fatal to plaintiff's retaliation claim relating to the letter of reprimand and he cannot

establish a prima facie case of retaliation relating to the letter.  See Laboy v. O'Neill, No. 01-

5322, 2002 WL 1050416, at * 1 (D.C. Cir. March 13, 2002) ("because the official responsible for ordering appellant's termination was unaware of appellant's prior EEO activity, appellant failed to establish a prima facie case of retaliation") (citing Breeden, 532 U.S. at 272-73) ("alleged discriminating official's knowledge of prior equal employment opportunity (EEO) activity must precede official's contemplating adverse action"); Chandamuri v. Georgetown Univ., 274 F. Supp. 2d 71, 85 (D.D.C. 2003) ("To prove that a causal connection existed between his activities and the alleged retaliatory action, [the plaintiff] must demonstrate that [the employer] knew of his protected activity and that the retaliation closely followed the protected activity.").

Even if plaintiff could establish that Ms. Castillo had knowledge of his prior protected activity, summary judgment would still be appropriate in defendant's favor on this claim. As with plaintiff's suspension, which is explained below, plaintiff himself admits that the made the comments supporting the letter of reprimand. Accordingly, defendant has a legitimate, non-discriminatory reason for the letter – plaintiff's own conduct.

### VII.    SUMMARY JUDGMENT IN DEFENDANT'S FAVOR ON COUNTS V AND VII, WHICH RELATE TO PLAINTIFF'S SEPTEMBER 20, 2004 SUSPENSION, IS PROPER

In Counts V and VII, plaintiff asserts that this September 20, 2004 suspension was retaliatory and discriminatory.[5]  Undisputed facts – supported by plaintiff's own testimony – show the sole reason for plaintiff's suspension was his sexual harassment of a female employee, **_not_** his gender or prior EEO activity.

On January 27, 2004, plaintiff entered an office jointly shared by Ms. Vella Holmes and Mr. Gray Hazel.  Decl. of Eugene Casole p.2 (attached as Exhibit 1).  After entering the office, plaintiff "teased" Ms. Holmes by telling her that he believed she was an "opportunist."  Id. Plaintiff then told Ms. Holmes that management promoted her because they liked her.  Id. at p.3.

Following these comments, plaintiff turned to Mr. Hazel, who was also in the office, and asked, "What do they call an opportunist from your neck of the woods."  Id.  Before Mr. Hazel could respond, however, plaintiff stated, "I think they call them Vamps."  Id.  In response to plaintiff's comments, plaintiff thought Ms. Holmes and Mr. Hazel looked "perplexed."  Id.  In using the term "vamp," plaintiff meant to imply that Ms. Holmes was "an unscrupulous woman or unprincipled person, and that an unprincipled person was also an opportunist."  Id.

After seeing that his calling Ms. Holmes a vamp was not well received, plaintiff returned to his office, retrieved his dictionary, and returned to the office of Ms. Holmes and Mr. Hazel. Id.  Plaintiff then "positioned [himself] in front of Ms. Holmes' desk, opened the dictionary to

---

[5]  Although Count VI seeks to challenge the suspension based upon plaintiff's national origin, as explained previously, plaintiff never exhausted that claim.  To the extent that the Court finds that Count VI is somehow properly before the Court, however, the analysis in this section applies in equal force to Count VI.

the word 'vamp,' and read the definition: 'vamp (vamp) [Short for Vampire] Informal.  -n.  An

unscrupulous woman who seduces or exploits men.'" Id.  As plaintiff read the sentence aloud, he

paused, edited, and commented on the definition, accepting some language and qualifying it with

a comment and dismissing other language and commenting on it.  "Specifically, [when plaintiff]

read, '. . . who seduces . . .' [he] stated, 'I don't know about this stuff,' and waived [his] hand

over the dictionary in a gesture to dismiss this fragment, but them commented on the later part, '.

. . or exploits men,' again, in a kidding manner, 'Yeah, you're kind-of like that.'"  Id.  Prior to

leaving Ms. Holmes' office, it was apparent to plaintiff that his remarks "did not go over well."

Id.

