## COMPLAINANT'S AFFIDAVIT

I, (name) __EUGENE CASOLE__

an __X__ employee of ___ applicant to ___ former employee of the U.S. Department of Agriculture:

(Agency) __FOOD SAFETY and INSPECTION SERVICE__

(Office) __OPEER__

(Division) __EEO__

(Branch) _____

Located in (city and state) __WASHINGTON, D.C.__

In the capacity of (show both your organization title and the classification of your job, if different):
__STAFF OFFICER__

Grade __GS-13__ between (date) __05/95__ and (date) __PRESENT__

My telephone number during working hours is: __202-418-8870__

I HAVE BEEN ADVISED OF THE FOLLOWING:

I have an obligation to cooperate fully with the investigator, who has been assigned to conduct a thorough and impartial investigation of my complaint of discrimination. Therefore, I must provide a statement for the investigative record which is true and complete to the best of my knowledge and belief and which fully addresses the issues accepted for investigation. My statement must be specific with regard to names, dates, places, circumstances and related events, and disclose my firsthand knowledge of any directly related information which is relevant to the issue(s). My statement, along with my Informal Complaint, Counselor's Summary Report, my Formal Complaint, and the description of the issue(s) for investigation shall serve as the basis for the investigation. While I may voluntarily submit any additional documents or information to the investigator for consideration, it will be the investigator's responsibility to determine what evidence shall actually become part of the investigative report. If there are any documents or facts, which substantiate my allegations, I must provide them to the investigator, or make them known to the investigator. I may suggest witnesses to be interviewed by the investigator. However, the investigator will decide which witnesses to interview based on relevant information he or she feels will be furnished.

My statement is made under oath (or affirmation), without a pledge of confidentiality, in accordance with the rules, regulations, policies, and procedures of the Equal Employment Opportunity Commission and the Department of Agriculture. This means that any employee(s) whom I accuse of discrimination or other acts of impropriety may be shown relevant portions of this statement and be given an opportunity to respond. Agency officials responsible for processing complaints of discrimination will have access to the entire investigative report. If discrimination is found, any employee accused of discrimination will have an opportunity to review a sanitized version of the report. If discrimination is found and disciplinary action is proposed, the employee accused of discrimination will have an opportunity to review the report in its entirety without deletions. Participants in the discrimination complaint process are specifically protected by law and the EEO regulations from any acts of reprisal, discrimination, coercion, harassment, restraint, or inference for their participation in the investigation and other phases of complaint processing.

I have the right to be represented by a person of my choice during presentation of my complaint and preparation of my statement (so long as my choice does not result in a conflict of interest). I have __X__ have not___ chosen a personal representative at this stage of my complaint. In the event I have not chosen a representative but obtain a representative at a later date, I will advise the investigator and the Director of the Civil Rights Center in writing.

I have the right to review my statement prior to signing it, and may make initialed corrections if it is incomplete or inaccurate. I have a right to receive a copy of the signed statement.

Having reviewed the preceding information with the investigator, I solemnly __X__ swear ____ affirm that the statement that follows is true and complete to the best of my knowledge and belief, and fully addresses the issues and allegations raised by me in my EEO complaint.

000058

(Initials)
EXHIBIT __7__
Page __1__ of __9__ Pages

## COMPLAINANT'S AFFIDAVIT

..I.n a Staff Officer/Compliance Specialist with the Evaluation and Enforcement Division (EED), Office of Program Evaluation, Enforcement and Review (OPEER), Food Safety and Inspection Service (FSIS), United States Department of Agriculture (USDA).

I have been with USDA for 18 years and in my current position for 9 years. My first line supervisor is Mr. Wayne Bossler, Program Manager, EED, Administrative Branch, and my second line supervisor is Scott Safian, Director, EED, OPEER, FSIS, USDA.

I believe that I have been retaliated against by Messrs. Scott C. Safian, Richard T. Van Blargan, Deputy Assistant Administrator, OPEER and Ronald Hicks, Assistant Administrator, OPEER, when on July 16, 2003, I was given a letter of reprimand by Messrs. Safian and Bossler, signed by Ms. Marcelle Castillo, Senior Employee Relations Specialist, Employee Relations Branch, and dated June 26, 2003. It is important to note that the letter of reprimand is dated June 26, 2003; however, I did not get it until July 16, 2003. The retaliation stems from a previous EEO complaint that I filed against the Agency and specific FSIS officials.

