June 4, 2003

My name is Charles Geraci. I am currently employed as a supervisory compliance officer by the United States Department of Agriculture, Food Safety and Inspection Service (FSIS), Program Evaluation, Enforcement and Review (PEER), Compliance Investigations Division. My office is located at the Philadelphia, Pennsylvania District office. I have been employed by the Department for 32 years and have been a compliance officer since 1981.

Mr. Wayne Bossler, Administrative Branch Program Manager, Evaluation and Enforcement Division (EED), PEER, has requested that I provide a written statement concerning several comments and statements made by Mr. Eugene Casole, compliance specialist, EED, PEER, during the performance of a scheduled Consent Order meeting with Salem Packing Company, Inc.(Salem), management officials. This meeting took place from approximately 10:40 am – 12:00 noon on Wednesday, May 21, 2003.

My recollection of the events contained in this statement are strictly from memory as at the time of the Consent Order meeting, at Salem on May 21, 2003, I did not document any written notes.

Attendees at the meeting included; Mr. Michael Kain, PEER compliance officer, Mr. James Borda, Deputy District Manager, Pennsylvania District office, Circuit Supervisor, DVM, Hussain Magsi, SVMO, IIC Ahmed Esmail, Mr. Stanley Williams, Consumer Safety Inspector, Ms. Valerie Neris, compliance specialist, EED, PEER, Washington, DC, Mr. Eugene Casole, compliance specialist, EED, PEER, Washington, DC, Mr. Anthony (Tony) Bonaccurso (father and divested individual), Mr. Samuel (Sammy) Bonaccurso (son and firm manager), Ms. Daryl A. Casper, Quality Control Manager, the firm's office secretary, (name unknown), and myself. The meeting to present and review the terms of the Consent Order between FSIS and Salem Packing Company, Inc. was conducted in the firm's business office area at the official establishment.

As all the FSIS personnel were entering the office area at Salem on the day of the meeting Mr. Tony Bonaccurso stated that he may want to have his attorney present. In response to this comment Mr. Casole stated that the Order was already signed and there was no need for their attorney to be present today. I was uncomfortable with the response by Mr. Casole, and told Tony that if he was uncomfortable he could call his attorney and have him on the phone during the meeting, or that he could call his attorney and the meeting could wait until the attorney arrived.

Near the beginning of the meeting Mr. Casole commented to Tony that he (Eugene) knew his cousin who operated an official establishment in South Philadelphia and that sometime earlier when Eugene was an inspector in South Philadelphia he had shut him (referring to the cousin's official establishment) down. In my opinion, this comment by Mr. Casole had no bearing on the purpose of this meeting.

000170

EXHIBIT
Page 7 of 14 Pages

Mr. Casole then reviewed in detail the terms and provisions of the Order to fully identify and explain the responsibilities of Salem and FSIS' expectations concerning Salem's adherence to the requirements of the Order. Mr. Casole made a comment indicating that it was common knowledge that packing plant personnel may not have the education or ability to understand or prepare the required written documents needed to comply with the requirements of this Order. This comment seemed to demean the intelligence and abilities of both management and employees of regulated establishments. I do not specifically remember which paragraph of the Order was being presented by Mr. Casole at the time of this comment.

When paragraph D. 4. (regarding assault, intimidation, interference upon inspection personnel) of the Order was being discussed, Mr. Casole directed his focus and comment toward Tony, saying that he (Tony) had a problem with this in the past. At this time, and I believe in response to this comment by Eugene, I noticed that Tony stood up and then sat back down and said something in a strong voice to the effect that the previous incident was the inspectors fault*. I interjected that after today Tony would no longer be at the firm so it will no longer be an issue. Mr. Casole then continued to present the remaining terms of the Order. [with him.]

* TONY AND EUGENE KEPT EXCHANGING VERBAL COMMENTS ON THE SUBJECT TO THE POINT THAT

Towards the end of the review of the Order presentation Eugene made a comment directed to Tony saying something such as – at your age you should not even be here, you should be in Florida.

When FSIS personnel were departing, Samuel Bonaccurso said to me that I was welcome at any time, the other guy (referring to Eugene), is not welcome at all.

I returned to Salem Packing on May 29, 2003 as requested by Mr. Casole to get a letter on Salem letterhead that would address paragraphs H and J of the Order. I contacted both Sammy and Ms. Casper during this visit to the plant. While I was at the firm, Sammy commented to me recalling Eugene's comment on May 21st, during the review of the Order, by saying – who was he (Eugene) to say something to my father about his age and that he should be in Florida.

I do not remember exactly on what day I spoke with my supervisor, Mr. John Sworen, Acting Regional Manager, Philadelphia, CID, PEER, about a number of the comments made by Mr. Casole, although I believe it may have been on May 22, 2003. I told Mr. Sworen that I had participated in a number of such Consent Order meetings during my many years as a compliance officer and that I was personally uncomfortable about some of the comments and statements made by Eugene, and hoped that no repercussions came of it.

Mr. Sworen asked me who else was at the Consent Order meeting and I informed him the Mr. James Borda and other Agency personnel had also been present. Mr. Sworen then contacted Mr. Borda, whose office is nearby, and he joined John and I in John's office. Together we informed John of the comments and statements made by Mr. Casole during

the review of the Order that seemed unprofessional, or that could be interpreted as being disrespectful toward Salem management officials or other employed establishment personnel.

I do recall that Mr. Bonda, knowing that Eugene was training Ms. Valerie Neris in the procedurally correct and professional manner in which to conduct Consent Order meetings with establishment owners and/or managers, said that if there was ever a training session on how not to conduct a Consent Order meeting, this would be one to show.

I have read the preceding statement consisting of three typewritten pages and have been given the opportunity to make additions or corrections. It is true and correct to the best of my knowledge.

Witness: *Wayne N Bossler*           Signed: *[signature]*
       Wayne N. Bossler                              Charles Geraci

000172

EXHIBIT 22
Page 4 of 14 Pages