    After hearing a rumor that supervisory personnel had been made aware of his comments

to Ms. Holmes, plaintiff decided to apologize to Ms. Holmes.  Id. pp. 5-6.  To that end, on

January 29, 2004, he entered Ms. Holmes' office, approached Ms. Holmes and stated, "I hurt

you." Id. at p.6.  Plaintiff then kissed Ms. Holmes on the cheek.  Id.  In response, Ms. Holmes

said to plaintiff , "Eugene, what really hurt the most is that you believe those things about me."

Id.  Plaintiff then stated to Ms. Holmes, "[b]ut, that's what people are saying.  We can talk about

it later, if you want."  Id.  Plaintiff then left Mr. Holmes' office.

    In response to her treatment by plaintiff, Ms. Holmes filed a complaint against plaintiff.

Declaration of Vella Kay Holmes at p.4 (Exhibit 2).  Ms. Holmes filed the complaint because she

felt that plaintiff calling her a "vamp" was inappropriate and constituted sexual harassment,

particularly because she believed he was inferring that the only reason she has her position is

because she is a woman and does not have the ability to do the work required by the position.  Id.

p.5.  Additionally, Ms. Holmes felt that it was inappropriate for plaintiff to kiss her on the cheek

and that he had no right to touch her in any form or fashion other than what would be appropriate in a professional office, i.e., a handshake.  Id.

Following its receipt of the written complaint by Ms. Holmes, and an investigation of the incident, the Labor & Employee Relations Division proposed that plaintiff be suspended for five days for improper conduct.  Exhibit 3 (July 7, 2004 Proposed Suspension Letter).  Plaintiff received the proposed suspension letter on July 27, 2004, but refused to sign the letter.  Id. at p.4.

Two specifications supported the proposed suspension: (1) "On January 27, 2004 you called Ms. Holmes a 'vamp' and then left her office.  You returned to her office with a dictionary and proceeded to read the definition of the word" and (2) "On January 29, 2004, after apologizing to Ms. Holmes for the January 27th incident, you leaned over and kissed her on the cheek."  Id.  The proposed suspension letter also detailed several "aggregating factors" that supported the proposed suspension.  Specifically, the letter detailed a prior incident in which plaintiff was cautioned after making inappropriate comments during a meeting with other OPEER employees and another incident for which plaintiff was reprimanded after making offensive and discriminatory comments in a meeting with FSIS personnel and establishment management officials.  Id.  The proposed suspension then detailed plaintiff's right to submit a reply to the proposed suspension, and to have a representative throughout the process.

Although the proposed suspension letter provided plaintiff an opportunity to respond to the charges, on July 30, 2004, plaintiff hand delivered a letter to Ms. Kristie Kelm, Chief of the Employee Relations Branch stating that he "will have to decline" to respond to the proposed suspension.  Exhibit 4 (July 30 Letter from Plaintiff to Ms. Kristie Kelm).  The reasons set forth in plaintiff's letter for his declination to respond was that he did not believe he would receive a

fair and impartial conference and that he had previously filed an EEO complaint against the Employee Relations Branch.  Id.

On August 30, 2004, Ms. Kristie Kelm, the deciding official for the proposed suspension, issued her Decision Letter.  See Exhibit 5 (August 30, 2004 Letter from Kristie Kelm to Eugene Casole).  Plaintiff received this Decision Letter on September 2, 2004.  Id.  In her decision letter, Ms. Kelm found that the evidence supports the specifications set forth in the proposed suspension.  Id.  Mr. Kelm also stated that plaintiff had "not responded to the Specifications or offer[ed] any defense for your actions.  In the absence of any credible evidence to refute the Specifications, I must find that both Specifications are proven by a preponderance of the evidence and is, therefore, sustained."  Id.  Ms. Kelm explained in her decision letter that, although she considered plaintiff's length of service as a mitigating factor, his "misconduct [was] of an extremely serious nature, and strikes at the very core of the agency policy on expectations of employee conduct."  Id.  Ms. Kelm also considered plaintiff's prior incidents of inappropriate and offensive conduct for which he was cautioned and reprimanded.  Id.  Ultimately, Ms. Kelm found that plaintiff's "derogatory, discourteous and inappropriate behavior towards Ms. Holmes was unwelcome, unprofessional, wholly inappropriate, and inconsistent with Agency policy on expectations of employee conduct" and upheld proposed suspension of plaintiff for five days. Id.  Finally, the decision letter advised plaintiff of his rights to grieve the decision to suspend him for five days.  Id.