The following is some background information about Salem Packing Company and the events that led up to the Consent Order meeting where it was alleged that I made comments that were unprofessional and inappropriate, and which led to the issuance of the letter of reprimand.

Salem Packing Company (Salem) is a small slaughterhouse located in Salem, New Jersey. It family-owned and operated business. The president of the company is Mrs. Josephine ..naccurso. Anthony Bonaccurso (husband) was the former manager and Samuel Bonaccurso (son) is the vice president. Salem has operated under Federal inspection since 1980 and employees approximately 20 employees. Salem has a long history of non-compliance going back for approximately 15 years. In a few words, plant officials are difficult.

In November 1988 Salem was convicted in Superior Court, State of New Jersey, on two counts of the fourth degree for unlawfully discharging pollutants (animal waste products) from its slaughterhouse and processing operation onto the land and/or into waterways in New Jersey. In June 1997 and in December 2000 Salem and Anthony Bonaccurso were convicted in Superior Court on several counts. Additionally, Salem and Mr. Bonaccurse have a long non-compliance history with FSIS, regarding insanitary conditions in the plant, an unwillingness to perform mandatory *E. coli* testing, and threatening and intimidating inspection personnel.

Further, Salem and Mr. Anthony Bonaccurso were recently found in violation of the Packers and Stockyards Act (the Act) because the plant and Mr. Bonaccurso did not refrain from purchasing livestock without providing adequate bond or its equivalent, as required by the Act and regulations.

Page 1 of 7 Pages                                               Initials: _____

In June 2003, the USDA's Office of Inspector General (OIG) issued a Case Opening Memorandum (COM) for an alleged violation of the Federal Meat Inspection Act (FMIA). Because FSIS has statutory authority under the FMIA to withdraw or deny Federal inspection services from a recipient or applicant based on a Federal or State conviction of any felony, or more than one misdemeanor related to transactions in food, the Agency filed an administrative complaint to indefinitely withdraw Federal inspection from Salem. It was never the Agency's intent to close the plant. It recognized that Mr. Anthony Bonaccurso was allegedly the problem and FSIS sought to have him indefinitely divested, both operationally and financially, from the plant. This was accomplished on April 22, 2003, when Salem and Messrs. Anthony and Samuel Bonaccurso entered into a Consent Decision and Order with FSIS. It was my job, as the staff officer that was assigned to the case, to meet with FSIS and Salem Packing officials to explain the terms of the Consent Order.

In regards to the letter of reprimand which was issued to me on July 16, 2003, when Mr. Bossler informed me that he and Mr. Safian wanted to meet with me, I asked Mr. Bossler what the meeting was about. Mr. Bossler's response was that he could not tell me. The meeting took place in Mr. Safian's office. Mr. Safian had three (3) blue envelopes. These envelopes are used by agency personnel to send confidential information and are usually marked "Personal – Attention: To be opened only by." Mr. Safian opened one of the envelopes, took out a typed document and handed it to me. The document was from the Office of Management, Labor and Employee Relations Division (Personnel) and was dated June 26, 2003.

The document stated in part "This will serve as an Official Reprimand based on the following: REASON: IMPROPER CONDUCT...." The document went on to state what the alleged conduct was and referred to a Consent Order meeting held on May 21, 2003, with Salem Packing Company where I explained the terms and conditions of the Consent Order to Salem Plant Company and FSIS officials.

In the letter of reprimand, Personnel stated that during the meeting I made reference to plant official's lack of education and ability to understand or prepare the required written document needed to comply with the requirements of the Consent Order; that I made a remark that when I was an inspector, I shut down the plant manager's (Tony Bonaccurso) cousin's establishment; that I stated that Mr. Tony Bonaccurso had a problem in the past with intimidation, threatening, and interfering with inspection personnel; and that I made a statement to Mr. Tony Bonaccurso to the effect that at his age he should not even be here and should be in Florida.

I believe and allege that my comments and explanation, regarding the terms and conditions of the Consent Order, were intentionally taken out of context by FSIS management and Personnel officials, so that the Agency could justify taking a disciplinary action against me. I fervently believe and have alleged that it was done intentionally because I had filed an EEO complaint against Messrs. Safian, Van Blargan, and Hicks for discrimination based on reprisal

Page 2 of 7 Pages

Initials: [signature]

000060

EXHIBIT 7
Page 3 of 9 Pages

(prior EEO activity) involving non-selection. I was completely surprised by this action and made a comment to Mr. Safian, stating, "You're trying to find something."