The facts relating to plaintiff's treatment of Ms. Holmes are undisputed – the version of events set forth herein come directly from plaintiff's own declaration.  Given this fact, there can be no doubt that defendant had a legitimate non-discriminatory reason for plaintiff's September

20, 2004 suspension.  In fact, plaintiff's claims ignore the fact that if defendant had not taken the action against plaintiff that it did, it would have been open to a sexual harassment suit by Ms. Holmes.  See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742 (1998) (employer may be vicariously liable for sexual harassment by others in the workplace); Faragher v. City of Boca Raton, 524 U.S. 775, 807 (1998) (employer may raise an affirmative defense to vicarious liability when, among other things, the employer moved to correct promptly any sexually harassing behavior).  Additionally, given the undisputed nature of the evidence supporting the suspension, plaintiff cannot establish pretext.

## VIII.  SUMMARY JUDGMENT IN DEFENDANT'S FAVOR ON COUNT VII, RELATING TO PLAINTIFF'S FEBRUARY 17-MARCH 12, 2004 DETAIL TO OMAHA, NEBRASKA IS PROPER

Count VII challenges as retaliatory a three-week detail of plaintiff to the USDA's Omaha Nebraska office from February 17 to March 12, 2004.  Defendant is entitled to summary judgment on this claim; it had legitimate, non-discriminatory reasons for the transfer and plaintiff cannot establish pretext.[6]

On February 9, 2004, the Deputy Assistant Administrator for OPEER advised plaintiff that effective February 17, 2004, he was to report to the Agency's Omaha, Nebraska office for a three week detail.  Exhibit 6 (Letter from R. Van Blargan to E. Casole (2/9/04)).  The letter advising plaintiff of the detail expressly advised plaintiff that he would retain his current position title, grade and step during the detail.  Id.  The letter further advised plaintiff that, because the

---

[6]  Although defendant also disputes that plaintiff can establish an adverse employment action relating to the transfer, defendant does not challenge his ability to do so at this stage of the proceeding.

detail was not within commuting distance of his Maryland home, he would also receive payment of appropriate authorized transportation and per diem expenses associated with the detail.  Id.

Regarding the reason for the detail, the letter stated expressly informed plaintiff that he was being detailed while the Agency investigated his alleged sexual harassment of Ms. Holmes.[7] Specifically, the February 9 letter stated, "pending the results of the LERD investigation, it is in the best interests of the Agency to direct your detail assignment as specified.  Id.  In sum, the Agency determined that it was best to not have plaintiff in the same office as Ms. Holmes while it was investigating plaintiff's conduct, and, therefore, it detailed plaintiff to Nebraska for three weeks.  Accordingly, the Agency had legitimate, non-discriminatory reasons for the three-week detail of plaintiff to the Omaha, Nebraska office and defendant is entitled to summary judgment on this count.

## CONCLUSION

For the foregoing reasons, Counts I , II and VI should be dismissed for failure to state a claim, and summary judgment should be entered in defendant's favor on Counts III, IV, V, VI, VII and VIII.

---

[7]  As explained in the previous section, the LERD investigation was the investigation the Labor and Employee Relations Division conducted into plaintiff's sexual harassment of Ms. Holmes – conduct that he admits and for which he received a five day suspension

November 21, 2006                          Respectfully submitted,


_____/s/_____
JEFFREY A. TAYLOR, D.C. Bar # 498610
United States Attorney


_____/s/_____
RUDOLPH CONTRERAS, DC BAR #434122
Assistant United States Attorney


_____/s/_____
JOHN F. HENAULT, D.C. Bar # 472590
Assistant United States Attorney
555 Fourth Street, N.W. - Civil Division
Washington, D.C.  20530
(202) 307-1249
(202) 514-8780 (facsimile)