When I asked Mr. Safian who had complained and why had I not been interviewed, he simply ignored my questions and read my appeal rights. Mr. Safian was seen smiling throughout this process. I became very irritated—I was being officially reprimanded; my official employment record was being tarnished and Mr. Safian offered me no information. He just continued reading me my appeal rights.

Moreover, unbelievable as it may seem, neither Messrs. Bossler nor Safian ever questioned me about what had transpired at the meeting. It stands to reason, that if an employee is being accused of wrong-doing that his/her supervisor, at a minimum, would have expressed an interest in knowing what actually happened or be given an opportunity to explain their "side of the story," prior to disciplining the employee.

I would like to point out that throughout the entire meeting, particularly while Mr. Safian was reading my appeal rights, he was "gloating and appeared to be very pleased with the outcome." Again, this picture doesn't appear right. Here you have the most experienced staff officer handling administrative cases, with outstanding performance appraisals, being officially reprimanded and Mr. Safian is neither upset nor concerned. Mr. Bossler later told me that he was directed not to interview me. Somehow, that doesn't seem fair or equitable to me.

I also have serious concerns about the merits of Personnel's official reprimand that was issued to me. Under the heading "Background," Personnel stated: "You attended and presented at a Consent Order meeting at Salem Packing Company, Inc., on May 21, 2003, during which you made remarks that <u>may</u> have been <u>construed</u> as offensive, unprofessional and inappropriate to some of the meeting attendees." Moreover, under Specification 1, Personnel only paraphrased my comments. My question is: If Personnel was unable to determine what I actually said, evidenced by the fact that it was unable to quote me, how could Personnel make a determination that disciplinary action was warranted based on my comments? In addition, as remarkable as it may seem, the target of the investigation (me) was never interviewed. That doesn't make any sense. How can one conduct an independent, full and complete investigation without interviewing the target of the investigation? This undoubtedly shows, I believe, how illogical, incompetent, and inept Personnel officials were and how allegedly determined Messrs. Safian, Van Blargen and Hicks were out "to get me." In a few words, they operated and reprimanded me on a mere perception and nothing more.

I am very concerned that the disciplinary action was taken without any complaints from plant management. To the best of my knowledge, no one from the plant complained. During my conversations with Mr. Bossler at the Park & Ride on Route 197 in Bowie, Maryland, Mr. Bossler never stated that plant management complained. According to Mr. Bossler, Messrs. James Borda, Deputy District Manager, Philadelphia District, and Charlie Geraci, Supervisory Compliance Officer, complained, and that was it. After I filed my formal EEO

Page 3 of 7 Pages

Initials

000061

EXHIBIT 7
Page 4 of 9 Pages

mplaint, both Messrs. Bossler and Safian mentioned, at different times, that plant nagement complained. When I questioned Mr. Bossler further about some of the particulars, he informed me that Mr. Borda contacted Mr. Safian and Mr. Safian told him he should go through appropriate channels and report the matter to Mr. John Sworen, former, Regional Manager, Northeastern Region. When I questioned Mr. Bossler further, he told me "I don't know how much I can tell you." As I mentioned, when I asked Mr. Bossler why I was not interviewed regarding the "alleged" comments, he told me that Mr. Safian and a "guy" from Personnel told him not to interview me. Moreover, Mr. Bossler, not Personnel conducted the "investigation," which I found very interesting. Not only was I excluded from providing any information during the investigation, but, Mr. Safian, who is a target of an EEO complaint alleging of all things discrimination based on reprisal, was seen, according to Mr. Bossler, actively participating in an investigation about me. This is absurd. It doesn't make any sense.

When I asked Mr. Bossler if Ms. Valerie Neris, a staff officer trainee, at the time, who accompanied me on the Consent Order trip and was present during the meeting with FSIS and plant officials was interviewed, Mr. Bossler stated that he had interviewed her and that she didn't observe anything unusual or inappropriate. However, her observations were not considered because Mr. Bossler stated that she was new and didn't know anything. I found this interesting. Ms. Neris has a bachelor's degree and graduated with a 4.0 average and has field and headquarters experience; yet, management felt that she did not have the ability to realize if inappropriate remarks were made of if someone was verbally abusive. In July 2003, I approached Ms. Neris and asked her if she had observed anything that I had said that was inappropriate or harsh during the Consent Order meeting. Her response was no.

en I explained to Mr. Bossler that I too could produce witnesses that were at the meeting who would speak on my behalf, he just listened. When I told Mr. Bossler that Dr. Hussain Magsi, the circuit supervisor, who supervises the FSIS inspector that is assigned to Salem Packing Company, was such a witness and that he approached me after the meeting and stated, "I'm glad you were hard on then…they needed it," Mr. Bossler's comment to me about this entire incident was, "I guess it's just perception."

I believe that Mr. Borda's motive and intention for approaching Mr. Safian, aside from the fact that they are good friend, was that Mr. Borda believed that I applied for the regional manager position in Philadelphia, and he allegedly tried to lessen my chances in getting the job. The position is a GS-14 and slated to be upgraded to a GS-15. Mr. Borda expressed an interest and applied for the job. I am from the Philadelphia area; however, I did not apply for the job. Shortly after the letter of reprimand was issued, two staff officers on two separate occasions approached me in my office about the issue. Both gentlemen stated that they felt that I was ideally suited for the job in Philadelphia, and that Mr. Borda allegedly initiated the complaint because they thought that Mr. Borda believed I applied for the position and that Mr. Borda was allegedly trying to lessen my chances of being selected for the regional manager position. Both gentlemen also thought that Mr. Borda was just trying to earn some "brownie points" with Mr. Safian.

Page 4 of 7 Pages

Initials: [signature]

ually interesting is the timing of the letter of reprimand. If you note, it is dated June 26, 03; yet, it was hand-delivered to me by Mr. Safian on July 16, 3003, some 20 days later. Why? Why didn't Personnel issue the letter of reprimand immediately? Why would Personnel issue the letter of reprimand twenty days later? What's Personnel's justification for doing so? I believe and have alleged that Messrs. Van Blargan and Hicks thought I would apply for the Philadelphia regional manager position, so they waited until the announcement closed to see if I was on the promotion certificate. When they saw that I had not applied, they allegedly gave Mr. Safian the go-ahead to issue the letter of reprimand. It all makes sense. As I stated earlier, Mr. Safian was jubilant during the July 16th meeting—it was that obvious.

In regards to the Consent Order meeting, first let me state that I always start my presentation with FSIS and plant management officials by asking plant management if we can address each other on a first name basis, by advising plant management that no one wants to hurt them, and that plant management will be given every opportunity to succeed and satisfactorily complete the requirements of the Consent Order.

In response to Personnel's allegation that on May 21, 2003 during a meeting with Salem Packing Company plant management officials, and FSIS person, I told Anthony Bonaccurso, a member of plant management, that when I was an inspector I shut down his cousin's establishment," this is true. However, that was about 15 years ago and my only reason for doing so was to simply let Mr. Anthony Bonaccurso know that I knew his family, specifically his cousin (Joe Ferrante) and his brother (Joe Bonaccurso) and that we had something in common. This was my way of "breaking the ice," nothing more. In fact when I was introduced Mr. Anthony Bonaccurso, I greeted him in Italian. It was then that I told him I knew his cousin, and that when I was an inspector, I shut down his cousin's plant. He gave me a big smile and laughed it off, and that was my expectation. He reacted just like I thought he would. Moreover, I told Mr. Borda, minutes before the meeting began that I would tease Mr. Anthony Bonaccurso about the time I closed down his cousin's establishment. And, when I told Mr. Anthony Bonaccurso that I knew his brother who lived in Hollywood, Florida, who was a compliance officer with the State's meat and poultry inspection program, he responded, "You know Joe?" I believe that I either nodded my head or told him that I did.

I met Joe Bonaccurso at the Federal Law Enforcement Training Center in Marana, Arizona, in May 1992. Mr. Bonaccurso immediately befriended me and another FSIS compliance officer. We were seen together most of the time during the two-week training period. We got along so well that Mr. Bonaccurso invited us to visit his home in Hollywood, Florida. Joe Bonaccurso told me that his father owned and operated a Federal plant in Philadelphia, and that he and his brother (Anthony Bonaccurso—Salem) used to work at the plant. He also told me that the business had been sold and his brother owned and operated a plant in New Jersey. Prior to the Consent Order meeting, I told Messrs. Safian and Bossler that I knew Mr. Anthony Bonaccurso's brother and cousin and that I was going to tease him about shutting down his cousin's business.

Page 5 of 7 Pages

Initials: _____

regards to Personnel's Specification 1 that I also made the comment that it was common knowledge that packing plant officials may not have the education or ability to understand or prepare the required written documents needed to comply with the requirements of the Consent Order, that is not what I said. I explained to plant management the significance and FSIS' purpose for incorporating the two stipulations in the Consent Order, which required plant management to develop and implement a corporate code of ethics and to participate in a training program encompassing ethnical business practices. I shared with them my past experiences in dealing with plant officials that tried to write their firm's corporate code. My statement about packing officials generally not writing well is, I believe, an accurate statement. Generally speaking, plant officials don't write well. Plant officials generally struggle with the task; they then become frustrated and annoyed if they are approached by EED to make revisions. This is an accurate statement, and many staff officers in the division can attest to this. Since Salem had hired an attorney from the outset, I suggested they provide input, but to let their attorney write the corporate code. It seemed like an ideal solution. I also told plant management that their attorney could develop and offer the training.

In regards to Personnel's allegation that my comments to Mr. Anthony Bonaccurso (former manager) were inappropriate, unprofessional or an attempt to be abusive, this is not true, and at no time during or after the meeting did anyone say or complain about the way in which I conducted the meeting. Neither Mr. Samuel Bonaccurso, firm's president, nor did any plant or FSIS official say anything or give me any kind of indication that they were upset, unhappy or intimidated by the way I presented the stipulations outlined in the Consent Order. As I mentioned previously, no one from Salem complained. And, it was only after I received the letter of reprimand on July 16th did I become aware that some FSIS officials had a problem with my presentation at the Consent Order meeting.

When I was explaining the intimidation/threatening stipulation in the Order and mentioned that the Agency had problems in the past with Mr. Anthony Bonaccurso in this regard, Mr. Anthony Bonaccurso lost his temper and attempted to justify his past behavior by stating that the inspector was a "f....ing a... hole." I told Mr. Anthony Bonaccurso to stop, that I didn't want to hear it, and that when plant officials have disagreements with inspectors that there are procedures in place to appeal the inspector's decision. I then addressed Mr. Samuel Bonaccurso, who, in essence, represented new plant management, and advised that the Agency would not tolerate any intimidation, threats, etc., at any program employee, and to make sure Mr. Samuel Bonaccurso knew who was a program employee, I went around the room and pointed out several FSIS officials and advised Mr. Samuel Bonaccurso that these individuals were all program employees. Other than this, there were no other incidents. This was done only to show Mr. Samuel Bonaccurso that FSIS would not tolerate this type of behavior against any FSIS employee. When the Consent Order meeting ended, I specifically asked Mr. Samuel Bonaccurso for a tour of the plant. I asked Mr. Samuel Bonaccurso, in particular, because he represented new management. He obliged and gave me and Ms. Neris a tour of the facility. He provided us with frocks and headwear, appeared very proud and took an interest in showing us his plant, and was extremely friendly.

Page 6 of 7 Pages                                    Initials:

believe and allege that Messrs. Scott C. Safian, Richard T. Van Blargan, and Ronald F. Hicks, with assistance from Personnel were trying to make a misconduct issue, rather than present one, and that this was in retaliation because I filed an earlier EEO complaint. Further, it is my belief and allegation that Mr. Safian could not have not taken or initiated this action without Messrs. Van Blargan and Hicks' knowledge, approval, or concurrence.

This statement consists of seven (7) pages and I hereby solemnly swear and affirm that it is true and complete to the best of my knowledge and belief.

_Eugene Casole_
Eugene Casole, Complainant

District of Columbia . SS
Subscribed and Sworn to before me
this 14th day of April, 2004
_Bonnie L. Cobb_
Bonnie L. Cobb, Notary Public, D.C.
My commission expires August 31, 2006

000065

EXHIBIT 7
Page 8 of 9 Pages

I have reviewed this statement which consists of __9__ pages, and hereby solemnly __X__ swear ____ affirm that it is true and complete to the best of my knowledge and belief. I understand that the information I have given will not be held confidential and may be shown to the interested parties as well as made a permanent part of the record of investigation.

_____    April 14, 2004
(Signature of Affiant)                              (Date)

Signed before me at (City and State) _____

on this ____ day of _____, 20____

_____
(Signature of Investigator/Witness)

000066

(Initials)
**EXHIBIT** 7
Page 9 of 9 Pages