# COMPLAINT OF EMPLOYMENT DISCRIMINATION

**UNITED STATES DEPARTMENT OF AGRICULTURE**

NRF Issued via: ☒ Certified Mail/No.:7002 0860 0008 6244 3190;  ☐ Hand Delivered; or ☐ Other

**FSIS Case Number: FSIS-03334-2004**

| 1. e: *(First)* *(MI)* *(Last)* <br> Mr. Eugene  Casole | ☒ USDA Employee | ☐ USDA Applicant | ☐ Former USDA Employee |
|---|---|---|---|

| 2. Address: <br><br> *(Street)* ▓▓▓▓▓▓▓ <br><br> *(City, St. Zip)* : ▓▓▓▓▓▓▓ | 3. Telephone Numbers: <br><br> WORK: (202) 418-8870 <br><br> HOME: ▓▓▓▓▓▓▓ |
|---|---|

**4. Name Of Agency Which You Believe Discriminated Against You**

**USDA Food Safety and Inspection Service, 1400 Independence Ave., S. W. JL Whitten Bldg., Washington, DC 20250**

**5-A. Basis of Discrimination** *(Check)*

☐ Age  DOB:  
☒ Sex:  Male  
☐ Color  
☐ EPA:  
☒ Reprisal  
☐ National Origin:  
☐ Religion:  
☐ Race:  
☐ Disability:  
☐ Executive Orders:

**5-B Statutes:**

☒ Title VII  
☐ Age Discrimination Employment Act  
☐ Rehabilitation Act  
☐ Equal Pay Act

**6. Issues(s)** *(Enter date-provide any details on reverse of form.)* ★ **See Complaint and attachments**

☐ Appointment/Hire  
☐ Assignment of Duties  
☐ Awards  
☒ Disciplinary Action:  Suspension  
☐ Duty Hours  
☐ Evaluation/Appraisal  
☐ Examination/Test  
☐ Harassment  
☒ MISC: **See page 47 of Complaint**  
☐ Medical Examination  
☐ Pay-Including Overtime

☐ Promotion/Non Selection  
☐ Reasonable Accommodation  
☐ Reassignment:  
☐ Reinstatement  
☐ Retirement  
☐ Termination  
☐ Terms/Conditions of Employment  
☐ Time and Attendance  
☐ Training  
☐ Complaint Process  
☐ Conversion to Full Time

**7. Representative, if applicable.**

Name:    Phone No. : 202) 785-8499.:    Attorney: **Mr. Steven J. Silverberg**

Address: *(Street, City, State, Zip)*    ,    ,    **1819 L. Street, NW, Suite 700 Washington, D.C. 20036**

**8. Name of Counselor:** Victor Betancur, Counselor/Mediator    *Victor J. Betancur*    **EXHIBIT 2**

**9. Requested Remedy:** Remove suspension action and expunge record    **Page 1 of 94 Pages**

Complainant Signature: *[signature]*    Date: **01/05/05**

Form 1054

rec'd 1/5/05  D.DW

000075

RECEIVED  WLC  19248

EXHIBIT 2

COMPLAINT OF EMPLOYMENT DISCRIMINATION

I, Eugene Casole, am a staff officer with the Evaluation and Enforcement Division
(EED), Office of Program Evaluation, Enforcement and Review (OPEER), Food Safety
and Inspection Service (FSIS), United States Department of Agriculture.

**Personnel's "Notice of Proposed Suspension" (Proposed Suspension)**
As a result of a personnel investigation conducted by FSIS' Labor and Employee
Relations Division (LERD), Employee Relations Branch (ERB) or Personnel at the
Congressional Quarterly Building (CQB) which began on February 23, 2004 and
concluded on April 5, 2004, I received a "Notice of Proposed Suspension" (Proposed
Suspension) (copy enclosed) from Personnel on July 27, 2004. The Proposed Suspension
was dated July 7, 2004. With the Proposed Suspension, I received two copies of
Personnel's investigative report. Because Mr. Scott Safian, EED Director, was occupied,
the task was delegated to my immediate supervisor, Mr. Wayne Bossler, program
manager, to hand-deliver the Proposed Suspension and copies of the investigative report
to me.

The Proposed Suspension read, in part:

> As a result of written complaints received from co-workers, allegations surfaced
> that you had engaged in misconduct, specifically making inappropriate comments
> of a sexual nature to a female co-worker. I have carefully reviewed the evidence
> relating to the allegations and concluded that a proposal of disciplinary action is
> warranted. Accordingly, this notice constitutes a proposal to suspend you from
> duty without pay for a period not to exceed five (5) workdays. This proposal is
> based on the charge on **Improper Conduct.**

> **Specification 1:**

> On January 27, 2004 you called Ms. Holmes (Vella Kaye Holmes) a "vamp" and
> then left her office. You returned to her office with a dictionary and proceeded to
> read the definition of the word.

> **Specification 2:**

> On January 29, 2004, after apologizing to Ms. Holmes for the January 27th incident,
> you leaned over and kissed her on the cheek.

**BACKGROUND:**

EXHIBIT _1_
Page _1_ of _94_ Pages

As an aggravating factor, our records reflect that you were issued a Letter of
Caution on March 24, 2003 after making inappropriate comments during a meeting
with other OPEER employees. In addition, our records indicate that on June 26,
2003 you were issued a Letter of Reprimand after making offensive and

discriminatory comments in a meeting with FSIS personnel and establishment
management officials. In both instances, you were officially on notice that your
conduct had fallen below the standard of care expected of all federal employees.
Furthermore, you were informed that this type of behavior would not be tolerated.
- Despite counseling and the Letter of Reprimand you continue to engage in
inappropriate behavior in the workplace. Your derogatory, discourteous and
inappropriate behavior towards Ms. Holmes was unwelcome, unprofessional,
wholly inappropriate, and inconsistent with Agency policy on expectations of
employee conduct.

## Notice of Proposed Suspension—Analysis

A review of Personnel's investigative report revealed it to be a lengthy narration by
Ms. Cantres, the personnel investigator; signed/sworn statements from Messrs. Carlos
Torres, Gary Hazel, and Frank Busch, staff officers, Wayne Bossler, and Mss. Roslyn
Brogdon and Vella Kaye Holmes, staff officers, and me; **and extensive documentation
which I provided to Ms. Cantres during my interview on April 5th which alleged
Mr. Scott Safian with serious employee misconduct.** Moreover, the investigative
report did not contain my February 11, 2004 affidavit (copy enclosed) that I provided to
Personnel which also alleged other OPEER employees with serious employee
misconduct. **Basically, the investigative report is incomplete, i.e., it contains too
many inconsistencies and unanswered questions, primarily because the investigation
was conducted by Ms. Luz Contras, who, I believe and allege, was prejudice and
discriminated against me.** To support my claims and allegations of discrimination
based on reprisal (prior EEO activity), I have provided numerous examples in this
Complaint.

I also have serious concerns about the gross inaccuracies contained in the Proposed
Suspension. **The inaccuracies are so glaring that one can reasonably conclude, I
believe, that it was done knowingly, intentionally, and with forethought and
purpose.**

For example, Ms. Tia Denise Gayle, senior employee relations specialist, who signed the
Proposed Suspension stated, "As a result of written complaints received from co-workers,
allegations surfaced that you had engaged in misconduct, specifically making
inappropriate comments of a sexual nature to a female co-worker."     EXHIBIT  1

This is not true. I think Ms. Gayle is fabricating. My understanding is that only
Ms. Holmes complained. A review of the signed/sworn statements (signed statements)
indicates this to be the case. **Neither Messrs. Torres nor Busch complained.** In their
signed statement, both gentlemen believed that the incident was "blown out of
proportion." Mr. Torres stated, "I was more surprised that an investigation had been
requested because of that (the incident) and believe that the whole thing was blown out of
proportion." Mr. Busch stated, **"I think that if it was anyone else it would have been
stopped after the apology." Ms. Brogdon didn't complain.** In fact, she appeared
surprised that Mr. Safian was aware of the incident, "I came into the office about 7:00

a.m. and Frank Busch told me that Scott Safian wanted to speak with me about the incident with Eugene. **I asked Frank how Scott knew about the incident** and Frank said that he and Gary had discussed it." **Mr. Bossler didn't complain.** In his signed statement, Mr. Bossler stated, "I don't believe that Eugene was joking when he made the alleged comments; he was probably just stating what he believed or his perception of the truth." **And, Mr. Hazel didn't complain,** "I really believe that Eugene was trying to be funny, but that is nothing to say to a woman."

Again, it was only Ms. Holmes that complained, and Ms. Gayle and Personnel know that. I believe Ms. Gayle and Personnel are deliberately fabricating things in order to justify issuing the Proposed Suspension. As I understand it, on February 2, 2004, Ms. Holmes, accompanied by Mr. Gary Hazel, acting program manager, allegedly complained to Mr. Safian about the January 27th incident. That fact that Ms. Holmes vehemently refused at first to complain, despite Mr. Safian's insistence and then reconsidered after four days raises questions and concerns about the legitimacy of the complaint and Ms. Holmes' motives for going forward. In fact, this view point is shared by Messrs. Torres and Busch. In his signed statement, Mr. Torres stated, "I had heard that Eugene apologized to Ms. Holmes and **she accepted the apology then I heard that she went to Scott Safian at a later date but I don't know if she filed a complaint but I think she should have reacted sooner if she was offended by Mr. Casole's comments."** Mr. Busch stated, **"If Ms. Holmes was offended by the incident she should have come forward right away."** Mr. Busch also stated, **"I heard that she (Ms. Holmes) told Mr. Safian that she did not want to pursue anything then she changed her mind."**

In regards to my comments being of a "sexual nature," the fact is that the word "vamp" has many synonyms, including "flirt" and "charmer," and the fact is that Mr. Hazel captures my explanation of the word "vamp" in his "Record of Inappropriate Conversation," stating, "Eugene continued in discussing what he thought a 'vamp' was, 'Someone who used their charms with men to advance their position.'" **Despite the overwhelming evidence to the contrary, Ms. Gayle and Personnel have, I believe, knowingly and intentionally ignored the facts.** In his signed statement, Mr. Hazel stated, "I have no idea what Mr. Casole's intent was but I don't believe it to be sexual harassment." Messrs. Torres and Busch also stated that it wasn't sexual harassment, and Mr. Bossler didn't even address the issue in his signed statement.

EXHIBIT 1

Page 4 of 94 Pages

In regards to Personnel's Specification 2, Ms. Gayle stated in the Proposed Suspension, "...after apologizing to Ms. Holmes for the January 27th incident, you leaned over and kissed her on the check." I think it's outrageous that Personnel made an issue of this. The fact is that Messrs. Busch and Hazel encouraged me to apologize to Ms. Holmes because Ms. Holmes stated that her feelings were hurt, which I gladly did. Essentially, I gave Ms. Holmes a "zinger"—I was trying to convey to her how people in the division perceived her. As I stated in my affidavit, "...my remarks, which were intended to be nothing more than facetious and provide Ms. Holmes some insight as to what people in the division thought of her, did not go over well." I also stated, "My intentions were never to hurt Ms. Holmes." The fact is that Ms. Holmes, according to Messrs Busch and Hazel's January 28th telephone conversation, wanted me to apologize to her, and that the

"kiss," or more preciously, the peck on the check was given in conjunction with my verbal apology shows that it was part of the apology. Ms. Holmes stated that fact in her affidavit, "Eugene leaned over and kissed me on my cheek and said thank you, then left." There was nothing sexual about it—the peck on the check was given as gesture of good will and sincerity, and Mss. Holmes and Gayle and Personnel know that.

Equally important, I think, is that formal kissing is practiced and accepted by many cultures. It has nothing to do with sex. As an Italian, raised in a traditional Italian household, I have always kissed my mother. Because I work in the district, I have to live in the vicinity. Because my mother is a widow, in poor health, and lives in Pennsylvania, I visit her every weekend and have done so for the last sixteen (16) years. Consequently, before I leave and return to Washington, I'll give her a kiss on the cheek. I'll do it instinctively—almost without thinking. When someone I know introduces me to his wife, I'll give her a kiss on the check. In fact that situation occurred approximately two years ago with Tom Hoffman's wife. Mr. Hoffman was a former supervisor. I never met Mrs. Hoffman before that day. When Mr. Hoffman introduced me to his wife, I greeted her verbally, took her hand and gave her a peck on the cheek. When Under Secretary Dr. Elsa Murano's assistant, Ms. Cheryl Evans, who I don't see regularly, visited the CQB with Dr. Murano several weeks ago, I greeted her and gave her a peck on the cheek. When Ms. Margaret Burns, OGC staff attorney, got engaged, I took her hand, congratulated her and gave her a peck on the cheek, and there are countless other situations where I reacted the same. Again, it has nothing to do with sex. It's done to show respect, warmth, extend friendship and good will, and because informality exists.

But Ms. Gayle and Personnel and everyone else, for that matter, know this. The fact of the matter is that the United States has never been more diverse than it is today; that people, in general, have never been more exposed or interacted with more people of various cultures than ever before; and that personnel officials, because of who they are and what they do, are more conscious of this than the average person. Knowing all this, what does this suggest, if anything, about Ms. Gayle and Personnel's true motive in charging me with Specification 2? **For me, it can be no clearer or plainer—they were, I believe, out to "get me."**

In her affidavit Ms. Holmes stated that the kiss upset her and that she told Mr. Busch who witnessed it not to say anything because it was embarrassing. Really? I apologized and gave her a peck on the check, and that embarrassed her. If one simply refers to the narrative under the heading, "Informality Existed" in this Complaint, it's difficult to imagine Ms. Holmes being embarrassed about anything. I don't think Ms. Holmes is being truthful. According to Mr. Busch who witnessed my apology, he stated that Ms. Holmes did not appear to be offended by the kiss. Moreover, after I apologized, Mr. Busch approached me in my office and explained that Ms. Holmes was concerned that someone may have seen me give her the kiss, that it could be interpreted as sexual harassment and, as a precaution, Mr. Busch was told not to mention it to anyone. **This, I believe, was simply another feeble attempt by Mss. Holmes and Gayle and Personnel to throw everything and anything at me with the hope that it would stick.**

EXHIBIT ___

Page 5 of 94 Pages

000079

4

In regards to Personnel's "aggravating factors" under the heading "Background" of the Proposed Suspension, Ms. Gayle references the Letter of Caution issued by Mr. Safian to me on March 24, 2003 (copy enclosed) to justify issuing the Proposed Suspension.

**I have several concerns and take great exception of the way Personnel allegedly manipulates information and documentation to its advantage.** First, Mr. Safian's Letter of Caution was issued fourteen months prior to Personnel's issuance of its Proposed Suspension. **Letters of this type typically expire after one year; yet, Ms. Gayle, under the auspices of Personnel, used it justifying the proposed suspension.** In addition, Mr. Safian's Letter of Caution specifically referenced two incidents, occurring on March 4 and 5, 2003; but, Ms. Gayle only references the March 5th incident. Why would Ms. Gayle and Personnel focus only on the March 5th incident? **The answer is very simple—the March 5th incident reflects improper conduct on the part of Mr. Safian and is articulated in an e-mail** I sent to Messrs. Richard T. Van Blargan, former deputy assistant administrator, OPEER, and Ronald F. Hicks, assistant administrator, OPPER, and copied to Ms. Linda Collins, FSIS EEO Counselor/Mediator (copy enclosed). Actually, my April 9, 2003 e-mail particularized three (3) alleged incidents of misconduct by Mr. Safian. Mr. Safian's alleged misconduct has surfaced numerous times and was addressed in several of my EEO complaints, so Personnel had knowledge of this fact. Personnel, essentially, did what Messrs. Van Blargan and Hicks did when this was brought to their attention—nothing. **Ms. Gayle and Personnel and Messrs. Van Blargan and Hicks treat Mr. Safian more favorably than me.**

Ms. Gayle also uses Personnel's Letter of Reprimand that was issued to me on June 26, 2003 in justifying the proposed suspension, stating that I made "offensive and discriminatory comments." Again, this is not true. Personnel's June 26th Letter of Reprimand (copy enclosed) states, "You attended and presented at a Consent Order meeting at Salem Packing Company, Inc. on May 21, 2003 during which you made remarks that may have been construed as offensive, unprofessional and inappropriate to some of the meeting attendees." **Basically, Personnel issued its Letter of Reprimand based on the perception of two individuals that attended the meeting** and are loyal to Messrs. Van Blargan and Hicks, and not what I actually said. As a side note, there were over fifteen (15) people that attended the meeting, and no one else complained; yet Personnel issued its Letter of Reprimand. As a result, I filed another EEO complaint, and Personnel was fully aware that I contested this disciplinary action. **Again, this wasn't an oversight by Ms. Gayle or Personnel—it's too blatantly obvious. It was, I believe, done knowingly, intentionally, and with forethought and purpose.**

*Background (The incident)*

EXHIBIT __1__
Page __6__ of __94__ Pages

*On January 27, 2004, I stretched my legs and walked over to Room 314 of our office building to speak with Ms. Vella Kaye Holmes, compliance specialist, and Mr. Gary Hazel, acting program manager, criminal/civil branch.*

000080

5

*I found Ms. Holmes and Mr. Hazel behind their desks. Ms. Holmes and Mr. Hazel share a large office. Ms. Holmes was speaking to someone on the telephone. Mr. Hazel was working on his laptop. I sat in the chair next to Mr. Hazel's desk.*

*I initiated a conversation with Mr. Hazel regarding the vacant deputy director position in the Compliance and Investigations Division (CID). The job had been announced on the internet approximately two weeks ago. I asked Mr. Hazel if he knew who had applied. Together, we began mentioning names of individuals we believed had applied. As I recall, six names were mentioned: Mr. Vincent Marquez, supervisory compliance officer, Fresno, California; Mr. Luis Zamora, supervisory compliance officer, Boulder, Colorado; Mr. Pedro Bobea, supervisory compliance officer, Guaynabo, Puerto Rico; Mr. Frank Busch, compliance specialist, EED, Administrative Branch, Washington, D.C.; Mr. Mike Miller, compliance specialist, CID; Washington, D.C.; and Mr. Ajibade Ogundipe, compliance specialist, EED.*

*I recall asking Mr. Hazel if he knew how long Messrs. Marquez and Zamora had held their supervisory positions. Mr. Hazel stated that it was approximately two years. He stated that he was sure of this fact because he had competed for both jobs, but had lost them to Messrs. Marquez and Zamora.*

*I remember reviewing each of the candidates' credentials and qualifications very quickly in my head and making an assessment. One-by-one, I looked at each of the applicants' work experience, work complexity, if the candidate worked or developed any high-profile cases, length of supervisory experience, if any, Washington experience, if any, and geographic work experience. I then compared each applicant's qualifications against each candidate, made an overall assessment and verbalized this to Mr. Hazel as to who I thought was the most qualified applicant for the deputy position. I stated to Mr. Hazel that based on my program knowledge (extensive Compliance background) and diverse work experience, I appeared to be the most qualified. Mr. Hazel did not disagree, but he thought that Mr. Busch may have a chance because he was well liked.*

*In my opinion, how much the selecting officer likes you should not be a criteria, and it's not a criteria in the Merit Promotion Plan. Promotion should be based only on merit.*

*As I recall, Mr. Zamora's name then came up. Apparently, Mr. Zygmunt Sala, director, CID, was in Artesia, New Mexico on a training exercise. Mr. Zamora, who was also taking the Compliance training, was going to pick Mr. Sala up at the airport. I told Mr. Hazel that I knew about it and commented that I thought Mr. Zamora was an opportunist for various reasons, including being a "yes man," that is, a person that is in constant agreement with management, regardless of the situation or circumstances. I also stated that Mr. Zamora was a nice guy, well liked by management, that he actively participated, in some capacity, with ATSP (Association of Technical and Supervisory Professionals), a professional association of FSIS employees that are not unionized, and that FSIS management likes that. In other words, Mr. Zamora was doing all the right things and obtaining some exposure.*

EXHIBIT 1
Page 1 of 94 Pages

I am not a "yes man." I think for myself and always try to do the right thing all the time. Personal integrity, truthfulness, honesty, and credibility mean everything to me. And, I will always speak out when I believe that we, the division, program, or Agency are off-target in its thinking, methodology, or objective.

As I explained earlier, when I walked in Ms. Holmes and Mr. Hazel's office, Ms. Holmes was on the telephone, but as I ended my discussion with Mr. Hazel, I noted that Ms. Holmes was no longer talking on the telephone and was listening to my conversation with Mr. Hazel.

I then teased Ms. Holmes, stating I thought she was an opportunist. I did this in a kidding manner and with a smile. Ms. Holmes, apparently, had been off the telephone some time because she understood what I said and explained that Mr. David Green, former district manager, Chicago District, had explained to her that the staff officer position that she was offered in EED last March was an opportunity, and that she should take it.

Ms. Holmes and I then got into a discussion about how long she had been in Washington, when she actually reported, and when her promotion became effective. According to Ms. Holmes, her promotion became effective while she was still in Chicago. She explained that OPEER management made the promotion effective immediately, despite the fact that she had not physically reported to Washington until much later. She stated that OPEER management did that because she was still working on the LaGrou Cold Storage case. My response to Ms. Holmes was that management did that because they liked her.

I then turned to Mr. Hazel and jokingly asked him, "What do you call an opportunist from your neck of the woods?" Before Mr. Hazel replied, I said, "I think they call them vamps?" Mr. Hazel's response was, "Not in my neck of the woods." Both Mr. Hazel and Ms. Holmes were perplexed. They didn't know where I was coming from. I guess most people think that the word "vamp" only means seductress. What I really was saying was that the word "vamp" also meant an unscrupulous woman or unprincipled person, and that an unprincipled person was also an opportunist. When I saw that my comments didn't go over well—that neither Ms. Holmes or Mr. Hazel weren't smiling or saying anything, I returned to my office, reached for my dictionary, WEBSTER'S II, New Riverside University Dictionary (Property of the U.S. Government), The Riverside Publishing Company, and returned to Room 314.

When I returned, I found Ms. Roslyn Brogdon, compliance specialist, EED, sitting in the chair next to Mr. Hazel's desk. Mss. Holmes and Brogdon and Mr. Hazel were having a conversation. I didn't capture what they were talking about. I positioned myself in front of Ms. Holmes desk, opened the dictionary to the word "vamp," and read the definition: "vamp (vamp) [Short for Vampire] Informal. -n. An unscrupulous woman who seduces or exploits men." As I read the sentence aloud, I paused, edited and commented on portions of the definition, accepting some language and qualifying it with a comment and dismissing other language and commenting on it. Specifically, I read "An unscrupulous

woman" and facetiously stated, "You're like that." When I read aloud, "...who seduces..." I stated, "I don't know about this stuff," and waived my left hand over the dictionary in a gesture to dismiss this fragment, but then commented on the later part, "...or exploits men," again, in a kidding manner, "Yeah, you're kind-of like that, too."

Ms. Brogdon, who was not present during the earlier discussion I had with Ms. Holmes, stated something to the effect that I should be careful about what I say. I then explained to Ms. Brogdon that I just didn't say "vamp," but that I also stated that I thought Ms. Holmes was an opportunist. I didn't elaborate any further—I just let it go.

The incident ended when Ms. Holmes said to me, "You're lucky I have a sense of humor." It appeared that my remarks, which were intended to be nothing more than facetious, did not go over well. As I was near the doorway entrance of the office, I gave Ms. Holmes a thumbs-up and stated, "You're alright Vel." At that point, I wasn't pleased with the outcome, but I considered the matter closed.

When I went back to my office, I picked up my thesaurus. As a noun, Merriam-Webster's Collegiate Thesaurus (Property of U.S. Government), defines the word "vamp" as a flirt, coquette. As a verb, the thesaurus defines "vamp" as a charmer. In fact, it's the first definition. This definition is more in tune with the word as I recognize and have used it in the past. Basically, what I was trying to say and explain was that I looked at Mr. Zamora, for example, as a "yes man" and Ms. Holmes, as somewhat unscrupulous and as "a charmer," and both as opportunists.

Funk & Wagnalls New Comprehensive International Dictionary of the English Language, Deluxe Edition, definition of "unscrupulous" is: " 'unscrupulous' adj. Not scrupulous; having no scruples; <u>unprincipled</u>." It defines the word "exploit" as: " 'exploit' n. To use for one's own advantage; take advantage of ...." And, it defines "vamp" as: " 'vamp' v.t. To seduce <u>or prey upon</u> (a man) by utilizing one's feminine charms." Further, as: "An <u>unscrupulous</u> flirt or coquette." Copies of these excerpts were contained in my affidavit that I provided to Ms. Kelm on February 11, 2004.

**Notation:**

EXHIBIT 1
Page 9 of 94 Pages

Why do I look at Ms. Holmes like this? About a year ago, I had a conversation with Messrs. Busch and Hazel outside the front entrance of the CQB. The conversation was about a recent incident involving Ms. Holmes and Mr. Hazel. Apparently, Mr. David Lavers, (former program manager of the criminal/civil branch) gave Ms. Holmes and Hazel each a criminal case to review, comment, and then to brief him at a later time. Ms. Holmes came up with the idea that she and Mr. Hazel should review both case files, discuss them with each other, and then provide Mr. Lavers with a briefing of their own cases. What actually occurred was that Ms. Holmes took Mr. Hazel's comments about her case and represented them as her thoughts and comments. Mr. Hazel was mad. He felt used. I advised him not to help her anymore, and he said he wouldn't. Mr. Busch was also aware of this incident. Does that not sound unethical, unscrupulous, exploitive?

My concern is that I appeared to have been misunderstood, but, based on my thought process, beginning with Mr. Zamora and concluding with Ms. Holmes, the word "vamp" was used appropriately. My thought process and rationale, as explained above, makes sense.

**Background—Continuation:**
*Later that day, just before 4:30 P.M., I ran into Mr. Hazel in the restroom on the 3rd floor of the CQB. When he saw me, he began laughing about the incident, stating that I had "pissed her (Ms. Holmes) off." I don't believe I responded.*

*The following day, Wednesday, January 28, 2004, at approximately 7:30 A.M., after using the 1st floor restroom and while returning to my office through the exit door, I heard some loud talking and laughter to my right—at the far end of the corridor. There were a couple of staff officers from the division near Room 314, and they were talking and laughing about yesterday's incident regarding Ms. Holmes. I didn't say anything. I just went to my office and closed the door.*

*Approximately thirty minutes later, Messrs. Busch, Hazel, and Carlos Torres, compliance specialist, criminal/civil branch, all came into my office, each holding a dictionary (WEBSTER'S II, New Riverside University Dictionary). They were playing a gag on me. Someone stated, "What's the word of the day?" I didn't say anything—I just listened. And then someone else said, "We all know that's true about Vella Kay, but you didn't have to tell her." Mr. Busch then played a joke on me, telling me that Ms. Holmes had called in sick today because I had upset her. I believed it, and I, too, became upset. Mr. Hazel then stated that Mr. Busch was only kidding me, that Ms. Holmes was really sick. Mr. Busch then confirmed this, stating that Ms. Holmes stated that she was sick because of a cold and would be in tomorrow.*

*I believe it was early afternoon when I heard a rumor that someone from EED related the incident with Ms. Holmes to Mr. Mike Miller, compliance specialist, CID, and that Mr. Miller allegedly approached Mr. David Langley, program manager, about the incident. Allegedly, Mr. Langley turned Mr. Miller away, stating he was not my supervisor. According to what I heard, Mr. Miller then allegedly contacted Mr. Sala, director, CID, who was in Artesia, New Mexico about the incident, and that Mr. Sala then contacted Mr. Safian. According to the rumor, Mr. Miller allegedly initiated these contacts because we were both competing for the deputy position in CID, and that Mr. Miller was feeling the pressure.*

*Shortly thereafter, Mr. Busch came to my office and advised that he and Mr. Hazel telephoned Ms. Holmes at her home, that she had been sleeping, that they woke her and had a discussion about my comments to her. According to Mr. Busch, when he and Mr. Hazel asked Ms. Holmes if she was going to pursue the incident by filing a complaint, she emphatically said no, that she, too, had made inappropriate comments to me. When asked if she would mind it if I apologized to her the following day (Thursday, January 29th), she stated that she would love for me to do that, that she liked me and liked kidding with me, and that she simply wanted to work together.*

EXHIBIT  *1*

Page *10* of *94* Pages

Late Wednesday afternoon, at approximately 3:30 P.M., after an EED meeting on the Criminal, Civil, and Administrative Tracking System (CCATS) Data Dictionary, with all the management analysts, staff officers, and program managers in the criminal/civil and administrative branch, Mr. Hazel approached me in my office and stated that he knew I was worried about the incident with Ms. Holmes, that he didn't want me to worry about it, that he thought the incident would be resolved, and that it wouldn't hurt if I apologized to Ms. Holmes the following morning.

It was approximately 6:40 A.M., Thursday morning, January 29, 2004, when I arrived at my office. Mr. Safian was already at work and seen in the corridor, near Room 309B, talking to Ms. Mary Razzak, management analyst. Mr. Safian looked very determined and aggressive. You couldn't help but notice this in his body language. Mr. Safian appeared to be interviewing division employees, supposedly about the January 27th incident because he was seen going from one employee to another at a fast pace. **He appeared to be on some kind of mission to allegedly "get me."** It was that obvious to me and other people in the division that observed Mr. Safian, that were aware of the incident with Ms. Holmes, and that had knowledge of my prior EEO activity. Both Messrs. Busch and Torres related those very same sentiments to me on different occasions. Mr. Safian saw me enter my office, but didn't say anything to me. Mr. Safian neither approached nor spoke to me regarding the incident until February 2, 2004.

At approximately 7:00 A.M., I went to Room 314 and saw Ms. Holmes behind her desk. Mr. Busch was also there. I approached Ms. Holmes and stated, "I hurt you" and gave her a peck on the check. She stated, "Eugene, what really hurt the most is that you believe those things about me." Apparently, Mr. Busch was there the entire time and heard everything. Mr. Busch later told me that Ms. Holmes was very concerned that he saw me give Ms. Holmes a peck on the check, that Mr. Busch would tell someone, and that it would be misinterpreted. Accordingly to Mr. Busch, she was concerned about it and warned him not to say anything to anyone. I ended my apology to Ms. Holmes, which only lasted three minutes, by stating to her, "But, that's what people are saying. We can talk about it later, if you want."

Later in the day, I was speaking with Mr. Ajibade Ogundipe in his office. I had not mentioned this incident to him, but, judging from his reaction to me, he appeared to have knowledge of the incident. When I asked him what he knew, he told me that someone in the division told him about it. Mr. Ogundipe's concern was that the incident could be construed as sexual harassment. I disagreed at first, but then I decided to approach and speak to only those individuals that were in the room the day the incident occurred.

I briefly met with Ms. Brogdon in her office and asked her if she thought the incident could be construed as sexual harassment. Ms. Brogdan didn't know, and she said that several times to me.

I briefly met with Mr. Hazel in my office and asked him if the incident could be construed as sexual harassment. His response was no.

*I then went to see Ms. Holmes in her office in Room 314.  She was speaking with Mr. Miguel Figarella, compliance specialist, EED, so I left.  A couple of minutes later I returned to see if she was available, but she wasn't—she was still speaking with Mr. Figarella.  I was very anxious to speak to her about this issue.  I waited a couple of minutes and then went again to Room 314.  When I arrived, I noticed that Mr. Figarella was just leaving.  I walked in the office and asked if I could speak with her.  She motioned to me to sit down, and I did.  Moments later, Mr. Hazel got up from his desk and left the room.  I asked her pointblank if she felt that I had sexually harassed her.  She said no and motioned with her right hand in a negative gesture.*

*I then asked Ms. Holmes if she knew why I used those words, "unscrupulous, exploitive, etc."  I explained that that was what I was hearing and what people were saying.  I posed several indirect questions to her.  I asked her if it was ethical to have someone write your application for promotion, and if it was ethical to say that you wrote a case if you didn't.  She stated that she wrote her own application and side-stepped the question about the case (La Grou), stating that it was a team effort.  She also said she couldn't stop people from talking.  I reminded her of the incident (case-swapping) with Mr. Hazel in a vague way and told her that I was purposely being vague because I didn't want there to be any more hard feelings among us at Headquarters.  She simply shook her head and gestured that she didn't know what I was talking about.  I told Ms. Holmes that she didn't have to do that—that I would teach her how to review cases, that I would help anyone, and that I helped train Michele Long, compliance specialist, EED, when Ms. Carol Seymour wanted to make her an Assistant District Manager for Enforcement (ADME).  I also told her that I wanted to approach her earlier, but that I didn't.  Ms. Holmes explained that she came to Washington to learn something, that she thought she was smart and could learn how to review cases, and I agreed.  I told her that I wouldn't "bother her anymore" (about the issue).  Nothing else was said.  I then left and haven't spoken to Ms. Holmes since the incident, other than to greet her.*

*I believe it was about noon on January 29ᵗʰ when Mr. Busch came to my office and advised that when **Mr. Safian interviewed Ms. Holmes and allegedly attempted to solicit a complaint**, Ms. Holmes was very firm with Mr. Safian, stating that I had apologized to her early this morning and that she accepted it and considered the matter closed.  According to Mr. Busch, Ms. Holmes stated to him, shortly after being interviewed by Mr. Safian, that **Mr. Safian allegedly made some inappropriate and prejudicial remarks to Ms. Holmes about me.**  When Ms. Holmes advised Mr. Safian that she considered the matter closed and wasn't going to pursue anything, **Mr. Safian allegedly stated he was going to advise Personnel anyway because I had a "history."  Mr. Safian then indirectly asked Ms. Holmes if her reluctance to cooperate and provide him with a complaint was because of that "Compliance good-old-boy mentality."  (I take exception to Mr. Safian's actions and comments—I believe he was pressuring Ms. Holmes to complain.)***

*On Friday, January 30, 2004, I briefly saw Ms. Holmes as I was exiting and she was entering the exit doorway near my office.  It was approximately 11:30 A.M. and she had*

*her lunch in her hands. I said, "Hey!" and she did the same. I saw Ms. Holmes again at approximately 4:30 P.M. as she was approaching the third elevator car on the 3rd floor. I was in the elevator car, near the control panel. As I held the door open, I said, "Hi, Vel." She said nothing and went to the rear of the car. We did not speak. I left the elevator car when it stopped on the 2nd floor.*

**Notation:**
It is no secret that Ms. Holmes and Mr. Safian socialize outside of the workplace. In the past, Ms Holmes has accompanied Messrs. Safian and Louis Leny, district manager, Albany District Office, who is also a friend of both Ms. Holmes and Mr. Safian, to local drinking establishments in the District. And, most recently, Mr. Safian invited some out of town people, Messrs. Ronald Hicks (Mr. Safian's second-level supervisor) and Gary Hazel, Ms. Holmes, and others at his home for drinks on two occasions during the week of August 23, 2004.

As I understand it, on the second evening, when Mrs. Safian was away visiting her family, something interesting happened. Someone from work advised me of it on September 7, 2004. This person came to my office and told me about it. Apparently, Ms. Rita Voll, management analyst, Philadelphia District Office, was in town the same week supervisory program investigators had their conference. Ms. Voll was also at Mr. Safian's house both evenings. It was after midnight when Ms. Holmes made the remark that the local buses were no longer running because of the late hour, and that she needed a ride home. **Mr. Safian, who had earlier agreed to take Mr. Hicks home because Mr. Hicks didn't have his car, elected instead to drive Ms. Holmes to her apartment.** Ms. Voll, who wasn't familiar with Northern Virginia, was a little annoyed when she was asked to take Mr. Hicks home. **Mr. Hicks apparently didn't understand what was going on, so when he questioned Ms. Voll about it, she allegedly said, "Three's a crowd."**

I also have concerns about Mr. Hazel's motives. It was common knowledge and expected that Mr. Safian would soon announce the program manager position for the criminal/civil branch. Mr. Hazel wanted the job very much. **According to Mr. Ogundipe, who advised me of a conversation he had with Mr. Hazel about the program manager position, Mr. Hazel stated that he would do anything to get that job.** Anything! Anything at all—even lie? Did Mr. Hazel approach Ms. Holmes, on Mr. Safian's behalf, and encourage her to complain? I certainly think it's a possibility.

And, during the week of September 27, 2004, there was a National Conference in Reno, Nevada. Generally, a Headquarters staff officer doesn't go to these meeting unless the staff officer is expected to give a presentation; yet, Mr. Hazel and Ms. Holmes did attend. That was interesting. I'm curious—how did Mr. Safian justify that expense? Many people at Headquarters questioned this, too. **It appeared that Mr. Hazel and Ms. Holmes received unusually favorable treatment.**

EXHIBIT  *1*

Page *13 of 94* Pages

While at the airport and prior to their flight, Mr. Safian and Ms. Holmes were seen by someone at Headquarters sitting at a table together. They were then seen boarding their

flight together. And, while in Reno, Mr. Safian and Ms. Holmes were often seen together. **Many people attending the conference noticed this.** All kinds of rumors were circulating at Headquarters, including the obvious—that Mr. Safian, allegedly, was intimately involved with Ms. Holmes. Ms. Voll, who had not attended the meeting in Reno because her mother was seriously ill, allegedly acknowledged this to me during a conversation I had with her in my office on November 2, 2004, that she, too, heard the same rumor about Mr. Safian and Ms. Holmes at the Philadelphia District office.

Moreover, I had a conversation with Mr. Busch in my office, prior to the meeting in Reno, regarding Mr. Safian and Ms. Holmes. As I recall, Mr. Busch approached and asked me if I noticed anyone in the division that was working later than usual. I told Mr. Busch that I didn't know because my workday, like his, ended everyday at 4:30 p.m. Apparently, Ms. Vanessa Watts, EED secretary, allegedly told Mr. Busch that she noted that Mr. Safian and Ms. Holmes often worked late.

Finally, several weeks prior to departing to the national conference in Reno, Nevada, Mr. Safian re-announced a GS-14 position in his division. The position, a Compliance Officer (Liaison Program Manager), was originally announced as GS-14 position, requiring applicants to meet the 12-month in-grade requirement. The Announcement Number was W-EED-2004-0018 and scheduled to close on October 15, 2004. In other words, candidates applying for the position must have at least 12 months at the GS-13 level to be considered. Ms. Holmes only recently received her GS-13. As announced, Ms. Holmes could not apply. While in Reno, Mr. Safian had a sudden inspiration to re-announce the position as a GS-13 with a promotion potential to a GS-14. The Announcement Number was W-EED-2004-0020 and also closed on October 15, 2004. Why would Mr. Safian do that? Was the position intended for Ms. Holmes? A lot of division employees thought so. Why would Mr. Safian want to give Ms. Holmes a GS-14? Was Ms. Holmes promised anything in exchange for her complaint?

What eventually occurred was that several highly qualified Headquarters and field people applied for the position and word of it got to Mr. Safian. As I understand, Mr. Safian subsequently stated to Mr. Busch that he was not going to be the selecting official, but would let Messrs. Randy Robertson and Fred Siller, individuals that previously held the position, make the selection. I also heard that Ms. Holmes didn't apply. My thinking is that there were too many applicants that were far more qualified than Ms. Holmes and that when Mr. Safian realized, I believe, that he "couldn't pull it off," he told Ms. Holmes not to apply for the position and simply ended his quest.

Mr. Safian's relationship with Mr. Hazel and Ms. Holmes concerns me greatly. They appear to have more than a business relationship. **In light of the January 27th incident between Ms. Holmes and me and the fact that Ms. Holmes allegedly refused to complain and then four days later, accompanied by Mr. Hazel, elected to file a complaint, suggest anything at all?**

**Background—Continuation:**

Later that morning, on February 2nd, my immediate supervisor, Mr. Wayne Bossler, program manager, advised me that Mr. Safian wanted to see us both in Mr. Bossler's office. Mr. Bossler and I were seated at his round table when Mr. Safian joined us. When Mr. Safian arrived, he also seated himself at the round table and was observed holding a pen and legal pad in his hands. **Mr. Safian stated from the outset that I had made "inappropriate remarks" to Ms. Holmes, that my remarks were made in front of other people, that he didn't know if I was kidding when I made the remarks, and that, irregardless, my remarks were still inappropriate. He stated that he wanted to approach me on Friday, January 30th, but that I was not available. That wasn't true—I was in my office all day, and he saw me late in the afternoon. I suspect that Mr. Safian said that to make it appear that Ms. Holmes always intended to complain—to shorten the timeframe from four days to two.** If you recall, Ms. Holmes complained to Mr. Safian on Monday morning. When I questioned Mr. Safian about how he could make such a determination without first interviewing me, he didn't say anything. **Mr. Bossler, who apparently was listening very attentively to my conversation with Mr. Safian and agreed with my assessment, said, "That's right."** Mr. Safian didn't respond. Mr. Safian then explained that everyone in CID and EED were now aware of the incident and then allegedly accused me of being responsible. I emphatically denied it. In response, I told Mr. Safian that I had, only moments earlier, advised Mr. Bossler of the incident, and explained that on the morning of January 28th, while returning to my office after using the 1st floor restroom, I heard and saw Mr. Hazel and two other staff officers talking and laughing about the incident. **When I advised Mr. Safian of this, he didn't say anything and then dropped the issue. I believe he was trying to find fault wherever he could.** Mr. Safian then asked if I wanted to give him a statement. I couldn't believe he asked me that. I then posed an indirect question to Mr. Safian, stating why would I do that, **explaining that he was a target of two EEO complaints alleging reprisal,** that he obviously didn't understand that a conflict of interest existed, and that I neither wanted to talk to or give him a statement. I found it astonishing that Mr. Safian, being an attorney, couldn't comprehend this because he tried to justify his involvement by repeatedly stating to me that he was my supervisor. I then told Mr. Safian that Personnel, not he, should be conducting the investigation, and that I would give Personnel a written statement. Mr. Safian then advised that Ms. Kristie Kelm from Personnel was handling the issue. Mr. Bossler then wrote her name on a yellow "Post it" and gave it to me. When he asked me how soon I could do this, I replied that I would need about one week, explaining that Friday was my compressed day (my day off), that I had requested sick leave for the following Monday, February 9th, because of my mother, and that I wanted my attorney to review my statement and provide me feedback before I provided it to Personnel—this would take time. **Mr. Safian's response was that my request was "unreasonable." Again, I asked Mr. Safian why was he involved and why was he making decisions about issues that he should neither be directly involved nor concerned him.**

I believe it was Mr. Bossler who suggested that we try telephoning Ms. Kelm. When I advised Ms. Kelm that I had two EEO complaints against the Agency, involving Mr. Safian and others, that I needed to advise my attorney, and that I needed time to prepare a detailed statement because I saw bigger issues awaiting me, she tried to

EXHIBIT  2

Page 15 of 94 Pages

*dissuade me by stating that Personnel was, at the present time, only interested in conducting an inquiry of the incident and simply wanted something quick and not very detailed. I then advised Ms. Kelm that I would try to have something for her by Friday, February 6th.*

*Before the meeting ended, I told Mr. Safian that I believed that a double standard existed, that I didn't remember Personnel ever looking into the March 5, 2003, incident in which he used profanity during an EED staff meeting in which women were present (enclosed is a copy of 04/09/03 e-mail). Mr. Safian's response was that he apologized, and that if it had bothered me, I should have told him so. This was a revelation—in the past, Mr. Safian had always denied it. I told Mr. Safian that I did better than that—I told his supervisor, Mr. Richard Van Blargan, and he did nothing. Mr. Safian's response was, "You didn't tell me." What? I don't understand Mr. Safian's twisted logic. And, when I reminded Mr. Safian of an incident occurring approximately two years ago involving Messrs. Wayne Bossler and Abdalla Amin, former staff officer with EED, about profane remarks Mr. Safian made to Messrs. Bossler and Amin about their work on the New on Sang Poultry Consent Order, Mr. Bossler stated, "I vaguely remember something like that," and Mr. Safian said nothing.*

*I also reminded Mr. Safian about Mr. John Sworen's (Mr. Sworen was the former regional manager of the Philadelphia District) recent outburst and use of profanity, which was directed at me, during a conference call (enclosed is a copy of 12/09/03 e-mail). When I asked Mr. Safian if management did anything about that, he stated that management did, but that he couldn't tell me. When I told Mr. Safian that management did nothing, primarily because management recently gave Mr. Sworen a large award for " management excellence" (enclosed a copy of the December '03 issue of "The Beacon"), which I found very amusing; and, again, Mr. Safian said nothing.*

**Notation:**
I purposely raised these alleged misconduct issues involving Messrs. Safian and Sworen to prove my point that when the incidents were brought to Messrs. Van Blargan and Hicks or Personnel's attention, nothing was done. **Messrs. Safian and Sworen repeatedly received more favorable treatment than me.** My question is: Why?

*Background—Continuation:*
*I then returned to my office and began working on my statement. I also tried to contact my attorney. As I recall, my attorney was out of town and was scheduled to return the following week. I promptly went to Mr. Safian's office and approached him on this matter. I advised Mr. Safian that I could not provide Ms. Kelm with a statement until I had an opportunity to speak with my attorney, and that I needed more time. Mr. Safian then telephoned Ms. Kelm, and I advised her of the situation. She was not very understanding and insisted that I provide her with something by Friday, February 6th. I told her that I would try, but that it was doubtful.*

*On Wednesday, February 11, 2004, I hand-delivered my affidavit to Personnel. Personnel is located on the 3rd floor, 1st wing, of the South Building. Before I delivered*

my affidavit, I had two original copies notarized by a notary at the Agriculture Credit Union. I hand-delivered one original copy to Ms. Robinn Reed, director, LERD, and the other copy I retained for my records.

It was approximately 9:30 a.m. when I arrived. As I recall, there was neither a secretary nor receptionist available. I went into a room, at the far end of secretary/receptionist area, and saw a middle-aged woman sitting at a table which was positioned perpendicular to a large desk. She was facing me, but she never raised her head. She was signing papers or something. When I introduced myself, explained why I was there, and told her that I was looking for Ms. Kelm, she told me that Ms. Kelm had the day off. When I explained that I came to give Ms. Kelm my affidavit, she extended her hand, took the document, and stated that she would give it to her. And, when I said, "And you are?" She then identified herself as, "Robinn Reed, director," but never looked up once at me the entire time I was there. **I left her office thinking that this woman knew who I was and despised me—her body language was that blatant.**

As I exited Ms. Reed's office, I heard her get up from her chair and follow me into the main office. I heard her footsteps. Before exiting the main office, I stopped and positioned myself short of the doorway. I was holding my organizer, it was still open, and I was trying to locate the shuttle schedule. My back was facing the wall. From the corner of my right eye, I saw and heard Ms. Reed use the time recorder, which was positioned near the wall and approximately eight feet from where I was standing. **I also saw her staring and nodding her head at me in a very disapproving fashion.** She apparently was using the time recorder to document the date and time she received my affidavit. As I made my way to the main office exit, I ran into a tall, middle-aged man. I was directly in his path, but he wasn't looking at me. Because he was so tall, he was looking over my head. He appeared to be looking very intently at Ms. Reed. I was left with the distinct impression that it was her boyfriend or fiancé. I thought that was very interesting, so I turned my head. When I did that, I got a good glimpse of Ms. Reed's facial expression. **She was still staring at me in a very scornful way and nodding her head.**

On Wednesday, February 4, 2004, I had a lengthy discussion with Mr. Hazel. It was early morning, and he was in the corridor, near the doorway entrance of my office. I approached him and asked if we could talk. He came into my office, seated himself, and we had a long discussion. I asked him why he had ignored me and Mr. Busch for the last couple of days, and that I and Mr. Busch both noticed it. He stated that he was neither ignoring me nor Mr. Busch; but, rather, that Mr. Busch was ignoring him.

Mr. Hazel's comment appeared to be partially true. In a conversation, shortly after the incident, Mr. Busch did mention that he intentionally stayed away from Room 314 on Friday, January 30th because the door was observed almost entirely closed and he heard Ms. Holmes and Mr. Hazel arguing.

I asked Mr. Hazel what was going on with Ms. Holmes—I heard that she complained.
Mr. Hazel then explained what occurred over the later part of last week, beginning with

EXHIBIT 2
Page 17 of 94 Pages

late Thursday afternoon, January 29, 2004, when I re-approached Ms. Holmes, up to Monday, February 2, 2004, when Ms. Holmes, accompanied by Mr. Hazel, supposedly elected to complain to Mr. Safian. I asked Mr. Hazel what that was about. He said he didn't know, that he only accompanied Ms. Holmes to Mr. Safian's office because he was the·acting branch chief.

When I asked him if he wanted to know what I said to Ms. Holmes on Thursday afternoon, January 29th, his response was that he didn't want to get involved. Get involved? I told Mr. Hazel that he was already involved.

We briefly talked about the day of the incident, January 27, 2004. When Mr. Hazel explained that he didn't understand where I was coming from and that he was mortified when I made those remarks to Ms. Holmes, I advised Mr. Hazel that the word "vamp" has many synonyms, including the word "charmer," and can be used many ways. Mr. Hazel didn't say anything. In regard to his comment that he was "mortified," I reminded Mr. Hazel that I ran into him shortly before 4:30 P.M. that afternoon in the 3rd floor restroom at CQB, and that when he saw me, he was still laughing about the incident and telling me how I "pissed-off" Ms. Holmes; that the following day, January 28th, I heard him talking and laughing loudly with two other staff officers in the corridor, near Room 314, about the incident; and that approximately thirty minutes later, he and Messrs. Busch and Torres ran into my office holding dictionaries and played a gag on me. **After I stated this to Mr. Hazel, he stated, "Yeah, it was funny."** Then I advised him of the events that led me to re-approach and what transpired during my conversation with Ms. Holmes.

Specifically, I advised Mr. Hazel of my earlier conversation with Mr. Ogundipe, who believed that the incident may be construed as sexual harassment. Consequently, I explained, I approached everyone that was in Room 314 when this occurred, including Mss. Holmes and Brogdon and him and specifically asked if they believed it was sexual harassment. I asked Mr. Hazel if he remembered when I approached him on this matter in my office. He stated that he did. I then reminded him of his response and advised that Ms. Brogdon was indecisive, and that Ms. Holmes had said no.

I then explained in detail my conversation with Ms. Holmes, omitting nothing. I advised that I tried to explain to Ms. Holmes why I used those words, unscrupulous, exploitive, etc., namely, because people were talking about her. I advised Mr. Hazel that I indirectly asked Ms. Holmes if it was ethical to have someone write your application for promotion or to take credit for a case that you didn't write, and Ms. Holmes' response to my indirect questions. Mr. Hazel's response was that it wasn't my business—that if Ms. Holmes wanted to be that way, I should let her. When I explained to Mr. Hazel that I also commented to Ms. Holmes about the case-swapping incident that occurred approximately one year ago between him and Ms. Holmes, his response was that he didn't tell me that. **When I told him that he did and reminded him that it occurred outside the 2nd floor overhang at the CQB and that Mr. Busch was also there, he acknowledged the fact, stating, "Yeah, I did."** When I reminded Mr. Hazel how mad he was about the whole incident, he again conceded.

EXHIBIT 1

Page 18 of 94 Pages

*I believe that it was in the afternoon of February 11, 2004, that Mr. Wayne Bossler, my supervisor, approached me, in the corridor near my office, and advised that Mr. Safian wanted to meet with me. A moment later, Mr. Safian appeared in my office with Mr. Bossler. Mr. Safian was holding a 9 by 12-inch blue envelope. Mr. Safian said that he was told by Mr. Richard T. Van Blargan, deputy assistant administrator, OPEER, to hand-deliver this to me, and that Mr. Bossler was present to witness this. Mr. Safian further stated that he didn't know what the envelope contained.*

*The envelope contained a letter from Mr. Van Blargan, dated February 9, 2004, directing me to report Mr. Donald Smart, director, Program Review Staff, or his designee, for a detail extending from February 17, 2004 to March 12, 2004. Mr. Van Blargan's letter further stated that I, "...reportedly engaged in improper conduct by making unsolicited, inappropriate, and unsubstantiated remarks to another OPEER employee while on duty." It also stated that **Mr. Van Blargan had requested Personnel to conduct a full and independent investigation into these allegations <u>and any other reported misconduct activities at the CQB</u>**, and that the investigation was scheduled to begin on February 23, 2004 (copy enclosed).*

*On the afternoon of February 12, 2004, the day after receiving Mr. Van Blargan's letter, I was speaking with Mr. Ajibade Ogundipe, staff officer, EED, in his office. I was lamenting to Mr. Ogundipe over Mr. Van Blargan's decision to detail me to the TSC and the consequences it would have on my mother's health. Mr. Ogundipe was very sympathetic. He then explained that Mr. Michael Miller, staff officer, CID, allegedly advised him of a conversation he had with Mr. Safian about me. **During this conversation Mr. Safian allegedly stated to Mr. Miller, "I finally got him,"** referring to me. According to what Mr. Miller allegedly related to Mr. Ogundipe, Mr. Safian allegedly explained that on Wednesday, February 18th, he and Messrs. Van Blargan and Hicks were going to have a meeting and discuss what to do about me (see e-mail dated February 13, 2004).*

*On March 24, 2004, I received a telephone call from Ms. Luz Cantres, an investigator with Personnel, who is assigned to the Philadelphia District Office. Apparently, Personnel had one investigator from its Philadelphia office and another from its Beltsville office conduct the personnel investigation at the CQB. **What? Personnel didn't have any investigators at Headquarters to conduct an investigation at the CQB? My thoughts were that I was the target of the investigation and, for appearances, Personnel managers wanted to at least give the impression that the personnel investigation was conducted independently, fairly and impartially, so they detailed an investigator outside of Headquarters to conduct the investigation.***

*Ms. Cantres was very stern, pushy, and sarcastic. This is what she said, in part, (referring to my trip to Omaha) "You're back! They told me that you were back! I'm finally going to meet you!" She then told me that she was ready to wrap up the investigation, that everyone had been interviewed but me. She said, "I don't want to come down (referring to Washington, D.C.), you come up!" Apparently, Ms. Cantres*

EXHIBIT 1
Page 19 of 94 Pages

knew that I commuted to the Philadelphia area every weekend to visit my mother who is seriously ill. It appeared to me from the outset that she was trying to justify holding the interview in Philadelphia, stating that the Agency would pay for my parking expenses. She then asked me if I was going to come alone or bring my attorney. I told her that I didn't know, that I would have to think about it. When I asked Ms. Cantres if I was obligated to give her a statement, she said yes. When I asked her to show me where it said that—was I required by statute or regulation, she never showed me anything, stating that I was required to meet and provide her with a statement. She further explained that if during the interview, she believed my actions were considered criminal in nature (referring to the January 27th incident), she would stop the interview, advise me of my Miranda rights, and then turn the case over to the appropriate authorities. I found that very interesting and unsettling. Ms. Cantres explained that she didn't want to interview me at the Philadelphia District Office because there were too many people, that she preferred to do it at the Federal building, and that she would send me an e-mail by Friday, March 26th to confirm our appointment and provide me with directions and a room number (see Cantres' e-mail, dated March 26, 2004 at 12:55 pm.).

After speaking with Ms. Cantres, I promptly telephoned my attorney and made him aware of what occurred. He, in turn, telephoned Ms. Cantres immediately. In her e-mail, Ms. Cantres acknowledged that my attorney attempted to contact her, had left a message, and that she returned his telephone call on Friday, March 26th, prior to sending her e-mail: "Your attorney did leave me a message but has not returned my call of earlier today so I'm going to leave you the meeting information and I expect that there will be no problem with you meeting me." **My attorney telephoned Ms. Cantres because there was a problem, and I believe she knew it and that's why she delayed returning his telephone call until late Friday afternoon.** I didn't feel that Ms. Cantres' request to interview me in Philadelphia was reasonable, particularly because my duty station is Washington, D.C., not Philadelphia, and that I technically would have to obtain authorization to travel to Philadelphia. Ms. Cantres, on the other hand, had received travel authorization from her superiors because she was, I believe, intentionally detailed by her superiors to conduct the personnel investigation at the CQB. In fact, despite my objections, I was forced to travel to Philadelphia under threat of possible disciplinary action (see Mr. Van Blargan's March 31, 2004 letter to me) and did subsequently submit a travel voucher for mileage, parking expenses, and per diem. **As I explained to my attorney, I believed that this was a ploy, a strategy Personnel used to separate me from attorney—they didn't want him there, and Personnel used whatever tactics they could, I believe, to accomplish this.**

As I recall, because my attorney was with a client and because Ms. Cantres ended her workday at 3:30 p.m., Friday, March 26th, my attorney was unsuccessful in reaching her. Consequently, I obtained Ms. Cantres' cellular phone number from a receptionist at Personnel (Headquarters) and telephoned and advised her, again, that there was a problem and that the meeting will have to be re-scheduled. My attorney did the same, leaving a message at her office number and on her cellular phone.

EXHIBIT _1_

Page _10_ of _94_ Pages

*I then received an e-mail from Ms. Cantres on Monday, March 29, 2004, stating that the proposed meeting was not an option, and that I had to meet with her in Philadelphia (see Cantres' e-mail, dated March 29th at 6:47 a.m.). In response, I sent an e-mail to my attorney and copied Mr. Bossler, my supervisor, and Ms. Cantres, explaining that I had spoken with my supervisor about the issue, that he agreed that we gave Ms. Cantres enough notice on Friday to cancel the meeting, and for my attorney to coordinate with Ms. Cantres to re-schedule the meeting (see my e-mail, dated March 29th at 7:27 a.m.). Several minutes later, Ms. Cantres responded with another e-mail, **which I found disturbing and threatening and my supervisor found inappropriate and "out of line"** (see Cantres' e-mail, dated March 29th at 7:46 a.m.). In response, I sent another e-mail to my attorney and copied Ms. Robinn Reed, director, LERD, Mr. Wayne Bossler and Ms. Luz Cantres, requesting that he telephone and speak with Ms. Cantres' supervisor about the tone of her recent e-mail—**that I perceived it as threatening and intimidating** (see my e-mail, dated March 29th at 9:20 a.m.). My attorney made several attempts to speak with Mss. Reed and Cantres, but neither returned his telephone calls. Several hours later Ms. Cantres sent me her final e-mail, explaining that the meeting was re-scheduled for April 5, 2004 in Philadelphia (see Cantres' e-mail, dated March 29th at 1:05 p.m.).*

*On March 30, 2004, Mr. Bossler telephoned Ms. Cantres, and she promptly returned his telephone call. Mr. Bossler then approached me and told me that I had to go to Philadelphia to be interviewed. When I asked Mr. Bossler why, he stated that he couldn't tell me.*

*On March 31, 2004, I asked Mr. Bossler to telephone Ms. Cantres and to ask her if I can have my attorney present while I am being interviewed, that I wanted to know in advance before I went through the expense of bringing my attorney up from Washington—I didn't want any surprises. Mr. Bossler agreed to telephone Ms. Cantres because he believed I had a legitimate concern. When Ms. Cantres was asked if I could have my attorney present, she said yes. When asked if my attorney could ask questions, she said yes, but if he asked too many, she could ask him to leave. What? **Ms. Cantres then advised Mr. Bossler that my attorney and I would be given an opportunity to examine any incriminating evidence (statements, memorandums of interview, affidavits, etc.) which was obtained during the investigation.***

*On April 1, 2004, I received a letter from Mr. Van Blargan, dated March 31, 2004, reiterating that **Personnel was conducting a full and independent investigation into allegations of reported misconduct activities <u>among OPEER employees</u> (PLURAL) located at the CQB** and directing to be interviewed by Ms. Cantres in Philadelphia.*

*On April 5, 2004, I traveled from my residence, Annapolis, Maryland, to the Federal building in Philadelphia and met with Ms. Luz Cantres. The interview took place in a huge conference room on the second floor of the Federal building. I arrived approximately thirty minutes before the interview was scheduled to begin. I seated myself at a long table that was positioned in the front of the room and waited for*

EXHIBIT  1

Page 11 of 94 Pages

Ms. Cantres. As I recall, Ms. Cantres arrived about twenty minutes after 9:00 a.m. and was wearing a sweat suite and pulling a luggage tote (her computer equipment). **The very first thing Ms. Cantres said to me was, "Is your attorney coming?"** When I explained that April 5th was the beginning of Passover, that my attorney would have had to be home by dusk, and that I told my attorney that I would handle the interview and to take the day off, she replied, "Does that mean you're going to give me a signed statement?" I, in turn, said, "That all depends what the statement says." Ms. Cantres' response was, "It (the statement) will say whatever you want it to say." Ms. Cantres appeared to be nervous, apologetic, and regretful because she then clutched her chest with her hand and mentioned the incident with the e-mail and offered an excuse, stating that she simply "got caught up" with the e-mails. She asked if we could start over. She then introduced herself and extended her hand. I believe I said, "Okay, sure" and shook her hand.

I was seated toward the end of this long table. Ms. Cantres seated herself at the end of the table, which was to my left. My earlier belief that Ms. Cantres was somewhat nervous appeared to be true because she was seen fumbling with her computer equipment. She was trying to set up her equipment and was struggling with the printer, the computer wiring, and attempting to locate a floor receptacle with an electrical charge and was nervously verbalizing the above the entire time she was setting up her equipment.

As I was watching Ms. Cantres set up her computer equipment, I noticed a large stack, approximately four inches high, of what appeared to be signed statements. There were many statements—one could easily count them from a distance because each statement appeared to have been fastened together with a paper clip. They were seen resting near the corner of the table or at the opposite end of where Ms. Cantres had positioned her computer.

From the outset, Ms. Cantres tried to explain why Headquarters assigned her to the investigation, **but stopped short of explaining Personnel's rationale for doing so, stating only that they (Personnel) wanted someone outside of Washington to conduct the investigation.** She also stated that she was encouraged to fly to Omaha, Nebraska, and interview me, but that she declined because she felt that it wouldn't have been very productive and decided to wait until I returned to Washington.

**When I asked Ms. Cantres pointblank if I was the only target in the investigation or if there were others, she acknowledged that I initially was but that subsequently changed when the investigation revealed other misconduct among OPEER employees.** She never identified these individuals to me, but **Ms. Cantres did clearly state to me that she had identified other misconduct by OPEER employees during her investigation at the CQB.** When I asked Ms. Cantres if the incident was criminal in nature (referring to her initial comments to me during a telephone conversation on March 24, 20040), she said no, and added that she knew I was worried about it. I was tempted to tell Ms. Cantres that I became worried about it only after, I believe, she knowingly and intentionally put



*that thought in my head knowing that it was never a criminal matter, but I didn't say
anything to her—I just let it go.*

*Ms. Cantres then stated that people in the division, basically, spoke well of me, motioning
with her hand to the stack of signed statements, but that they didn't necessarily agree
with what I said about Ms. Holmes.* **Contrary to what Ms. Cantres told Mr. Bossler on
March 31, 2004, that my attorney and I would have an opportunity to examine and
refute any incriminating evidence, Ms. Cantres never showed me anything.** *She also
said that people thought I was very intelligent, but that I was a loner, too; that I was quiet
and kept to myself, rarely interacted with other employees, and was routinely seen in my
office with the door almost completely closed.*

**While interviewing me, Ms. Cantres accused me of making inappropriate comments to
Mr. Zygmunt Sala, director, CID, in the presence of other CID employees at the CQB.
I take exception to this. It is not Ms. Cantres' job to accuse me of anything.** *I knew
what Ms. Cantres was referring to when she said, "And, what you said to Zig Sala ... in
front of other people." And, when she said, "You complain, but you don't apply for
jobs!" I think my response was, "Yeah, so? What did I say to Ziggy?" In responding to
Ms. Cantres, I, basically, reiterated the comments I made to Mr. Sala on October 29,
2003, that, I believe, OPEER management rarely promotes applicants on merit, that
selections appear to be based more on favoritism, nepotism, and convenience, and that
OPEER management must always follow the Merit Promotion Plan and select the most
qualified candidate, whether I am an applicant or not, or I will complain and use it in my
EEO complaint. And, when I finished, Ms. Cantres didn't say anything more on the
subject.*

*I then advised Ms. Cantres that I had filed two EEO complaints against Messrs. Scott
Safian, Richard Van Blargan, and Ronald Hicks; that one involved non-selection and the
other was for retaliation; and that Personnel, her supervisor, in fact, had recently
reprimanded me for comments I made during a Consent Order trip because Personnel
believed that my comments could have been perceived to be inappropriate. When I told
Ms. Cantres that, she just rolled her eyes in disbelief.*

*I then asked Ms. Cantres if Personnel ever investigated or wrote up Ms. Theresa
O'Connor, former management analyst, when she allegedly left work early on several
occasions without charging leave; or if Personnel ever investigated or wrote up Mr. John
Sworen, former regional manager, Philadelphia District, when he allegedly used
profanity several times in the workplace; or if Personnel ever investigated or wrote up
Mr. Safian for any of his alleged outrageous behavior. Ms. Cantres didn't say too
much—she just listened.* **And to be extra sure Ms. Cantres understood what I had
alleged Mr. Safian did on one particular occasion, I actually walked her through the
documentation pertaining to Phoenix Poultry and explained how allegedly Mr. Safian
knowingly and intentionally misrepresented the terms of an administrative order to the
respondents, and when I got through, Ms. Cantres unequivocally understood the extent
of Mr. Safian's alleged misconduct because she stated, "It's not there," referring to**

**EXHIBIT** *1*
**Page** *23* **of** *77* **Pages**

*the amended language in the signed Consent Order.  I then provided Ms. Cantres with
faxes, e-mails, and a computer disk which documented the alleged misconduct.*

*Ms. Cantres then advised me of her interview with Ms. Holmes.  Ms. Cantres explained
that when she interviewed Ms. Holmes about the incident and, in particular, about my
remarks, Ms. Holmes became tearful because she was hurt.  **Ms. Cantres stated very
clearly to me that she believed that Ms. Holmes was hurt and that her tearful account
of the incident was sincere.  The fact that Ms. Cantres made such a claim, prior to
interviewing me, suggests that Ms. Cantres lost her objectivity and was incapable of
conducting a fair and impartial investigation.**  Ms. Cantres then told me that
Ms. Holmes was partly responsible for some of things that happened to her, but that there
were other things that she couldn't control, namely, gossip.*

***When I explained my version of the incident and explained and justified my use of the
word "vamp," as I did previously in my February 11th affidavit, I saw Ms. Cantres roll
her eyes.  I take exception to this—again Ms. Cantres showed that she was prejudice
and was incapable of conducting a fair and impartial investigation.***

*And, when I proofread the signed/sworn statement that Ms. Cantres had prepared for my
signature, I noticed something that was highly irregular.  Specifically, the last sentence in
the first full paragraph on page seven of my statement originally read that I didn't make
an issue of when Ms. Holmes stated that I wanted a twelve-year old virgin because
someone else made the comment before Ms. Holmes.  **I never said that to Ms. Cantres.
Those were her words and thoughts, as related by Ms. Holmes to Ms. Cantres,** and
what further convinced of this was that immediately after reading the sentence I looked
up at Ms. Cantres and found her focused on me as I was reading this particular sentence.
**The distinct impression that I was left with over this incident was that Ms. Cantres
appeared very focused on me and this sentence and was waiting to see if I would
overlook it or alter its meaning.**  I then promptly changed the language in the sentence to
read, "...it was vulgar and disgusting but I did not make an issue of it because
informality existed."  **What further reinforced my belief that this was intentional** was
that Ms. Cantres was using my affidavit of February 11th to assist her in composing my
signed/sworn statement, and that my affidavit clearly stated that I didn't make an issue of
Ms. Holmes comments because informality existed.  Ms Cantres was very shrewd from
the outset, taking the necessary precaution of advising me that my statement may not be
exactly as I related to her.  **Again, I take exception to this.  These actions by
Ms. Cantres are nothing more, I believe, than deplorable tactics to get a person to say
something that the person never intended to say.***

**EXHIBIT  2**

*At the conclusion of the meeting, I accompanied Ms. Cantres to the second-floor* **Page 24 of 94 Pages**
*elevators.  I believe Ms. Cantres stated that she shared an office with someone on the fifth
or seventh floor of the Federal building, but that she didn't have any copying equipment
and, therefore, couldn't provide me with a copy of my statement.  As a result, she stated
that she would mail me a copy the following week when she returned to the Philadelphia
District Office.*

*As we were walking towards the elevators, we were talking about the incident and, in particular, the comments I made to Ms. Holmes and the comments Ms. Holmes made to me. **Ms. Cantres went to great lengths to explain, rationalize, and justify Ms. Holmes' point of view about the comment Ms. Holmes made to me on January 5th, explaining that Ms. Holmes made the comment only after someone else had made the same - comment moments earlier, and that consequently Ms. Holmes didn't think that I would take exception.** What? I don't think so. I neither liked it then nor do I like it now, regardless of who said it, and I advised my supervisor of it and referenced it in my affidavit that I provided to Personnel on February 11, 2004. Moreover, I have alleged that Ms. Holmes made the same comment on another occasion, and that incident, too, is referenced in my affidavit. **Ms. Cantres appeared to be siding, taking the same position with Ms. Holmes on this point. Again, I take exception to Ms. Cantres actions. As stated earlier, Ms. Cantres lost her objectivity and, I believe, intentionally disregarded other potential incriminating evidence that implicated other OPEER employees of misconduct.***

*On July 27, 2004, I received Personnel's Notice of Proposed Suspension letter, dated July 7, 2004, and two copies of the investigative report. Because Mr. Safian was occupied, the task was delegated to Mr. Bossler. Mr. Bossler hand-delivered the package, containing Personnel's letter and two copies of the investigative report, to me in his office.*

*A review of Personnel's investigative report revealed it to be a lengthy narration by Ms. Cantres; signed/sworn statements from Messrs. Carlos Torres, Gary Hazel, and Frank Busch and Mss. Roslyn Brogdon and Vella Kaye Holmes, and me; and **extensive documentation which I provided to Ms. Cantres during my interview on April 5th which alleged Mr. Scott Safian with serious employee misconduct.** Moreover, the investigative report does not contain my February 11th affidavit that I provided to Personnel which also alleged other OPEER employees with serious employee misconduct. **Basically, the investigative report is incomplete, i.e., it contains too many inconsistencies and unanswered questions, primarily because the investigation was conducted by Ms. Contras, who, I believe, was prejudice and discriminating.***

*On July 28, 2004, Mr. Bossler and I telephoned Ms. Kelm and provided her with an oral response to Personnel's Notice of Proposed Suspension, dated July 7, 2004, which was subsequently supplemented with a written response and hand-delivered to Personnel on July 30, 2004 (copy enclosed). Mr. Safian, who was in Mr. Bossler's office and had moments earlier ended his conversation with Bossler, was also present during the conference call. Basically, I advised Ms. Kelm of two important issues: First and foremost was the fact that Personnel conducted its investigation, assessed the investigative findings, and referred to the USDA Guide for Disciplinary Penalties for the appropriate disciplinary action based on the evidence collected and determined guilt without first giving me an opportunity to refute the evidence. **Personnel officials, after making such a definitive determination, then asked if I cared to refute the evidence or plead my case before a hearing officer, which procedurally makes no sense at all.***

**EXHIBIT** 2
**Page** 25 **of** 94 **Pages**

*Equally important is my second issue, which involves Personnel and my second EEO Complaint, Agency No. 040128.* **The fact that I named Personnel as a co-conspirator in an EEO case involving discrimination and based on retaliation (prior EEO activity) hardly portrays Personnel as fair and impartial body.** *Ms. Kelm had difficulty understanding this and was heard saying, "What does that have to do with anything!" What? Conversely, Mr. Safian, who I named in three of the four EEO complaints that I formally filed with USDA's Office of Civil Rights, appeared to understand my concern because he was heard saying, "Understood."*

## Ms. Vella Kay Holmes—Background

In December 2000, Glenda Ashcoff, former staff officer with EED, and I traveled to Chicago to attend a criminal trial in Federal court. The case was called Helmos Food Products and was documented by a compliance officer called Paul Wolseley. It was a simple rodent case involving a food distributor. Prior to going to the courthouse, Ms. Ashcoff and I went to the Chicago District Office. I first met Ms. Holmes, in passing, at the district office. At the time, she was, I believe, a GS-9 and was working for the Office of Field Operations (OFO) or Inspection.

In January 2000, I attended a meeting with some of our field managers, which at the time were referred to as ADMEs (Assistant District Managers for Enforcement), at George Mason University, Arlington, Virginia. While having lunch with several ADMEs in a university eatery, Mr. Leny, ADME, Chicago District, mentioned to me that Ms. Holmes wanted to be a compliance officer. Sometime in 2001, Ms. Holmes became a compliance officer. I have no doubt and believe Mr. Leny arranged this. My thinking is that she was hired as a GS-9 Compliance Officer. As a rule, she would have had to remain in-grade at least nine months before being eligible to be promoted to a GS-11 Compliance Officer. In July 2002, there was a re-organization, a re-shuffling of compliance officers—GS-11 Compliance Officers and GS-12 Senior Compliance Officers were absorbed by OFO. Unlike traditional compliance officers that were investigating and documenting criminal and civil cases, OFO compliance officers were investigating and documenting sanitation and food safety violations in federally inspected plants. Because of her GS-11 grade, Ms. Holmes was re-assigned to OFO. Because Ms. Holmes became a compliance officer in 2001 and was re-assigned in July 2002, her exposure to criminal and civil cases, to speak nothing of administrative (unfitness) cases, was at best minimal. When Ms. Holmes applied and accepted the staff officer position in EED, she was a GS-11 Compliance Officer with OFO, and not even a seasoned one. I have a question: **How much sense did it make for Mr. Safian to select Ms. Holmes, a person who had been a compliance officer less than two years, who, incidentally, was with OFO approximately one year documenting sanitation and food safety violations, as a criminal and civil case reviewer in EED.** None, it made no sense. One would think that a division director would want to hire a seasoned compliance officer that has experience investigating and writing criminal and civil cases to work in his division to review criminal and civil cases, not a novice compliance officer. **Mr. Safian's selection of Ms. Holmes didn't make any sense.** I was aware of at least one person who was far

EXHIBIT 2
Page 26 of 94 Pages

009100

more qualified than Ms. Holmes, but he didn't get the job. **I can explain Mr. Safian's actions with a few words: I believe it's called favoritism, pre-selection, or pre-selection of non-selection—discrimination.**

As I explained earlier, prior to the re-structuring, Compliance Officer Wolseley documented a rodent case called Helmos Food Products. It was a criminal case. It was prosecuted by an assistant United States attorney called Eric Sussman. After the firm and principals were convicted, the supervisory compliance officer in the Chicago District Office retired. The vacancy was announced and Mr. Leny promoted Mr. Wolseley to the supervisory compliance officer position. Mr. Leny then left his ADME position to become district manager of the Albany District Office. Mr. Leny was replaced by Mr. Mike Bird. Because Messrs. Bird and Wolseley don't get along, Mr. Wolseley left and became a frontline supervisor with OFO and supervised Ms. Holmes.

It is no secret that Messrs. Safian and Leny are close friends, that Mr. Leny and Ms. Holmes are close friends. In fact, I believe it was Mr. Leny that hired Ms. Holmes as a compliance officer before the re-organization. I like so many at Headquarters heard rumors that Ms. Holmes and Mr. Wolseley were intimately involved. In fact, in her statement Ms. Holmes acknowledged hearing about the rumor, **"I knew there was a rumor about me before I got here (Headquarters) that the only reason I got this position (staff officer-case reviewer in EED) was because I slept with a supervisor (Wolseley?) in the field.**

According to the rumor, Mr. Wolseley was married, the situation become uncomfortable, he feared that his wife would find out about the alleged affair, so he encouraged Ms. Holmes to apply for the EED staff officer position in Washington. I have no doubt and believe that Mr. Leny approached Mr. Safian and also put in a good word for Ms. Holmes to facilitate the process. I also heard the rumor that **when Mr. David Green, former district manager, Chicago District Office, learned of the alleged affair, he was furious and allegedly wanted to get rid of Ms. Holmes.**

What does this all mean? It's very simple—merit was never a consideration in promoting Ms. Holmes to the staff officer position in Washington. **I believe Ms. Holmes' selection wasn't about merit or selecting the most qualified applicant—it was about favoritism and convenience.**

EXHIBIT 1

Page 27 of 94 Pages

**Informality existed**
From the outset and in my February 11, 2004 affidavit to Personnel, which described the January 27th incident and aftermath, I stated very clearly that informality existed among a small clique of people within the division and that topics of discussion varied and ranged across the spectrum. I then identified individuals, namely, Mss. Vella Kaye Holmes and Roslyn Brogdon and Messrs. Frank Busch, Gary Hazel, Carlos Torres, staff officers, EED, and me as having actively participated and/or witnessed these discussions and provided Personnel with a small glimpse of these conversations:

000101

Soon after reporting to Headquarters, I believe, it was during the summer of 2003, I had an interesting conversation with Ms. Holmes in the copying room, around the corner from my office. As I recall, I asked her where she was from, and because her first name, "Vella," was so unusual, I asked her how she got it. I believe she told me that she was from Arkansas, that her father was a minister, she actually preferred "Mary Kay" over "Vella," and that she was named "Vella" after her grandmother. I jokingly told her that I liked "Vella" over "Mary Kay," so I was going to call her "Vella." As expected, she told me that I could call her either "Vella" or "Mary Kay." I then jokingly told her that we had a problem, and I couldn't call her "Vella" because there was obviously something missing. She didn't understand, so I explained that because she came from the Deep South and most parents gave their children two first names because they loved their children so much, "Vella" alone wouldn't work—we need something to attach to "Vella." When I suggested "Vella Babe," her mood changed and she became very sentimental. She told me that Mr. Paul Wolseley (her former supervisor) called her "Kay Babe." **I don't think too many people are aware of this bit of trivia. When Mr. Busch was asked about that, he told me that he didn't even know.** As a side note, even before I started and during my routine, she appeared to be attracted to me—I felt that she was just too close and invading my space as I was talking to her. When I finally stepped back, she got the idea and moved away.

In regards to my comment above, that I believed that Ms. Holmes showed an interest, it's interesting to note that in her signed statement, Ms. Holmes recalled an earlier conversation I had with her in which she mocked me, stating, "…he concentrates on finding a woman that is 'not used' and has no children."

The conversation Ms. Holmes referred to in her signed statement occurred sometime in the summer or fall of 2003. As I recall, I was standing near, but not directly in front of her desk in Room 314. I don't recall if Mr. Hazel was there. I also think that Ms. Holmes is incorrect—the conversation I had with Ms. Holmes about the young woman that I was engaged and came from a very wealthy family occurred in Mr. Busch's office, and Mr. Busch was present because he made some comments. The conversation I had with Ms. Holmes where I made the comment that I wanted a virtuous woman ("not used") occurred in her office, and I don't recall if Mr. Bush was there. I believe I was talking about a young woman that was introduced to me before I abruptly left the Philadelphia area and went to New York. She was very pretty, lived at home with her parents, and was virtuous, and I expressed those traits to Ms. Holmes. Prior to making my comment, Ms. Holmes posed a hypothetical question to me. She was sitting behind her desk when she posed her question. Ms. Holmes wanted to know if I would consider marrying a woman that was previously married and had two grown sons. She explained that I would not be imposed upon—that this woman would accept responsibility for her sons. The similarities were so striking—I knew she was talking about herself, and I turned out to be right. As I recall, I facetiously stated that I wasn't interested in "used" or previously married women and qualified my comment by stating that I didn't want "someone else's wife," that I wanted someone like me—never married. When I said that, she snapped her fingers, as if to say "shucks" or "dam" and the conversation ended. Had

EXHIBIT 2
Page 28 of 94 Pages

it been someone other than Ms. Holmes, I would not have phrased it like that, but **I did
so because informality existed, and I had no interest.**

I was seated at a chair in front of Mr. Busch and Ms. Brogdon's desk in Room 318 at the
CQB. Ms. Brogdon was not present. Mr. Torres was standing to my right. Mr. Busch
allegedly explained an incident which described Ms. Holmes sitting in a chair in
Mr. Busch and Ms. Brogdon's office, actually the very same chair that I was seated as I
listened to this story, in which Ms. Holmes allegedly wanted to show Mr. Busch what a
good contortionist she was by lifting her leg over her head. I don't recall my reaction. I
think I just smiled or shook my head.

Again, on another occasion, I was seated in the very same chair in Room 318 speaking
with Mr. Busch. Ms. Brogdon was not present. As Mr. Busch and I were talking,
Ms. Holmes walked in the room. She was wearing either a dress or a skirt that was well
above the knee. Mr. Busch looked at her and raved to me how "good" Ms. Holmes
looked. I turned towards Ms. Holmes, looked at her, and then turned to Mr. Busch and
said, "She knows that she has great legs." **I looked back at Ms. Holmes and she had
this big smile on her face.**

On a different occasion, I walked down the corridor to Mr. Busch and Ms. Brogdon's
office. I saw Mr. Busch near the entrance of Room 314, Ms. Holmes and Mr. Hazel's
office. Mr. Busch allegedly leaned over to me and stated that Ms. Holmes allegedly
showed Mr. Hazel the spider veins on her legs. I then asked Mr. Hazel if that was true.
Mr. Hazel, paused for a second and then allegedly stated, "Yes, she did." Mr. Busch and
I just laughed.

Again, on a different day, I went to see Mr. Busch in Room 318. Ms. Brogdon was
sitting behind her desk. Mr. Busch allegedly explained to me that Mr. Torres allegedly
liked to play with Ms. Brogdon's dolls. These were little female figurines that had a solid
torso and head, but had flimsy cloth legs and plastic shoes. Allegedly, Mr. Torres liked
to lift the doll's legs over the doll's torso. Everyone laughed, including Ms. Brogdon,
who allegedly stated, "I told Carlos to leave my girls (dolls) alone."

I believe I was in my office and it was in the fall of 2003 when Mr. Busch allegedly
advised me of a conversation he had with Ms. Holmes. Apparently, Ms. Holmes has a
close male friend in Missouri. I think it was Missouri. In any event, this "friend"
allegedly gave Ms. Holmes a sex toy for her birthday present. I was flabbergasted and
almost fell out of my chair when Mr. Busch allegedly told me this story. I subsequently
saw Ms. Holmes in the corridor at the CQB, and told her that I wanted to ask her
something. She then followed me into my office. I then told Ms. Holmes that I heard the
story about her male friend from Missouri that gave her the birthday present. As I recall,
I told her that I couldn't believe it, and before I asked her if was true, I lost my
composure and began laughing uncontrollably. According to Mr. Busch, she later
approached him and asked Mr. Busch if he was the one that told me the story. Allegedly,
Mr. Busch said he did and laughed about it. She allegedly approached Mr. Busch, raised

000103

EXHIBIT 7

Page 29 of 94

her hand as if to strike him across the face, and then caressed his cheek and said, "I can't stay mad at you."

I believe it was in October 2003 when Mr. Busch related a conversation to me that he had with Ms. Holmes. As I remember it, Mr. Busch and I were scheduled to go to FSRE. (Food Safety Regulatory Essentials) training at George Mason University in Arlington, Virginia. I think it was a three-week course. I was on the train platform at the Foggy Bottom subway station. Mr. Busch allegedly approached and advised me of a rather risqué conversation he had with Ms. Holmes. Apparently, Ms. Holmes allegedly has a girl friend that is bi-sexual. As I understand it, this woman had an unpleasant experience while she participated in a threesome. As was allegedly explained by Ms. Holmes to Mr. Busch and then allegedly related to me, this woman made the remark that she broke off her relationship with this person because she was tired of eating "sh.." or fecal material. I was rather surprised that Mr. Busch had such a conversation with Ms. Holmes, and from the look on Mr. Busch's face, he looked surprised, too. To be honest, I didn't understand the woman's remark when Mr. Busch first told me—he had to re-tell the story to me.

On another occasion Mr. Busch allegedly advised me of a conversation he had with Ms. Holmes. As I understand it, Ms. Holmes allegedly was at a bar with her boyfriend. Supposedly, a waitress, with a low cut top, made a pass at Ms. Holmes' boyfriend. Ms. Holmes became annoyed and allegedly told the waitress that if she didn't leave her boyfriend alone that Ms. Holmes would grab her breasts and twist them in a knot.

As I explained in my February 11th affidavit to Personnel, this was only a sample of many more incidents of this kind, which, in my opinion, demonstrated that informality existed and continued within this small clique of individuals until the January 27th incident.

For example, Ms. Holmes' informal comments to me occurred prior to and as late as January 5th, and Mr. Busch clearly confirmed this in his signed statement, "Ms. Holmes commented that what he (Eugene) wanted was a 12 year old virgin. It didn't go anywhere else and ended there; **these types of conversations were normal in the office.**"

EXHIBIT  _1_

Page _30_ of _94_ Pages

## Analysis of Signed/Sworen Statements (Sworn Statements)
In the Notice of Proposed Suspension, dated July 7, 2004 and signed by Ms. Tia Denise Gayle, senior employee relations specialist, LERD, she stated, in part:

> As a result of <u>written complaints received from co-workers,</u> allegations surfaced that you had engaged in misconduct, specifically making inappropriate comments of a <u>sexual nature</u> to a female co-worker. I have carefully reviewed the evidence relating to the allegations and concluded that a proposal of disciplinary action is warranted.

If Ms. Gayle is referring to the signed/sworn statements (sworn statements) that

000104

Ms. Cantres obtained from Mss. Vella Kaye Holmes and Roslyn Brogdon and Messrs.
Frank Busch, Carlos Torres, and Gary Hazel from February 24, 2004 through March 2,
2004, then I have serious concerns which must be addressed.

A review of the sworn statements shows some agreement. For example, Ms. Holmes
said, "Eugene usually keeps to himself and sometimes he asks me for help on his
computer." Mr. Hazel said, "Mr. Casole generally keeps his office door closed and does
not participate in small talk." Ms. Brogdan said, "...he stays in his office a lot and is
always serious." Mr. Busch stated, "Mr. Casole is kind of a loner so I go out of my way
to speak with him." And, Mr. Torres said, "Eugene Casole is a quiet person and mostly
keeps to himself." He further stated, "Some have said that Mr. Casole is strange, he tends
to keep his office door closed or gaped open...."

For the most part, I think the above statements are true. However, Ms. Holmes also
stated, "I share an office with Gary (Mr. Hazel) and Eugene comes in sometimes daily,
sometimes less often," which is not true. I work in the administrative branch. I do very
little criminal and civil work. There is no reason for me to frequently visit with either
Ms. Holmes or Mr. Hazel. Moreover, had I gone to Ms. Holmes and Mr. Hazel's office
as often as Ms. Holmes stated, more division employees would have noticed and
commented on that fact, but no one did. **I believe Ms. Holmes deliberately
exaggerated the frequency of my visits to impress and sway Ms. Cantres into
thinking that I was pursuing Ms. Holmes, which is not true.**

I am a loner, I do keep to myself, and I stay in my office a lot with the door gaped open.
I have a question: If I am what they say, serious-minded, a loner, doesn't engage in small
talk, and am constantly in my office with the door closed, how then could I have known
so much about Ms. Holmes or have been able to perceive her as being unscrupulous,
unethical, and exploitive. I didn't know Ms. Holmes before she reported to Washington.
I'm from the Northeast and she's from the Midwest. It appears to me that someone or
several people would have had to provide me with information about Ms. Holmes. The
notion that someone outside of Headquarters provided me with information isn't
plausible because the overwhelming events occurred at Headquarters, not in the field. I
have a question: Is it possible that Messrs. Hazel, Busch and Torres talked to me about,
advised me of, often ridiculed, and lamented to me about Ms. Holmes? Yes, I think so.

On the other hand, a review of Mss. Holmes and Brogdon and Mr. Torres' sworn
statements and Messrs. Hazel and Busch's statement, conversation records, and "notes to
the file" also shows some inconsistencies and untruths.

EXHIBIT  2
Page 31 of 94 Pages

**Signed/Sworen Statement—Vella Kaye Holmes:**
In her sworn statement and from the outset, Ms. Holmes stated, "I am not really aware of
any inappropriate jokes or conversations." This is untrue as reflected from the numerous
examples which I provided under "Informality Existed."

In regards to her comments about the twelve year old virgin, Ms. Holmes stated, "I did
not make the initial comment about him (Eugene Casole) wanting a 12-year old virgin,

000105

someone else said that. However, I did restate the comment in that I said you can't have a 12-year old virgin and I don't think that is what you want."

**Background:**
*As I recall, Ms. Holmes made the comment on two different occasions. The first incident occurred in Room 314, Ms. Holmes and Hazel's office, and the second incident, which Ms. Holmes addressed in her statement, in Mr. Busch's old office, Room 318.*

*On January 5th Mr. Busch and I were in Ms. Holmes and Mr. Hazel's office talking to Ms. Holmes. Mr. Hazel was not working that day. I was sitting behind Mr. Hazel's desk and Mr. Busch was sitting in a chair near Mr. Hazel's desk. It was a casual conversation, often humorous. There was some discussion about women, dating, and marriage. I am still single—never married. As I recall, Mr. Busch was teasing me about my personal values, stating that I wouldn't live with a woman, that I didn't want a divorced woman, etc. It was then that Ms. Holmes stated that I wanted a twelve-year old virgin.*

*The incident was repeated in Room 318, Mr. Busch's old office. Again, it was only the three of us, Ms. Holmes, Mr. Busch, and me. Ms. Holmes reiterated her earlier comment verbatim. She further took it upon herself, I believe, to tell me in her nasty little way that forty-year old virgins didn't exist. I don't believe I responded.*

*Really, was that appropriate? I am forty-eight years old. I have nieces and nephews that are twelve years of age. A twelve-year old girl is a child. That was more than an inappropriate remark—it was suggestive, disgusting, and vulgar. Moreover, Ms. Holmes made the same remark on another occasion. I was speechless and embarrassed when Ms. Holmes made the remarks.*

**In regards to Ms. Holmes restating the comment, this is not true.** In his sworn statement, Mr. Busch clearly stated that she made the comment and that these types of conversations were normal in the workplace, "Ms. Holmes commented that what he (Eugene Casole) wanted was a 12 year old virgin. It didn't go anywhere else and ended there; these types of conversations were normal in the office." **The fact that Mr. Busch stated that these types of conversation were typical and occurred in the workplace clearly indicates that informality existed, too.**

Ms. Holmes may be correct that the comment was initially made by "someone else," namely Mr. Busch, but it is untrue that she re-stated it. After reading Ms. Holmes' statement, I subsequently approached Mr. Busch and asked if he had made the comment. Mr. Busch admitted doing so. **I have a question: Why didn't Personnel question Mr. Busch on this issue?** Why, because, I believe, Personnel wasn't interested in implicating Ms. Holmes or anyone else with misconduct and simply wanted to sweep it under the rug. Nonetheless, Mr. Busch acknowledged to me that he heard Ms. Holmes made the same comment on two separate occasions. Moreover, Mr. Busch advised me after Messrs. Busch and Hazel telephoned Ms. Holmes on January 28th that

EXHIBIT 1
Page 32 of 44 Pages

000106

31

**she admitted making inappropriate remarks to me.** In Mr. Busch's conversation record, dated January 29th, he stated, "Vella said that she kids around too and probably says some things she shouldn't say." I believe she was referring to the above incidents.

The facts are that Ms. Holmes made the comment on two different occasions while Mr. Busch was present; that she subsequently acknowledged doing so to Messrs. Busch and Hazel on January 28th during a conference call; that Ms. Holmes' comments were made prior to the January 27th incident, with the most recent incident occurring on January 5, 2004, **and that Personnel, I believe, intentionally ignored the issue.**

In regards to the January 27th incident, Ms. Holmes stated, "I heard Eugene say to me 'what do they call a person like you in your neck of the woods.' I replied 'what do you mean' to which Eugene replied 'don't they call that a vamp, isn't that what you are, an opportunist.'"

Again, Ms. Holmes is not being truthful, and I believe it's intentional. If one refers to Mr. Hazel's "Record of Inappropriate Conversation," which appears to be more accurate than Mr. Hazel's sworn statement and coincides with my February 11th affidavit to Personnel, there is no verbal exchange between Ms. Holmes and me when I make the comment to Mr. Hazel, "What do they call an opportunist from your neck of the woods?" Before Mr. Hazel replied, I said, "I think they call them vamps?" It was Mr. Hazel, not Ms. Holmes, who responded to my last comment. Mr. Hazel said, "Not in my neck of the woods." Again there was no verbal exchange at that juncture or going forward between Ms. Holmes and me. Mr. Hazel stated, "At that point, I looked at Kay (Ms. Holmes) and she looked at me in disbelief." And, then Mr. Hazel stated, "Eugene continued in discussing what he thought a "vamp" was …."

In regards to when I returned to Room 314 with a dictionary, Ms. Holmes stated, "A few other individuals came into the office and then Eugene returned to our office with a dictionary and said 'Vamp…an unscrupulous woman who uses her feminine wiles to advance her position, now that's you, right?"

Again, this is not true. This is not the definition that appears in the dictionary which I retrieved from my office. I believe Ms. Holmes is simply making things up. The dictionary that I used is a standard copy issued to staff officers and clerical personnel in the division. It is a red hardback book entitled "WEBSTER'S II, New Riverside University Dictionary (Property of the U.S. Government), The Riverside Publishing Company, and Ms. Holmes' "definition" does not appear in that dictionary.

As I recall, when I returned, I found Ms. Roslyn Brogdon, compliance specialist, EED, sitting in the chair next to Mr. Hazel's desk. Mss. Holmes and Brogdon and Mr. Hazel were having a conversation. I didn't capture what they were talking about. I positioned myself in front of Ms. Holmes' desk, opened the dictionary to the word "vamp," and read the definition: "vamp (vamp) [Short for Vampire] Informal. -n. An unscrupulous woman who seduces or exploits men." As I read the sentence aloud, I paused, edited and commented on portions of the definition, accepting some language and qualifying it with

EXHIBIT 2

Page 32 of 94

a comment and dismissing other language and commenting on it. Specifically, I read "An unscrupulous woman" and facetiously stated, "You're like that." When I read aloud, "...who seduces..." I stated, "I don't know about this stuff," and waived my left hand over the dictionary in a gesture to dismiss this fragment, but then commented on the later part, "...or exploits men," again, in a kidding manner, "Yeah, you're kind-of like that, too."

Moreover, Ms. Holmes version doesn't coincide with either Mr. Hazel's version as captured in his "Record of Inappropriate Conversation" or Ms. Brogdon's version as provided in her sworn statement. **In fact, inaccurate as Mr. Hazel and Ms. Brogdon's versions are, they are more similar to my version than what Ms. Holmes indicated occurred. I have a question: Why didn't Ms. Gayle or Personnel see that? Why, because they didn't want to see it.**

Ms. Holmes then stated, "I know that Eugene was not joking when he said it; while we may engage in chit chat, we don't joke with each other like that, not that I ever recall." Really? I don't think so. **The fact that Ms. Holmes made inappropriate comments to me, with sexual overtones, prior to this incident tells me differently.**

Because both Messrs. Busch and Hazel subsequently advised me that Ms. Holmes was offended by my comments and because Mr. Busch encouraged me to apologize, I did so. My intention was never to hurt her. As I recall, on Thursday morning, January 29, 2004, I went to Room 314 and saw Ms. Holmes behind her desk. Mr. Busch was also there. I approached Ms. Holmes and stated, "I hurt you" and gave her a peck on the check. She stated, "Eugene, what really hurt the most is that you believe those things about me." Apparently, Mr. Busch was there the entire time and heard everything. Mr. Busch later told me that Ms. Holmes was very concerned that Mr. Busch saw me give Ms. Holmes a peck on the check, that Mr. Busch would tell someone, and that it would be misinterpreted. Accordingly to Mr. Busch, she was concerned about it and warned him not to say anything to anyone. I ended my apology to Ms. Holmes, which only lasted three minutes, by stating to her, "But, that's what people are saying. We can talk about it later, if you want."

Ms. Holmes, on the other hand, has another version. She stated:

EXHIBIT 2
Page 34 of 94 Pages

> At one point Eugene came in the office while I was there with Frank Busch and said he was sorry and that he didn't mean to upset me. I told Eugene that I didn't understand why he said that but that I accept your apology and I don't want to discuss this further. Eugene leaned over and kissed me on my check and said thank you, then left. I asked Frank what all that was about and Frank said that he didn't know and that Eugene is Italian. The kiss upset me because I didn't know where it came from. I even asked Frank not to mention it because it was embarrassing.

Again, Ms. Holmes has a different version of what occurred, particularly after I gave her a peck on the check. According to what Mr. Busch related to me in my office shortly after I apologized, Ms. Holmes was concerned about my welfare and actually warned

000108

Mr. Busch not say anything to anyone. **I have another question: Why didn't Ms. Cantres question Mr. Busch about this issue? Why was she content with only hearing Ms. Holmes' version—after all Mr. Busch was present and Personnel did subsequently use the incident to support its 2nd Specification. Why, because it would have damaged Personnel's case against me.**

Later in the day, I was speaking with Mr. Ajibade Ogundipe in his office. I had not mentioned the January 27th incident to him, but, judging from his reaction to me, he appeared to have knowledge of the incident. When I asked him what he knew, he told me that someone in the division told him about it. Mr. Ogundipe's concern was that the incident could be construed as sexual harassment. I disagreed at first, but then I decided to approach and speak to only those individuals that were in the room the day the incident occurred.

I briefly met with Ms. Brogdon in her office and asked her if she thought the incident could be construed as sexual harassment. Ms. Brogdan didn't know, and she said that several times to me.

I briefly met with Mr. Hazel in my office and asked him if the incident could be construed as sexual harassment. His response was no.

I then went to see Ms. Holmes in her office in Room 314. She was speaking with Mr. Miguel Figarella, compliance specialist, EED, so I left. A couple of minutes later I returned to see if she was available, but she wasn't—she was still speaking with Mr. Figarella. I was very anxious to speak to her about this issue. I waited a couple of minutes and then went again to Room 314. When I arrived, I noticed that Mr. Figarella was just leaving. I walked in the office and asked if I could speak with her. She motioned to me to sit down, and I did. Moments later, Mr. Hazel got up from his desk and left the room. I asked her pointblank if she felt that I had sexually harassed her. She said no and motioned with her right hand in a negative gesture.          **EXHIBIT** _2_

I then asked Ms. Holmes if she knew why I used those words, "unscrupulous, exploitive, etc." I explained that was what I was hearing and what people were saying. I posed several indirect questions to her. I asked her if it was ethical to have someone write your application for promotion, and if it was ethical to say that you wrote a case if you didn't. She stated that she wrote her own application and side-stepped the question about the case (La Grou), stating that it was a team effort. She also said she couldn't stop people from talking. I reminded her of the incident (case-swapping) with Mr. Hazel in a vague way and told her that I was purposely being vague because I didn't want there to be any more hard feelings among us at Headquarters. She simply shook her head and gestured that she didn't know what I was talking about. I told Ms. Holmes that she didn't have to do that—that I would teach her how to review cases, that I would help anyone, and that I helped train Michele Long, compliance specialist, EED, when Ms. Carol Seymour wanted to make her an Assistant District Manager for Enforcement (ADME). I also told her that I wanted to approach her earlier, but that I didn't. Ms. Holmes explained that she came to Washington to learn something, that she thought she was smart and could learn

**Page** _25_ **of** _94_ **Pages**

000109

how to review cases, and I agreed. I told her that I wouldn't "bother her anymore" (about the issue). Nothing else was said. I then left and haven't spoken to Ms. Holmes since the incident, other than to greet her.

Ms. Holmes, however, has a different version. In her sworn statement, Ms. Holmes stated:

> At approximately 4:00 Eugene came into my office while I was alone and told me that he was told that the incident could be considered sexual harassment and asked me if I thought it was sexual harassment; I told him that I didn't want to discuss it. Then Eugene told me why he thought I was unethical and the rumors that were going around about me such as the fact that I did not write my own application; I explained to Eugene that I did write my own application and that although I did seek assistance in that I had some others review and comment but I wrote my application. Then Eugene said other things like the big case I worked on and that I took credit for writing the whole thing; I told him that I never took credit for writing the whole thing that it was a team effort. Eugene also said that I took someone else's view of a case assigned to me and presented it as my own. Gary (Mr. Hazel) walked into the office at this point and Eugene left the office.

In a few words, Ms. Holmes entire recollection of this specific incident is inaccurate and inverted, and I believe that it was done intentionally and with a purpose in mind. Even her last sentence is inaccurate, namely, Mr. Hazel was present when I entered Room 314 and began speaking with Ms. Holmes. In an undated memorandum, Mr. Hazel stated, "On Thursday evening at approximately 4:00 PM, Eugene Casole came into the office that I share with Ms. Vella Kaye Holmes and stopped to speak with her." Mr. Hazel then stated that he left the room, "I was gone from the room approximately 3 minutes."

The other point I want to make is, considering my frame of mind, the fact that moments earlier I was advised by a co-worker that my comments could be construed as sexual harassment and my eagerness to speak with Ms. Holmes, why then would I want to aggravate the situation further with Ms. Holmes by being accusatory? Knowing all the facts, why then would anyone say or do the things that Ms. Holmes stated happened during that meeting? It doesn't make any sense. **Ms. Holmes' account of what occurred when I re-approached her makes no sense at all. I believe that it's simply another fabrication and effort by Ms Holmes to incriminate me.**

**EXHIBIT** 2

**Page** 36 **of** 44 **Pages**

**Signed/Sworn Statement—Gary D. Hazel:**
In his sworn statement, Mr. Hazel first stated, "I have not heard or participated in any conversations of an inappropriate nature," but then re-stated it to read, "**I do not remember** participating in any conversations of an inappropriate nature." Mr. Hazel did it again—He first stated, "I have not had previous conversations with Mr. Casole regarding Ms. Holmes," but then re-stated it to read, "**I don't remember** having previous conversations with Mr. Casole regarding Ms. Holmes." He further stated, "I also have not heard anyone telling jokes of an inappropriate nature."

000110

Mr. Hazel's statements are not true. For example, I can recall an incident occurring in late 2003. I had walked around the corner from my office to see Mr. Busch. I can't recall why I approached him. In any event, I either met Mr. Busch in the corridor, near Room 314, Mr. Hazel and Ms. Holmes' office, or we both walked into Room 314 together. As I recall, Mr. Hazel was behind his desk, and Ms. Holmes was not in the office at the time. Mr. Busch and I were standing in the middle of the room. I asked Mr. Hazel, "Where's Vella?" As Mr. Hazel slowly got up from his desk, he allegedly said, "Well, she's right here under my desk!" He then, allegedly, began jerking his buttocks in and back and forth motion and called out Ms. Holmes' first name several times. Mr. Busch and I just looked at each other, blushed, and laughed hysterically.

There was also an incident, which I mentioned earlier under "Informality Existed," where I walked down the corridor towards Mr. Busch's old office, and I saw Mr. Busch standing near the entrance of Room 314, Ms. Holmes and Mr. Hazel's office. Mr. Busch allegedly leaned over to me and stated that Ms. Holmes allegedly showed Mr. Hazel the spider veins on her legs. I then asked Mr. Hazel if that was true. Mr. Hazel paused for a second and then allegedly stated, "Yes, she did." Mr. Busch and I just laughed.

I also recall another incident which occurred underneath the 2nd floor overhang at the CQB. I believe it was during the summer of 2003 because Mr. Hazel and I were only wearing a shirt. Mr. Busch was the only one wearing a sports jacket, but he always a jacket. Like so many of our conversations, this one was also about Ms. Holmes, specifically about her trip to Artesia, New Mexico. I believe Ms. Holmes had gone to Artesia to take the Basic Compliance Officer course. Allegedly, Ms. Holmes was seen, by others attending the training, drinking heavily and in the company of Supervisory Compliance Officer Darren Sisk. I don't know if Mr. Sisk is married. In any event, one evening Ms. Holmes allegedly got so drunk that she had to be carried to her room. In regards to our conversation, I can't recall if it was Mr. Busch or Mr. Hazel that allegedly insinuated that Ms. Holmes was promiscuous and that she just "gives it away." I'm not sure who made the remark. I then joking stated that I was interested. Mr. Hazel responded to my comment by allegedly telling me that if I were to indulge and because Ms. Holmes' vagina was so large that he would have to throw a rope around my neck to pull me out after I fell in. Mr. Busch and I heard that remark loud and clear. It was so graphic that it will forever be imprinted in our memory.

EXHIBIT 2
Page 37 of 94 Pages

Incidentally, in his sworn statement, Mr. Torres, staff officer, confirmed that jokes were told but refrained from identifying any person(s), "Some individual joke but mostly among themselves and not in the open, no one in particular." Mr. Bossler, a program manager in EED, acknowledged in his sworn statement that he heard jokes of an inappropriate nature, "I have heard jokes of an inappropriate nature, but only on rare occasions." Mr. Busch and Ms. Brogdon both acknowledged that jokes or comments of an inappropriate nature occurred in the workplace. **Yet, Mr. Hazel denied it, "I also have not heard anyone telling jokes of an inappropriate nature."** How is that possible? He interacts with everyone in both divisions at the CQB and is neither a loner nor does he keep his door closed. **The problem, I think, is that Mr. Hazel simply can't answer a question honestly, which, incidentally, undermines his credibility.**

000111

In regards to the January 27th incident, Mr. Hazel provided conflicting information to Ms. Cantres. He first stated, "I was present on January 27, 2004 when Mr. Casole indicated that Ms. Holmes was a vamp." In the following paragraph of his sworn statement, Mr. Hazel then stated, "He (Eugene Casole) made comments about those that may be applying for the position and that some of them were opportunistic (opportunists) then he looked at Ms. Holmes and said 'sort of like you, what do they call that in your neck of the woods' and called her a vamp." In Mr. Hazel's "Record of Inappropriate Conversation," which he provided to Ms. Cantres, he presented a different narrative. Mr. Hazel stated:

> On 01/27/04, at approximately 12:23 PM, Mr. Eugene Casole came into my office area and sat down and started discussing the potential candidates for the (CID) deputy director position. After making several comments concerning the potential candidate(s), Mr. Eugene (Casole) looked across the room at Ms. Vella Kaye Holmes and said something to the effect, "You're opportunistic (an opportunist). What do you call someone from your neck of the woods who's opportunistic (an opportunist)? Vamp." Eugene appeared to be smiling.

Mr. Hazel further stated, "Eugene continued in discussing what he thought a 'vamp' was, 'Someone who used their charms with men to advance their position.'" This quote by Mr. Hazel is inaccurate, and although Mr. Hazel's narrative, on the whole, captures the incident better than his sworn statement, it also is not entirely accurate. As I recall, I teased Ms. Holmes, stating I thought she was an opportunist. There was also a three or four-minute dialogue between Ms. Holmes and me regarding what an opportunist was. Because Ms. Holmes and Mr. Hazel didn't know that the word "vamp" also meant charmer, I told them so. I then explained that I looked at Ms. Holmes as a charmer— someone who gets men to do things for her.

For example, I mentioned earlier of an incident where Mr. Hazel was mislead into reviewing a case for Ms. Holmes, which resulted in Ms. Holmes taking full credit for Mr. Hazel's work product. I also mentioned how unusual it was that Mr. Safian authorized Ms. Holmes and Mr. Hazel's attendance at the National Conference in Reno, Nevada, and Mr. Safian's sudden inspiration to re-announce the liaison program manager job as a straight GS-13 position—so that Ms. Holmes could possibly apply for the position. Ms. Holmes was also successful last April in persuading Mr. Martin Hickman, deputy director, CID to let her fly from Washington, D.C., to San Antonio, Texas, so that Ms. Holmes and Supervisory Compliance Officer Tina Henarie could drive together to Artesia, New Mexico, for a Compliance training course. What? I never heard such a thing. Was it financially advantageous for the government? I have no idea. My point is that neither Mr. Hazel nor Mr. Hickman supervised Ms. Holmes at the time when she received these perks. How does one explain this influence that Ms. Holmes has over men? Simple—Ms. Holmes is a charmer.

EXHIBIT 1
Page 38 of 94 Pages

In his conversation record, Mr. Hazel then described what occurred when I returned with a dictionary. He stated, "At that point Eugene (Casole) came back into the room holding a

000112

37

dictionary. He stood in front of Kay's desk, looked up the word 'vamp' in the dictionary and read it aloud to her, then said something to the effect 'Isn't that you?'" Actually, Mr. Hazel captured it pretty well, but his narrative still isn't entirely accurate. Because it appeared to me that Ms. Holmes and Mr. Hazel, still didn't understand how I was using the word, I returned with a dictionary. I did more than just read the definition of the word "vamp," I accepted some parts of the definition, qualified other parts, and dismissed other parts altogether.

As I indicated in my February 11th affidavit to Personnel, this is what occurred: When I returned, I found Ms. Roslyn Brogdon, compliance specialist, EED, sitting in the chair next to Mr. Hazel's desk. Mss. Holmes and Brogdon and Mr. Hazel were having a conversation. I didn't capture what they were talking about. I positioned myself in front of Ms. Holmes desk, opened the dictionary to the word "vamp," and read the definition: "vamp (vamp) [Short for Vampire] Informal. -n. An unscrupulous woman who seduces or exploits men." As I read the sentence aloud, I paused, edited and commented on portions of the definition, accepting some language and qualifying it with a comment and dismissing other language and commenting on it. Specifically, I read "An unscrupulous woman" and facetiously stated, "You're like that." When I read aloud, "…who seduces…" I stated, "I don't know about this stuff," and waived my left hand over the dictionary in a gesture to dismiss this fragment, but then commented on the later part, "…or exploits men," again, in a kidding manner, "Yeah, you're kind-of like that, too."

Ms. Brogdon, who was not present during the earlier discussion I had with Ms. Holmes, stated something to the effect that I should be careful about what I say. I then explained to Ms. Brogdon that I just didn't say "vamp," but that I also stated that I thought Ms. Holmes was an opportunist. I didn't elaborate any further—I just let it go.

The following day or January 28th, Mr. Hazel stated, "The next day (or that evening) I spoke with Mr. Frank Busch who was in Mr. Torres' office. We were all stunned that he (Eugene Casole) would say such a thing."

Stunned? I don't think so. As I recall and noted in my February 11th affidavit to Personnel, on Wednesday, January 28, 2004, at approximately 7:30 A.M., after using the 1st floor restroom and while returning to my office through the exit door, I heard some loud talking and laughter to my right—at the far end of the corridor. There were a couple of staff officers from the division near Room 314, and they were talking and laughing about yesterday's incident regarding Ms. Holmes. I didn't say anything. I just went to my office and closed the door.

Approximately thirty minutes later, Messrs. Busch, Hazel, and Carlos Torres, compliance specialist, criminal/civil branch, all came into my office, each holding a dictionary (WEBSTER'S II, New Riverside University Dictionary). They were playing a gag on me. Someone stated, "What's the word of the day?" I didn't say anything—I just listened. And then someone else said, "We all know that's true about Vella Kay, but you didn't have to tell her."



EXHIBIT 7
Page 39 of 94 Pages

In his sworn statement, Mr. Hazel admitted coming into my office with Messrs. Busch and Torres. He stated, "On January 28, 2004, **I did go into Mr. Casole's office along with Mr. Busch and Mr. Torres. The three of us entered the office carrying dictionaries and asked him what the word of the day was."** But, Mr. Hazel denied hearing the comment, "We all know that's true about Vella Kaye, but you didn't have to tell her."

Is it possible that Messrs. Hazel, Busch and Torres were the staff officers that I observed earlier in the corridor, near Room 314, that were loudly talking and laughing about the January 27th incident before coming to my office. Yes, I think so. I'll remind you what Mr. Hazel stated in his signed statement: He said, **"We were all stunned that he (Eugene Casole) would say such a thing."** Really? Gathering from Messrs. Hazel, Busch and Torres' subsequent actions, it appeared that none of these individuals suffered any lingering effects from my comments to Ms. Holmes.

In regards to the comments made in my office, Mr. Hazel acknowledged hearing the first comment, but denied hearing the second comment. Again, Mr. Hazel denied hearing anything, "**I do not recall** hearing anyone make a comment indicating "we all know she is one but you didn't have to tell her…" **Actually, both comments were allegedly made by Mr. Busch.** Because the incident happened so fast, I was unable at the time to determine who made the comments or to quote the person verbatim at the time. Subsequently, Mr. Busch allegedly acknowledged to me that he made both comments.

In his sworn statement, Mr. Hazel also denied telling me that I had "pissed off" Ms. Holmes. The incident happened on the afternoon of January 27th, at approximately 4:30 P.M. in the 3rd floor restroom at the CQB, and was captured in my February 11th affidavit to Personnel. Did I make it up? **I don't think so, particularly because, like other numerous occurrences, I captured the details of this incident.** Mr. Hazel, on the hand, can only repeatedly deny making such statements.   **EXHIBIT** 2

**Page 40 of 94 Pages**

**Signed/Sworn Statement—Roslyn A. Brogdon:**
In her sworn statement, Ms. Brogdon stated, "I am not aware of any jokes or comments of an inappropriate nature, at least I have not seen anyone upset over any of the jokes told." Ms. Brogdon statement is contradictory. The incident with the dolls, which was mentioned earlier under "Informality Existed," placed Mr. Busch, Ms. Brogdon, and me in Room 318 of the CQB. Mr. Busch then explained to me that Mr. Torres liked to play with Ms. Brogdon's dolls. In his sworn statement, Ms. Brogdon stated, "Some of the guys have made fresh comments about the way someone has posed one or when someone put their legs over their heads." I believe Ms. Brogdon intentionally avoided naming Mr. Torres as the "someone" who played with the dolls. **I have a question: Why didn't Ms. Cantres press the issue and ask Ms. Brogdon to identify the person? This specific incident was noted in my February 11th affidavit, which was provided to Personnel before it began its investigation at the CQB. The fact is that Personnel wasn't interested in learning of or pursuing other employee misconduct— Personnel's investigation, I believe, was about "getting" Eugene Casole.** In spite of Mr. Van Blargan's March 31, 2004 letter to me acknowledging "allegations of reported

000114

<u>misconduct activities among OPEER employees</u> located at the CQB," **I was always the only target of the investigation.**

In regards to the "comments" that were made about the dolls, Ms. Brogdon stated, These comments were made by the guys and I have not heard any women making these comments. Not all the guys made the comments, usually just Carlos Torres, Frank Busch and Eugene Casole."

Actually, Ms. Brogdon is incorrect in implicating me. I never made comments about the dolls; I jokingly ridiculed Mr. Torres about playing with Ms. Brogdon's dolls. I also never manipulated the dolls' legs. And I always kidded Mr. Torres while Ms. Brogdon was present because it made her laugh—it was a routine that I used and practiced to make Ms. Brogdon laugh. It would go something like this: When I saw both Mr. Torres and Ms. Brogdon together, I would approach Mr. Torres and say, "Carlos, are you still playing with Roslyn's dolls? Carlos, did I not tell you to please stop that, you pervert!" That was the routine I used to make Ms. Brogdon laugh and was the extent of my involvement with the dolls.

In regards to the January 27th incident, Ms. Brogdon stated that she entered Ms. Holmes and Mr. Hazel's office after I returned with the dictionary and that she was aware of an earlier conversation I had with both of these individuals. Without knowing the content of my earlier conversation with Ms. Holmes and Mr. Hazel or what I specifically said or attempted to explain to Ms. Holmes or Mr. Hazel, Ms. Brogdon attempted to explain the entire incident to Ms. Cantres by stating that, "Eugene read the definition of the word vamp and kept telling Vella (Ms. Holmes) that was her."

**I really do take exception to this. Ms. Brogdon, without witnessing anything other than when I returned with the dictionary, attempted to explain what all transpired. And, then, Ms. Brogdon made assumptions, stating, "The way Eugene said it made me think that he probably thought that way about other women."**

Equally important, I think, is that Mss. Holmes and Brogdon have more than a working relationship. I believe they go to lunch together and that Ms. Brogdon has been to Ms. Holmes' apartment and watched her apartment while Ms. Holmes was away on travel. I, on the other hand, have never had more than a working relationship with Mss. Holmes or Brogdon or Messrs. Busch, Hazel or Torres.

In regards to the aftermath of the January 27th incident, Ms. Brogdon stated, "A few days later Frank Busch told me that Eugene said some other negative things about it (About the incident?) Then I heard he said something else to Vella Kaye (Ms. Holmes). **Ms. Brogdon's knowledge of what occurred after the January 27th incident is based on distorted second-hand information—rumors and misrepresentations, I believe, spread by Ms. Holmes after I approached her on January 29[th], which I subsequently explained and refuted.**

000115

40

**Signed/Sworn Statement—Frank N. Busch:**

In his sworn statement, Mr. Busch stated, "I think that Ms. Holmes' selection had been bothering Mr. Casole for some time." Actually, Mr. Safian's selection of Ms. Holmes for the staff officer position in the criminal/civil branch of EED bothered me no more than when CID Director Mr. Zygmunt Sala's selected Mr. Larry Hortert for the Northeast regional manager position, or when Mr. Joseph D. Priore and Ms. Lauren Behar were selected for supervisory compliance officer positions in Philadelphia and New York City, respectively. The fact is that none of these individuals were the best qualified and selected solely on merit. The fact is that many people who knew the particulars and understood the politics would agree with me that politics, favoritism, and nepotism were the determining variables in selecting these individuals for these positions. And, the fact is that these selections not only bothered me and Mr. Busch and others at headquarters but also many compliance officers in the field.

Mr. Busch then said, "During the meeting (March 5, 2003) when Mr. Safian announced his selection of Ms. Holmes, Mr. Casole stood up and loudly told him to justify the selection." Unfortunately, Mr. Busch's recollection of the March 5th incident is inaccurate. I neither stood up nor loudly asked Mr. Safian to justify his selection of Ms. Holmes, and there were plenty of witnesses in the conference room that can verify this. As I recall, I was sitting directly across from Mr. Safian when he advised everyone of his selection. He then immediately began praising Ms. Holmes, stating that she was very experienced and had written the La Grou case, which received a lot of acclaim from Under Secretary Elsa Murano. When I turned to Mr. Safian and asked if Ms. Holmes wrote cases, he replied that she did and turned away—ignoring me. I again approached Mr. Safian and indirectly asked if Ms. Holmes wrote cases, explaining that I, at the time, had been in Washington eight years and knew all the compliance officers, those that knew and those that didn't know how to write cases, and that I couldn't understand why I never heard of Ms. Holmes. I then asked him if he could justify his selection—with a "yes" or a "no." Mr. Safian didn't reply; he couldn't. Mr. Safian knew he had intentionally exaggerated Ms. Holmes qualifications to everyone in the division to justify his selection. The incident was more fully captured in an April 9, 2003, e-mail that I sent to Messrs. Van Blargan and Hicks and Ms. Linda Collins, EEO Counselor/Mediator, (copy enclosed).

Mr. Busch then summed it up by saying, "I think that Mr. Safian handled the situation well because I would have told him right there that I didn't have to prove anything to him." Really? What Mr. Busch didn't understand but perhaps understands more clearly now is that, irregardless of who the selecting official is, whether it be Messrs. Hicks, Van Blargan, Sala or Safian, the selecting official must follow the Merit Promotion Plan and always pick the most qualified applicant. In light of the fact that Mr. Busch recently lost the program manager job in the criminal/civil branch to Mr. Luis Zamora, who Mr. Busch and others in the division believe was less qualified and pre-selected for the position, I believe Mr. Busch's sentiments on the subject have dramatically changed.

In his sworn statement, Mr. Busch acknowledged telling and hearing other "staff members" tell jokes that perhaps were not appropriate. He stated, "I have told some

EXHIBIT 2
Page 42 of 94 pages

000116

41

jokes in the company of Mr. Torres and Mr. Figarella but only because I have a really good relationship with them. I have heard some of the other staff members tell jokes that may be inappropriate."

In regards to the incident with the dictionaries, Mr. Busch admitted that he and Messrs. Hazel and Torres came to my office and played a "joke" on me. He also acknowledged making the comment, "What's the word of the day?" However, Mr. Busch never addresses the second comment, stating only that, "I had told Mr. Casole that even if he thought the comments he made about Ms. Holmes to be true, he should not have said that."

The fact is that before Messrs. Busch, Hazel and Torres came into my office with dictionaries they would have had to first meet and discuss their little gag. Were Messrs. Busch, Hazel and Torres the individuals I heard on January 28th at the far end of the corridor loudly talking and laughing about the January 27th incident. Yes, I think so. All three individuals freely admitted coming into my office with the dictionaries and commenting, "What's the word of the day." And, as I indicated earlier, when approached, Mr. Busch did allegedly admit making both comments to me.

**Signed/Sworn Statement—Carlos N. Torres-Lopez:**
In his sworn statement Mr. Torres' stated, "To my knowledge there are no conversations of inappropriate things, mostly about the cases and things like that." This is not true, and Mr. Torres knows that. I have known Mr. Torres for approximately six years, and I can say, without hesitation, that Mr. Torres and I allegedly had numerous informal discussions about sex and specific women in the division and other women in the Agency. In fact, some of these discussions allegedly occurred when either Messrs. Busch or Figarella were in my office. The notion that two men, who have known each other for years, do not have general conversations about women and sex is naïve and unrealistic. Conversely, it's unrealistic to think that the same two men cannot have a decent conversation without using profanity or discussing sex.

Mr. Torres also stated, "I have never seen him (Eugene Casole) joke in any way. That's not true. For example, I stated earlier that I occasionally joked with Mr. Torres when Ms. Brogdon was present about Mr. Torres playing with Ms. Brogdon's dolls because it made Ms. Brogdon laugh.

In response to the January 27th incident, Mr. Torres stated, "I would not have joked like that but Ms. Holmes did not appear to be upset by the comment." I don't think Mr. Torres is being very truthful. Prior to the January 27th incident, Mr. Busch advised me of an incident which occurred in Mr. Busch's old office, Room 318 at the CQB. The incident was mentioned earlier under "Informality Existed." It involved Ms. Holmes when she allegedly wanted to show Mr. Busch that she could lift her leg over her head. As I recall, Mr. Torres allegedly asked Ms. Holmes if she would lift her leg over her head for him. According to Mr. Torres, Ms. Holmes declined. I believe Mr. Torres initially advised me of this in Mr. Busch's old office and then, again, on one other occasion in Mr. Torres' office.

000117

EXHIBIT 2    Page 43 of 94 pages

Mr. Torres further stated, "I have not heard anyone else make comments about Ms. Holmes." This, too, is not true. As recently as September 30, 2004, Mr. Torres allegedly came into my office and advised that someone during the OPEER National Conference in Reno, Nevada, observed Mr. Safian and Ms. Holmes spending a lot of time together—it was that noticeable and that this person believed that Mr. Safian and Ms. Holmes were intimately involved.

I can recall another incident in June 2004 regarding Ms. Holmes. Apparently Ms. Holmes and Mr. Wolseley were going to receive an award from the Secretary of Agriculture for the La Grou case. Mr. Busch had advised me of it on June 24, 2004. I cannot recall if both Messrs. Torres and Busch came into my office together or separately, but both were allegedly critical and mentioned that Ms. Holmes should not have received the award.

**Signed/Sworn Statement—Wayne N. Bossler:**
Mr. Bossler is a program manager and my first level supervisor. During Mr. Bossler's interview with Ms. Cantres, Mr. Bossler acknowledged from the outset that he heard jokes of an inappropriate nature at the CQB, contradicting Mss. Holmes and Brogdon and Messrs. Hazel and Torres and confirmed what Mr. Busch and I have acknowledged from the beginning. Mr. Bossler stated, "I have heard jokes of an inappropriate nature, but only on rare occasions." The fact that a program manager admitted to hearing jokes of an inappropriate nature while his staff officers deny it raises questions about the truthfulness of Mss. Holmes and Brogdon and Messrs. Hazel and Torres' sworn statements.

During the interview, Mr. Bossler, for whatever reason, perhaps to show that I am anti-social, advised Ms. Cantres of a conversation I had with Mr. Bossler in December 2003. The conversation dealt with the annual Christmas party. As a rule and particularly now after filing several EEO complaints against OPEER management, alleging reprisal, I neither have nor will participate in these activities. Mr. Bossler then said that my comments made him uncomfortable, "…that a co-worker could feel this way about his other co-workers." My resentment, as Mr. Bossler is fully aware, is towards OPEER management and Personnel officials. My relationship with most of the employees in CID and EED and with staff attorneys at OGC is friendly and productive. Basically, I am neither obligated nor willing to break bread with OPEER management.

In regards to Mr. Bossler's comment that my refusal to sign my performance appraisal was not because I disagreed with the rating but because of my pending EEO complaints, this is not true, and I have repeated verbalized my position on the matter to Mr. Bossler. As I stated to Mr. Bossler during FY 2003 and most recently during FY 2004 and because my EEO complaints address performance issues which Mr. Safian raised, I will neither agree nor disagree with the rating and therefore declined to sign my appraisals until my EEO complaints are resolved.

EXHIBIT _L_
Page _44_ of _94_ Pages

000118

43

Mr. Bossler also made reference to a discussion he had with Messrs. Busch and Safian several months ago about having to be "perfect." Mr. Busch advised me of that discussion, **and I don't think Mr. Bossler was very honest and forthright with Ms. Cantres when he related the incident to her. I also believe that he intentionally portrayed the incident as he did to shield Mr. Safian's instigating traits.** I think Mr. Busch would agree with me. As I understand it, when Mr. Safian stated that "we need to be perfect," referring to the way cases are processed at Headquarters, Mr. Bossler, allegedly, lost his temper, pointed to his bald head and repeatedly told Mr. Safian that he wasn't perfect, and then he went into his office and slammed the door. As I understand it, **Mr. Safian found that very amusing and was seen smiling and laughing about the whole incident.**

Finally, in regards to Mr. Safian telling Mr. Bossler to "hang in there for a few months," referring to the difficulty Mr. Bossler had in making the transition from staff officer to program manager, **Mr. Bossler, again, I believe, intentionally gave Ms. Cantres and the reader an inaccurate perception of the situation. Again, I suspect that Mr. Bossler did that to protect Mr. Safian from any further embarrassment.** Actually, before Mr. Safian told Mr. Bossler to "hang in there," Mr. Safian allegedly was very disappointed with Mr. Bossler's performance and repeatedly advised him of it (I believe he actually scolded Mr. Bossler on several occasions in the presence of staff officers and other program managers) and was thinking about demoting him. Because Mr. Safian couldn't find a replacement, fortunately for Mr. Bossler, Mr. Safian told him to "hang in there."

**Personnel's "Decision on Proposed Suspension" (Suspension Notice)**
On September 2, 2004, Mr. Safian came into my office at the CQB late in the afternoon and hand-delivered to me a document from Personnel. The document was contained in a 9 by 12-inch blue envelope and labeled "Personal – Attention." For those that don't know, these envelopes are routinely used by Agency personnel to send confidential information. He appeared to be holding two blue envelopes. Mr. Safian sat down in one of the chairs in front of my desk and stated that he was asked by Personnel to hand-deliver something to me. He opened one of the envelopes and handed me a document which appeared to be a "Suspension Notice," it was dated August 27, 2004, and signed by Ms. Kristie Kelm, chief, Employee Relations Branch (ERB) (copy enclosed).

EXHIBIT _1_
Page _45_ of _94_ Pages

The Suspension Notice was addressed to me, originated from Ms. Kelm's office, but went through Mr. Safian and it read, in part:

> In a notice issued July 7, 2004, Tia Gayle, Employee Relations Specialist, proposed that you be suspended from employment for a period not to exceed five (5) days for the charge of **Improper Conduct.**

> After you received the notice proposing to suspend you, you submitted a written response received in our office on July 30, 2004. I gave careful consideration to all

000119

44

the evidence of record, including the letter of proposal and your written reply.

**Specification 1:**

On January 27, 2004, you called Ms. Holmes a "vamp" and then left her office. You returned to her office with a dictionary and proceeded to read the definition of the word.

**Specification 2:**

On January 29, 2004, after apologizing to Ms. Holmes for the January 27th incident, you leaned over and kissed her on the check.

**Written Reply:**

In your reply you stated that because you have named LERD in your November 25, 2003 EEO Complaint, you do not believe that our office would afford you a fair and impartial oral conference or genuinely consider any additional written submittal refuting evidence.

**Finding:**

The evidence supports the Specifications. You have not responded to the specifications or offer any defense for your actions. In the absence of any credible evidence to refute the Specifications, I must find that both Specifications are proven by a preponderance of evidence and is, therefore, sustained.

I have several concerns regarding the content of the Suspension Notice and, like Personnel's "Notice of Proposed Suspension", authored by Ms. Gayle, seriously question Ms. Kelm's objectivity in this matter. **The fact is that Ms. Kelm and other Personnel officials focused on facts which they believed helped their case against me while they blatantly ignored other glaring evidence which allegedly implicated other OPEER employees, namely, Ms. Holmes, Mr. Safian and others, of employee misconduct. My question is: Why would experienced personnel investigators and case reviewers, which is what Mss. Kelm and Gayle are, do that?**

For example, under the Specification 1, Ms. Kelm stated, "On January 27, 2004, you called Ms. Holmes a "vamp" and then left her office." Under the heading, "Analysis of the Penalty," Ms. Kelm further stated, "...I considered the fact that the sworn statements of Ms. Holmes and her supervisor, Mr. Hazel description of event were similar in content regarding your inappropriate behavior, which lends credibility to the charge."

**The fact is that Mr. Hazel contradicted himself in his sworn statement on this very issue.** Mr. Hazel first stated, "I was present on January 27, 2004 when Mr. Casole indicated that Ms. Holmes was a Vamp." In the following paragraph, Mr. Hazel then

EXHIBIT $\underline{L}$

Page $\underline{46}$ of $\underline{94}$ Pag

000120

45

stated, "He (Eugene Casole) made comments about those that may be applying for the position and that some of them were opportunistic (opportunists) then looked at Ms. Holmes and said 'sort of like you, what do they call that in your neck of the woods' and called her a Vamp." **And, Mr. Hazel is silent on the point in his "Record of Inappropriate Conversation," dated January 28, 2004, as to whether I indicated or called Ms. Holmes a vamp,** stating, "After making several comments concerning the potential candidate, Mr. Eugene (Eugene Casole) looked across the room at Ms. Vella Kaye Holmes and said something to the effect, 'You're opportunistic (an opportunist). What do they call someone from your neck of the woods who's opportunistic (an opportunist)? Vamp.' Eugene appeared to be smiling." As I stated earlier, because Mr. Hazel's "Record of Inappropriate Conversation" is dated January 28th, the day after the incident and is similar, though not entirely accurate, to my February 11th affidavit that I provided to Personnel, one is provided with a more accurate glimpse of what actually occurred and was said.

According to Ms. Kelm, Mr. Hazel and Ms. Holmes' sworn statements were similar in content in describing the incident. I don't think so. In fact, according to Ms. Holmes' version, she engaged in a dialogue with me, and that never happened, "I heard Eugene say to me 'what do they call a person like you in your neck of the woods.' I replied 'what do you mean' to which Eugene replied 'don't they call that a vamp, isn't that what you are, an opportunist.'" On the contrary, **I would argue that Mr. Hazel's January 28th "Record of Inappropriate Conversation" and my February 11th affidavit are, in fact, more similar in content on this point.**

Actually, the only similarity I see between Mr. Hazel and Ms. Holmes' sworn statements are when they allegedly told me to be quiet and leave the room after I made my comments, which, incidentally, never happened. According to Mr. Hazel, he stated, "I told Mr. Casole to be quiet because it was not funny and Ms. Holmes told him to be quiet." Ms. Holmes stated, "I told Eugene to be quiet and Gary told him that he should leave and he did." However, according to Mr. Hazel's "Record of Inappropriate Conversation," I didn't leave and continued talking, "Eugene continued in discussing what he thought a 'vamp' was, 'Someone who used their charms with men to advance their position." Again, this is another excellent example, I believe, of how untruthful and manipulative Mr. Hazel and Ms. Holmes have been throughout the entire investigation. **It also tells me that these blatant inconsistencies, like so many others in the investigative report, were intentionally overlooked and never addressed by Personnel officials. Why did this occur so often—because the investigation was a farce from the outset, was never intended to be a full, complete, and impartial, and was simply an all out effort, I believe, "to get" Eugene Casole.**

Under the heading "Finding," Ms. Kelm stated, in part, "You have not responded to the Specifications or offer any defense for your actions. In the absence of any credible evidence to refute the Specifications, I must find that both Specifications are proven by a preponderance of evidence and is therefore, sustained."

EXHIBIT 2

000121

46

Ms. Kelm's contention that I never responded to Personnel's Specification is blatantly untrue, and she knows it. In fact, I addressed these issues in my February 11th affidavit (copy enclosed) before Personnel referred to them as Specifications in its Suspension Notice. Before I was abruptly "detailed" to Omaha, Nebraska, I provided Personnel officials with detailed chronology of the January 27th incident and aftermath.

In regards to Personnel's Specification 1, I explained that from the outset that I took liberties with Ms. Holmes because I and several other employees at the CQB had an informal relationship with Ms. Holmes, and Personnel was provided with numerous examples to support my claim. **In Mr. Busch's sworn statement to Personnel, regarding Ms. Holmes' inappropriate comments to me, he confirmed that informality existed,** "Ms. Holmes commented that what he (Eugene Casole) wanted was a 12-year old virgin. It didn't go anywhere else and ended there; these types of conversations were normal in the office." **What did Personnel officials do with this evidence—they conveniently ignored it.**

In conclusion, under "Analysis of the Penalty," in the Suspension Notice, Ms. Kelm stated, "Clearly, the misconduct is of an extreme serious nature, and strikes at the very core of the agency policy on expectations of employee conduct." **I, in turn, would argue that any employee misconduct is unacceptable, including misconduct allegedly perpetrated by Ms. Holmes and Brogdon and Messrs. Safian, Busch, Hazel and Torres, something which Ms. Kelm and her office were unwilling to address, and in doing so, allegedly discriminated against me.**

**Other Misconduct**
In Mr. Van Blargan's March 31, 2004 letter to me, he stated that the Labor and Employees Relations Division (LERD) (or Personnel) was conducting a full and independent investigation into allegations of reported misconduct activities "among OPEER employees" located at the CQB. **Personnel's investigative report, provided to me on July 28, 2004, blatantly shows misconduct activities among other OPEER employees; yet, I was the only one that was disciplined.** Moreover, in reviewing Mss. Holmes and Brogdon and Messrs. Hazel, Busch, and Torres' signed/sworn statements, it appears that some, if not all, of these individuals allegedly provided false information to Ms. Cantres and therefore perjured themselves, which is a separate misconduct issue in itself. Moreover, during my April 5, 2004 interview with Ms. Cantres in Philadelphia, **I provided extensive documentation and information that allegedly implicated Mr. Safian of serious and repetitive employee misconduct; yet, Personnel failed to expand the personnel investigation and address the misconduct issues.**

EXHIBIT 1
Page 48 of 94 Pages

**Complainant's Issues**

- Personnel officials did not conduct a full, complete, and impartial investigation of the January 27th incident and aftermath

000122

- Results of Personnel's investigation revealed additional employee misconduct; yet I was the only one disciplined

- Personnel and OPEER officials who either participated or oversaw the investigation made prejudice remarks and/or gestures

- My accuser, Ms. Holmes, and all Personnel officials involved in the investigation and aftermath are women, which raises an inference of sexual discrimination

***Allegation – Charge:***

I believe and allege that FSIS Personnel officials, namely, Mss. Robinn Reed, director, Labor and Employee Relations Division (LERD); Kristie Kelm, branch chief, Employee Relations Branch (ERB), LERD; Tia Denise Gayle, employee relations specialist, ERB, LERD; and Ms.Luz Cantres, personnel investigator, ERB, LERD, in collusion with Messrs. Richard T. Van Balrgan, former deputy assistant administrator, Office of Program Evaluation, Enforcement and Review (OPEER); Scott C. Safian, director, Evaluation and Enforcement Division (EED); and Ronald F. Hicks, assistant administrator, OPPER, knowingly, willfully, intentionally, and with malice and forethought, discriminated against me, based on reprisal (prior EEO activity), when the Agency took a disciplinary action against me. I further believe and allege that Messrs. Van Blargan and Hicks orchestrated and coordinated the events which led to a personnel investigation, the investigation itself, and the Personnel's issuance of the Suspension Notice.

This Complaint of Employment Discrimination consists of forty-eight (48) pages, and I hereby solemnly swear and affirm that it is true and complete to the best of my knowledge and belief.

Eugene Casole
Complainant

EXHIBIT 1
Page 41 of 94 Pages

000123

**Affidavit of Eugene Casole**

I, Eugene Casole, am a staff officer with the Evaluation and Enforcement Division (EED), Office of Program Evaluation, Enforcement and Review (OPEER), Food Safety and Inspection Service (FSIS), United States Department of Agriculture.

I am responding to a Personnel inquiry, at the request of Ms. Kristie Kelm, Supervisory Employee Relations Specialist, Labor and Employee Relations Division (LERD), Human Resources Division (HRD), regarding an incident that I was involved in and occurred on January 27, 2004.

Before I explain in detail what happened and what was said, I want to advise that prior to this incident, I and several of the staff officers in EED, more notably, Messrs. Frank Busch, Gary Hazel, Carlos Torres, and perhaps others had an informal working relationship with Mss. Vella Kay Holmes and Roslyn Brogdon. In other words, informality existed within this small clique of people, topics of discussion varied and ranged across the spectrum. I and Messrs. Busch, Hazel, and Torres, actively participated with Mss. Holmes and Brogdon and/or witnessed these discussions.

Last Tuesday afternoon, January 27, 2004, I stretched my legs and walked over to Room 314 of our office building, West End Court (WEC), to speak with Ms. Vella Kaye Holmes, Compliance Specialist, and Mr. Gary Hazel, acting Program Manager, Criminal/Civil Branch.

I found Ms. Holmes and Mr. Hazel behind their desks. Ms. Holmes and Mr. Hazel share a large office. Ms. Holmes was speaking to someone on the telephone. Mr. Hazel was working on his laptop. I sat in the chair next to Mr. Hazel's desk.

I initiated a conversation with Mr. Hazel regarding the vacant deputy director position in the Compliance and Investigations Division (CID). The job had been announced on the internet approximately two weeks ago. I asked Mr. Hazel if he knew who had applied. Together, we began mentioning names of individuals we believed had applied. As I recall, six names were mentioned: Mr. Vincent Marquez, Supervisory Compliance Officer, Fresno, California; Mr. Luis Zamora, Supervisory Compliance Officer, Boulder, Colorado; Mr. Pedro Bobea, Supervisory Compliance Officer, Guaynabo, Puerto Rico; Mr. Frank Busch, Compliance Specialist, Evaluation and Enforcement Division (EED), Administrative Branch, Washington, D.C.; Mr. Mike Miller, Compliance Specialist, (CID); Washington, D.C.; and Mr. Ajibade Ogundipe, Compliance Specialist, (EED).

I recall asking Mr. Hazel if he knew how long Messrs. Marquez and Zamora had held their supervisory positions. Mr. Hazel stated that it was approximately two years. He stated that he was sure of this fact because he had competed for both jobs, but had lost them to Messrs. Marquez and Zamora.

EXHIBIT _1_
Page _50_ of _94_ Pages

000124

1

I remember reviewing each of the candidates' credentials and qualifications very quickly in my head and making an assessment. One-by-one, I looked at each of the applicants' work experience, work complexity, if the candidate worked or developed any high-profile cases, length of supervisory experience, if any, Washington experience, if any, and geographic work experience. I then compared each applicant's qualifications against each candidate, made an overall assessment and verbalized this to Mr. Hazel as to who I thought was the most qualified applicant for the deputy position. I stated to Mr. Hazel that based on my program knowledge (extensive Compliance background) and diverse work experience, I appeared to be the most qualified. Mr. Hazel did not disagree, but he thought that Mr. Busch may have a chance because he was well liked.

In my opinion, how much the selecting officer likes you should not be a criteria, and it's not a criteria in the Merit Promotion Program. Promotion should be based on merit alone.

As I recall, Mr. Zamora's name then came up. Apparently, Mr. Zygmunt Sala, Director, CID, was in Artesia, New Mexico on a training exercise. Mr. Zamora, who was also taking the Compliance training, was going to pick Mr. Sala up at the airport. I told Mr. Hazel that I knew about it and commented that I thought Mr. Zamora was an opportunist for various reasons, including being a "yes man," that is, a person that is in constant agreement with management, regardless of the situation or circumstances. I also stated that Mr. Zamora was a nice guy, well liked by management, that he actively participated, in some capacity, with ATSP (Association of Technical and Supervisory Professionals), a professional association of FSIS employees that are not unionized, and that FSIS management likes that. In other words, Mr. Zamora was doing all the right things and obtaining some exposure.

I am not a "yes man." I think for myself and always try to do the right thing all the time. Personal integrity, truthfulness, honesty, and credibility mean everything to me. And, I will always speak out when I believe that we, the division, program, or Agency are off target in its thinking, methodology, or objective.

As I explained earlier, when I walked in, Ms. Holmes and Mr. Hazel's office, Ms. Holmes was on the telephone, but as I ended my discussion with Mr. Hazel, I noted that Ms. Holmes was no longer talking on the telephone and was listening to my conversation with Mr. Hazel.

I then teased Ms. Holmes, stating I thought she was an opportunist. I did this in a kidding manner and with a smile. Ms. Holmes, apparently, had been off the telephone some time because she understood what I said and explained that Mr. David Green, former District Manager, Chicago District had explained to her that the staff officer position that she was offered in EED last March was an opportunity, and that she should take it.

Ms. Holmes and I then got into a discussion about how long she had been in Washington, when she actually reported, and when her promotion became effective. According to

Ms. Holmes, her promotion became effective while she was still in Chicago. She explained that OPEER management made the promotion effective immediately, despite the fact that she had not physically reported to Washington until much later. She stated that OPEER management did that because she was still working on the LaGrou Cold Storage case. My response to Ms. Holmes was that management did that because they liked her.

I then turned to Mr. Hazel and jokingly asked him, "What do you call an opportunist from your neck of the woods?" Before Mr. Hazel replied, I said, "I think they call them vamps?" Mr. Hazel's response was, "Not in my neck of the woods." Both Mr. Hazel and Ms. Holmes were perplexed. They didn't know where I was coming from. I guess most people think that the word "vamp" only means seductress. What I really was saying was that the word "vamp" also meant an unscrupulous woman or unprincipled person, and that an unprincipled person was also an opportunist. When I saw that my comments didn't go over well—that neither Ms. Holmes or Mr. Hazel weren't smiling or saying anything, I returned to my office, reached for my dictionary, WEBSTER'S II, New Riverside University Dictionary (Property of the U.S. Government), The Riverside Publishing Company, and returned to Room 314.

When I returned, I found Ms. Roslyn Brogdon, Compliance Specialist, EED, sitting in the chair next to Mr. Hazel's desk. Mss. Holmes and Brogdon and Mr. Hazel were having a conversation. I didn't capture what they were talking about. I positioned myself in front of Ms. Holmes desk, opened the dictionary to the word "vamp," and read the definition: "vamp (vamp) [Short for Vampire] Informal. -n. An unscrupulous woman who seduces or exploits men." As I read the sentence aloud, I paused, edited and commented on portions of the definition, accepting some language and qualifying it with a comment and dismissing other language and commenting on it. Specifically, I read "An unscrupulous woman" and facetiously stated, "You're like that." When I read aloud, "…who seduces…" I stated, "I don't know about this stuff," and waived my left hand over the dictionary in a gesture to dismiss this fragment, but then commented on the later part, "…or exploits men," again, in a kidding manner, "Yeah, you're kind-of like that, too."

Ms. Brogdon, who was not present during the earlier discussion I had with Ms. Holmes, stated something to the effect that I should be careful about what I say. I then explained to Ms. Brogden that I just didn't say "vamp," but that I also stated that I thought Ms. Holmes was an opportunist. I didn't elaborate any further—I just let it go.

The incident ended when Ms. Holmes said to me, "You're lucky I have a sense of humor." It appeared that my remarks, which were intended to be nothing more than facetious, did not go over well. As I was near the doorway entrance of the office, I gave Ms. Holmes a thumbs-up and stated, "You're alright Vel." At that point, I wasn't pleased with the outcome, but I considered the matter closed.

**EXHIBIT** _1_

**Page** _52_ **of** _94_ **Pages**

When I went back to my office, I picked up my thesaurus. As a noun, Merriam-Webster's Collegiate Thesaurus (Property of U.S. Government), defines the word "vamp" as a flirt, coquette. As a verb, the thesaurus defines "vamp" as a charmer.

In fact, it's the first definition. This definition is more in tune with the word as I recognize and have used it in the past. Basically, what I was trying to say and explain was that I looked at Mr. Zamora, for example, as a "yes man" and Ms. Holmes, as somewhat unscrupulous and as "a charmer," and both as opportunists.

Funk & Wagnalls New Comprehensive International Dictionary of the English Language, Deluxe Edition, definition of "unscrupulous" is: " 'unscrupulous' adj. Not scrupulous; having no scruples; <u>unprincipled</u>." It defines the word "exploit" as: " 'exploit' n. To use for one's own advantage; take advantage of ...." And, it defines "vamp" as: " 'vamp' v.t. To seduce <u>or prey upon</u> (a man) by utilizing one's feminine charms." Further, as: "An <u>unscrupulous</u> flirt or coquette." Copies of these excerpts have been provided.

*Background*
*Why do I look at Ms. Holmes like this? About a year ago, I had a conversation with Messrs. Busch and Hazel outside the front entrance of West End Court (WEC) building. The conversation was about a recent incident involving Ms. Holmes and Mr. Hazel. Apparently, Mr. David Lavers, (former program manager of the criminal/civil branch) gave Ms. Holmes and Hazel each a criminal case to review, comment, and then to brief him at a later time. Ms. Holmes came up with the idea that she and Mr. Hazel should review both case files, discuss them with each other, and then provide Mr. Lavers with a briefing of their own cases. What actually occurred was that Ms. Holmes took Mr. Hazel's comments about her case and represented them as her thoughts and comments. Mr. Hazel was mad. He felt used. I advised him not to help her anymore, and he said he wouldn't. Mr. Busch was also aware of this incident. Does that not sound unethical, unscrupulous, exploitive?*

My concern is that I appeared to have been misunderstood, but, based on my thought process, beginning with Mr. Zamora and concluding with Ms. Holmes, the word "vamp" was used appropriately. My thought process and rationale, as explained above, makes sense.

Later that day, just before 4:30 P.M., I ran into Mr. Hazel in the restroom on the 3rd floor of WEC. When he saw me, he began laughing about the incident, stating that I had "pissed her (Ms. Holmes) off." I don't believe I responded.

The following day, Wednesday, January 28, 2004, at approximately 7:30 A.M., after using the 1st floor restroom and while returning to my office through the exit door, I heard some loud talking and laughter to my right—at the far end of the corridor. There were a couple of staff officers from the division near Room 314, and they were talking and laughing about yesterday's incident regarding Ms. Holmes. I didn't say anything. I just went to my office and closed the door.

**EXHIBIT** ___2___

Approximately thirty minutes later, Messrs. Busch, Hazel, and Carlos Torres, **Page** 53 **of** 4 **Pages** Compliance Specialist, Criminal/Civil Branch, all came into my office, each holding a dictionary (WEBSTER'S II, New Riverside University Dictionary). They were playing a gag on me. Someone stated, "What's the word of the day?" I didn't say anything—I just

000127

4

listened. And then someone else said, "We all know that's true about Vella Kay, but you didn't have to tell her." Mr. Busch then played a joke on me, telling me that Ms. Holmes had called in sick today because I had upset her. I believed it, and I, too, became upset. Mr. Hazel then stated that Mr. Busch was only kidding me, that Ms. Holmes was really sick. Mr. Busch then confirmed this, stating that Ms. Holmes stated that she was sick because of a cold and would be in tomorrow.

I believe it was early afternoon when I heard a rumor that someone from EED related the incident with Ms. Holmes to Mr. Mike Miller, Compliance Specialist, CID, and that Mr. Miller allegedly approached Mr. David Langley, Program Manager about the incident. Allegedly, Mr. Langley turned Mr. Miller away, stating he was not my supervisor. According to what I heard, Mr. Miller then allegedly contacted Mr. Sala, Director, CID, who was in Artesia, New Mexico about the incident, and that Mr. Sala then contacted Mr. Safian. According to the rumor, Mr. Miller allegedly initiated these contacts because we were both competing for the deputy position in CID, and that Mr. Miller was feeling the pressure.

Shortly thereafter, Mr. Busch came to my office and advised that he and Mr. Hazel telephoned Ms. Holmes at her home, that she had been sleeping, that they woke her and had a discussion about my comments to her. According to Mr. Busch, when he and Mr. Hazel asked Ms. Holmes if she was going to pursue the incident by filing a complaint, she emphatically said no, that she, too, had made inappropriate comments to me. When asked if she would mind it if I apologized to her the following day (Thursday, January 29th), she stated that she would love for me to do that, that she liked me and liked kidding with me, and that she simply wanted to work together.

*Background (Ms. Vella Holmes comments)*
*Most recently, on January 5, 2004, and on another occasion, Ms. Holmes made inappropriate comments to me, which she acknowledged doing so to Messrs. Busch and Hazel on January 28, 2004.*

*Specifically, on January 5th Mr. Busch and I were in Ms. Holmes and Mr. Hazel's office talking to Ms. Holmes. Mr. Hazel was not working that day. I was sitting behind Mr. Hazel's desk and Mr. Busch was sitting in a chair near Mr. Hazel's desk. It was a casual conversation, often humorous. There was some discussion about women, dating, and marriage. I am still single—never married. As I recall, Mr. Busch was teasing me about my personal values, stating that I wouldn't live with a woman, that I didn't want a divorced woman, etc. It was then that Ms. Holmes stated that I wanted a twelve year-old virgin.*

*Really, was that appropriate? I am forty-eight years old. I have nieces and nephews that are twelve years of age. A twelve year-old girl is a child. That was more than an inappropriate remark—it was suggestive, disgusting, and vulgar. Moreover, Ms. Holmes made the same remark on another occasion. I was speechless and embarrassed when Ms. Holmes made the remarks.*

EXHIBIT __1__
Page 54 of 94 Pages

000128

5

Late Wednesday afternoon, at approximately 3:30 P.M., after an EED meeting on the Criminal, Civil, and Administrative Tracking System (CCATS) Data Dictionary, with all the management analysts, staff officers, and program managers in the criminal/civil and administrative branch, Mr. Hazel, approached me in my office and stated that he knew I was worried about the incident with Ms. Holmes, that he didn't want me to worry about it, that he thought the incident would be resolved, and that it wouldn't hurt if I apologized to Ms. Holmes the following morning.

On Thursday morning, January 29, 2004, I went to Room 314 and saw Ms. Holmes behind her desk. Mr. Busch was also there. I approached Ms. Holmes and stated, "I hurt you" and gave her a peck on the check. She stated, "Eugene, what really hurt the most is that you believe those things about me." Apparently, Mr. Busch was there the entire time and heard everything. Mr. Busch later told me that Ms. Holmes was very concerned that Mr. Busch saw me give Ms. Holmes a peck on the check, that Mr. Busch would tell someone, and that it would be misinterpreted. Accordingly to Mr. Busch, she was concerned about it and warned him not to say anything to anyone. I ended my apology to Ms. Holmes, which only lasted three minutes, by stating to her, "But, that's what people are saying. We can talk about it later, if you want."

Later in the day, I was speaking with Mr. Ajibade Ogundipe in his office. I had not mentioned this incident to him, but, judging from his reaction to me, he appeared to have knowledge of the incident. When I asked him what he knew, he told me that someone in the division told him about it. Mr. Ogundipe's concern was that the incident could be construed as sexual harassment. I disagreed at first, but then I decided to approach and speak to only those individuals that were in the room the day the incident occurred.

I briefly met with Ms. Brogdon in her office and asked her if she thought the incident could be construed as sexual harassment. Ms. Brogdan didn't know, and she said that several times to me.

I briefly met with Mr. Hazel in my office and asked him if the incident could be construed as sexual harassment. His response was no.

I then went to see Ms. Holmes in her office in Room 314. She was speaking with Mr. Miguel Figarella, Compliance Specialist, EED, so I left. A couple of minutes later I returned to see if she was available, but she wasn't—she was still speaking with Mr. Figarella. I was very anxious to speak to her about this issue. I waited a couple of minutes and then went again to Room 314. When I arrived, I noticed that Mr. Figarella was just leaving. I walked in the office and asked if I could speak with her. She motioned to me to sit down, and I did. Moments later, Mr. Hazel got up from his desk and left the room. I asked her pointblank if she felt that I had sexually harassed her. She said no and motioned with her right hand in a negative gesture.

I then asked Ms. Holmes if she knew why I used those words, "unscrupulous, exploitive, etc." I explained that that was what I was hearing and what people were saying. I posed several indirect questions to her. I asked her if it was ethical to have someone write your

000129

6

application for promotion, and if it was ethical to say that you wrote a case if you didn't. She stated that she wrote her own application and side-stepped the question about the case (LaGrou), stating that it was a team effort. She also said she couldn't stop people from talking. I reminded her of the incident (case-swapping) with Mr. Hazel in a vague way and told her that I was purposely being vague because I didn't want there to be any more hard feelings among us at Headquarters. She simply shook her head and gestured that she didn't know what I was talking about. I told Ms. Holmes that she didn't have to do that—that I would teach her how to review cases, that I would help anyone, and that I helped train Michele Long, Compliance Specialist, EED, when Ms. Carol Seymour wanted to make her an Assistant District Manager for Enforcement (ADME). I also told her that I wanted to approach her earlier, but that I didn't. Ms. Holmes explained that she came to Washington to learn something, that she thought she was smart and could learn how to review cases, and I agreed. I told her that I wouldn't "bother her anymore" (about the issue). Nothing else was said. I then left and haven't spoken to Ms. Holmes since the incident, other than to greet her.

On Friday, January 30, 2004, I briefly saw Ms. Holmes as I was exiting and she was entering the exit doorway near my office. It was approximately 11:30 A.M. and she had her lunch in her hands. I said, "Hey!" and she did the same. I saw Ms. Holmes again at approximately 4:30 P.M. as she was approaching the third elevator car on the 3rd floor. I was in the elevator car, near the control panel. As I held the door open, I said, "Hi, Vel." She said nothing and went to the rear of the car. We did not speak. I left the elevator car when it stopped on the 2nd floor.

On Wednesday, February 4, 2004, I had a lengthy discussion with Mr. Hazel. It was early morning, and he was in the corridor, near the doorway entrance of my office. I approached him and asked if we could talk. He came into my office, seated himself, and we had a long discussion. I asked him why he had ignored me and Mr. Busch for the last couple of days, and that I and Mr. Busch both noticed it. He stated that he was neither ignoring me nor Mr. Busch; but, rather, that Mr. Busch was ignoring him.

Mr. Hazel's comment appeared to be partially true. In a conversation, shortly after the incident, Mr. Busch did mention that he intentionally stayed away from Room 314 on Friday, January 30th because the door was observed almost entirely closed and he heard Ms. Holmes and Mr. Hazel arguing.

I asked Mr. Hazel what was going on with Ms. Holmes—I heard that she complained. Mr. Hazel then explained what occurred over the later part of last week, beginning with late Thursday afternoon, January 29, 2004, when I re-approached Ms. Holmes, up to Monday, February 2, 2004, when Ms. Holmes, accompanied by Mr. Hazel, supposedly elected to complain to Mr. Safian. I asked Mr. Hazel what that was about. He said he didn't know, that he only accompanied Ms. Holmes to Mr. Safian's office because he was the acting branch chief.

EXHIBIT 2
Page 56 of 94 Pages

000130

When I asked him if he wanted to know what I said to Ms. Holmes on Thursday afternoon, January 29th, his response was that he didn't want to get involved. Get involved? I told Mr. Hazel that he was already involved.

We briefly talked about the day of the incident, January 27, 2004. When Mr. Hazel explained that he didn't understand where I was coming from and that he was mortified when I made those remarks to Ms. Holmes, I advised Mr. Hazel that the word "vamp" has many synonyms, including the word "charmer," and can be used many ways. Mr. Hazel didn't say anything. In regard to his comment that he was "mortified," I reminded Mr. Hazel that I ran into him shortly before 4:30 P.M. that afternoon in the 3rd floor restroom at WEC, and that when he saw me, he was still laughing about the incident and telling me how I "pissed-off" Ms. Holmes; that the following day, January 28th, I heard him talking and laughing loudly with two other staff officers in the corridor, near Room 314, about the incident; and that approximately thirty minutes later, he and Messrs. Busch and Torres ran into my office holding dictionaries and played a gag on me. After I stated this to Mr. Hazel, he stated, "Yeah, it was funny." Then I advised him of the events that led me to re-approach and what transpired during my conversation with Ms. Holmes.

Specifically, I advised Mr. Hazel of my earlier conversation with Mr. Ogundipe, who believed that the incident may be construed as sexual harassment. Consequently, I explained, I approached everyone that was in Room 314 when this occurred, including Mss. Holmes and Brogdan and him and specifically asked if they believed it was sexual harassment. I asked Mr. Hazel if he remembered when I approached him on this matter in my office. He stated that he did. I then reminded him of his response and advised that Ms. Brogdon was indecisive, and that Ms. Holmes had said no.

I then explained in detail my conversation with Ms. Holmes, omitting nothing. I advised that I tried to explain to Ms. Holmes why I used those words, unscrupulous, exploitive, etc., namely, because people were talking about her. I advised Mr. Hazel that I indirectly asked Ms. Holmes if it was ethical to have someone write your application for promotion or to take credit for a case that you didn't write, and Ms. Holmes' response to my indirect questions. Mr. Hazel's response was that it wasn't my business—that if Ms. Holmes wanted to be that way, I should let her. When I explained to Mr. Hazel that I also commented to Ms. Holmes about the case-swapping incident that occurred approximately one year ago between him and Ms. Holmes, his response was that he didn't tell me that. When I told him that he did and reminded him that it occurred outside the 2nd floor overhang at WEC and that Mr. Busch was also there, he acknowledged the fact, stating, "Yeah, I did." When I reminded Mr. Hazel how mad he was about the whole incident, he again conceded.

In order to provide a better understanding of how informal the relationships were within this small clique of people, I thought I would provide a small glimpse.

EXHIBIT 1
Page 57 of 94 Pages

I was seated at a chair in front of Mr. Busch and Ms. Brogdan's desk in Room 318 at WEC. Ms. Brogan was not present. Mr. Torres was standing to my right. Mr. Busch allegedly explained an incident which described Ms. Holmes sitting in a chair in Mr. Busch and Ms. Brogdan's office, actually the very same chair that I was seated as I listened to this story, in which Ms. Holmes allegedly wanted to show Mr. Busch what a good contortionist she was by lifting her leg over her head. I don't recall my reaction. I think I just smiled or shook my head.

On a different occasion, I walked down the corridor to Mr. Busch and Ms. Brogdon's office. I saw Mr. Busch near the entrance of Room 314, Ms. Holmes and Mr. Hazel's office. Mr. Busch allegedly leaned over to me and stated that Ms. Holmes had showed Mr. Hazel the spider veins on her legs. I then asked Mr. Hazel if that was true. Mr. Hazel, paused for a second and then allegedly stated, "Yes, she did." Mr. Busch and I just laughed.

Again, on a different day, I went to see Mr. Busch in Room 318. Ms. Brogdon was sitting behind her desk. Mr. Busch allegedly was explaining to me that Mr. Torres allegedly liked to play with Ms. Brogdon's dolls. These were little female figurines that had a solid torso and head, but had flimsy cloth legs and plastic shoes. Allegedly, Mr. Torres liked to lift the doll's legs over the doll's torso. Everyone laughed, including Ms. Brogdan, who allegedly stated, "I told Carlos to leave my girls (dolls) alone."

And, there are many more incidents of this kind, which, in my opinion, demonstrates that informality existed within this small clique of individuals.

This statement consists of nine (9) pages and I hereby solemnly swear and affirm that it is true and complete to the best of my knowledge and belief.

_Eugene Casole_
Eugene Casole

_Dieynaba Diene_
Dieynaba Diene
Notary Public, District of Columbia
My Commission Expires 2-28-2008

EXHIBIT 2
Page 58 of 91 Pages

000132

9

Q11. I have conducted preliminary inquiries and referred other matters regarding alleged improper conduct or other employee issues to the agency's Labor and Employee Relations Division (LERD), OM, FSIS.

For example, on or about May 30 and June 16, 2003, I referred a matter to LERD involving potentially unprofessional conduct by Mr. Casole. Mr. Casole had made statements at a meeting among FSIS employees and industry officials that were potentially inappropriate or unprofessional. The issue was referred to me by John Sworen, a field enforcement manager with CID, OPEER, upon complaints made to him by FSIS employees in attendance. Upon advice from LERD, Mr. Casole's supervisor – Wayne Bossler – documented the incident, including obtaining statements from those with knowledge, which were referred to LERD.

On or about July 8, 2003, I referred a matter to LERD regarding alleged inappropriate or unprofessional comments made by Manfred Siller, Training Program Manager, EED. Mr. Siller had made comments to students at a training session he was attending or leading. An agency employee had complained to me about the comments. I obtained written statements from individuals with knowledge of the matter, including the complainant. I referred the matter along with the information and statements to LERD for review, investigation and/or other appropriate action.

On or about December 12, 2003, I referred a matter to LERD for review, inquiry and/or other action, regarding the use of inappropriate or offensive comments made by John Sworen, Regional Manager, CID, OPEER. The comments were made during a conference call I participated in along with other FSIS employees. Mr. Casole, who was a participant in the call, complained about the comments made by Mr. Sworen. I also found them to be inappropriate. I referred the issue and provided relevant documents to LERD regarding this matter.

On or about September 15 and 22, 2004, I referred information to LERD for review, investigation and/or other action regarding a matter involving David Langley, Program Manager, EED. On or about September 14, I had been made aware that Mr. Langley was involved in a personal relationship with one of his female employees. I provided LERD with statements from Mr. Langley and the female employee. Subsequently, I provided an agency misconduct investigator with a signed statement in the matter.

I have provided the investigator in this matter with copies of my referral letters to LERD on these issues.

Q12. The LERD issued Mr. Casole a Letter of Reprimand on or about June 26, 2003, for making offensive and derogatory remarks in a meeting with FSIS personnel and establishment management officials. Mr. Siller was issued a Letter of Caution by the agency. I am not aware of any disposition of the matter I referred to LERD regarding Mr. Sworen. I believe that the investigation and/or disposition of the matter involving Mr. Langley remains open.

EXHIBIT _2_
Page _59_ of _94_ Pages

000133

THIS PAGE WAS INTENTIONALLY LEFT BLANK

EXHIBIT 2
Page 60 of 94 Pages



First-Class Mail
Postage & Fees PAID
USPS
Permit No. G-10

UNITED STATES POSTAL SERVICE

Sender: Please print your name, address, and ZIP+4 in this box •

Brenda J Smith
P.C. Box 819
Exon Hill MD 20750

Notice of Rights L.Nweikeecha

EXHIBIT 2
Page 61 of 94 Pages

000135

 United States Department of Agriculture | Food Safety and Inspection Service | Office of Management | 5601 Sunnyside Avenue Stop 5261 Beltsville, MD 20705

## <u>NOTICE TO THE COMPLAINANT</u>

The Investigator assigned to investigate your complaint is <u>only authorized to investigate the issues that have been formally accepted by the U.S. Department of Agriculture's (USDA), Office of Civil Rights (OCR). H/She is not authorized to investigate new incidents that may have occurred since you filed your current complaint.</u>  Therefore, if you have a new incident that has not been officially accepted for processing by OCR, you must submit a statement, in writing, to: USDA, OCR, Employment Complaints Division (ECD), 1400 Independence Avenue, S.W., Stop Code 9440, Washington, DC 20250.  You may also fax your statement to: Fax: (202) 401-1138.

Your statement must: (1) describe the new incident(s) in detail; and (2) state that you are requesting that your complaint be amended to include the new incident(s).

Your request will be reviewed by ECD in a timely fashion to determine if the new incident(s):

1.  Provides additional evidence to support the existing claim, but does not raise a new claim in and of itself;

2.  Raises a new claim that is like or related to the claim(s) raised in the pending complaint; or

3.  Raises a new claim that is not like or related to the claim(s) raised in the pending complaint.

The Investigator will continue to investigate your present complaint so that it will not be unnecessarily delayed and will await further instructions from this office regarding the new incident(s) of alleged discrimination.

Sincerely,

H. Steven L. Newbold II
Director
Civil Rights Division

EXHIBIT 1
Page 62 of 94 Pages

000136



| United States Department of Agriculture | Food Safety and Inspection Service | Office of Management | 5601 Sunnyside Avenue Stop 5261 Beltsville, MD 20705 |
|---|---|---|---|

Date $+/22/05$

Dear FSIS Employees:

The Complainant, Eugene Casale , has filed an Equal Employment Opportunity (EEO) complaint of discrimination with the Department of Agriculture (USDA), Food Safety and Inspection Service (FSIS). Pursuant to 29 CFR, Part 1614, of the Equal Employment Opportunity regulations and any applicable Departmental Regulations, the private firm of Vaughn & Associates has been contracted by FSIS to investigate this complaint. I hereby authorize the following individual to conduct the investigaiton and take sworn statements:

Name: Brenda J Smith

Title: **EEO Contract Investigator**

Upon identifying him/herself to you, the contract investigator will expect your full and complete cooperation. You are required to provide sworn or affirmed testimony by affidavit, without pledge of confidence, about matters pertaining to the complaint. You are also required to provide access to all requested files, documents, and/or record systems that are the property of USDA, FSIS that could assist in addressing the complaint.

The information obtained during the investigation as well as the information collected for use in resolving the complaint of discrimination filed by the Complainant is protected by the Privacy Act of 1974 (PL. 93-579). The information will be incorporated into a report of investigation to be distributed to the USDA, Office of Civil Rigths, FSIS' EEO Officer, the Complainant (and his/her representative, if appropriate), and possibly the EEOC and the Federal appeal and court systems.

Please be advised that refusal by a complainant to cooperate during the investigation will result in termination of the investigation process and cancellation of the complaint. Further, FSIS employees are advised that failure to cooperate during the investigation will result in disciplinary action being initiated against you.

Sincerely,

H. Steven L. Newbold II
Director
Civil Rights Division

**EXHIBIT** 1
Page 65 of 94 Pages

000137

 **USDA**

| United States Department of Agriculture | Food Safety and Inspection Service | Office of Management | 5601 Sunnyside Avenue Stop 5261 Beltsville, MD 20705 |

Date  4/22/05

Dear FSIS Employees:

The Complainant, _Eugene Casule_ , has filed an Equal Employment Opportunity (EEO) complaint of discrimination with the Department of Agriculture (USDA), Food Safety and Inspection Service (FSIS). Pursuant to 29 CFR, Part 1614, of the Equal Employment Opportunity regulations and any applicable Departmental Regulations, the private firm of _Vaughn & Associates_ has been contracted by FSIS to investigate this complaint. I hereby authorize the following individual to conduct the investigaiton and take sworn statements:

Name: Brenda J Smith

Title: **EEO Contract Investigator**

Upon identifying him/herself to you, the contract investigator will expect your full and complete cooperation. You are required to provide sworn or affirmed testimony by affidavit, without pledge of confidence, about matters pertaining to the complaint. You are also required to provide access to all requested files, documents, and/or record systems that are the property of USDA, FSIS that could assist in addressing the complaint.

The information obtained during the investigation as well as the information collected for use in resolving the complaint of discrimination filed by the Complainant is protected by the Privacy Act of 1974 (PL. 93-579). The information will be incorporated into a report of investigation to be distributed to the USDA, Office of Civil Rigths, FSIS' EEO Officer, the Complainant (and his/her representative, if appropriate), and possibly the EEOC and the Federal appeal and court systems.

Please be advised that refusal by a complainant to cooperate during the investigation will result in termination of the investigation process and cancellation of the complaint. Further, FSIS employees are advised that failure to cooperate during the investigation will result in disciplinary action being initiated against you.

Sincerely,

H. Steven L. Newbold II
Director
Civil Rights Division

**EXHIBIT** _1_
Page _04_ of _94_ Pages

· 000138

# DRAUGHN & ASSOCIATES
# P.O. BOX 819
# OXON HILL, MARYLAND  20750

Telephone: (301) 292-8175                    Fax: (1-866) 646-3310

MEMORANDUM

DATE:      May 4, 2005

To:        Samora Bennerman, Equal Employment Opportunity Specialist

FROM:      Brenda J. Smith, Senior EEO Investigator *Brenda J. Smith*

SUBJECT:   Request for Information/Data/Documents – Eugene Casole,
Agency No. 050222

This is to request that you (or your office) provide the following
information/data/documents to me for inclusion in subject investigative report file
**ASAP and/or no later than 15 days from receipt** of this memorandum.

1. The United States Department of Agriculture (USDA), FSIS,
   guidelines for disciplinary in effect at the time (July 2004).

2. Complainant's current position description.

3. Organizational charts (2 separate) for the Office of Program
   Evaluation, Enforcement and Review (**OPEER**); and the
   Evaluation and Enforcement Division (**EED**)

4. Workforce profile - breakdown of all employees in **OPEER**
   (headquarters) by name, title, grade, division/office, location, sex,
   and prior EEO activity, if available.  Please provide the same
   information for all employees in **EED**.

5. Copies of letters of proposed suspension and suspension.

6. Copy of SF-50 pertaining to the suspension.     **EXHIBIT  1**

7. Copy of "evidence file" used to support proposed suspension and **Page 65 of 94  Pages**
   suspension, e.g., investigative report, statement of witnesses,
   written rebuttal/response by Complainant, and any other pertinent
   documents.

8. Number of disciplinary actions taken against employees in **OPEER** (headquarters) and **EED** for the past two (2) years broken down by sex, reprisal, type of discipline, responsible official(s).

9. Complaint History -- Number of EEO complaints (past two years) filed against Richard Van Blargen, Ronald Hicks, and Scott Safian.

If additional information, data or documents are needed as a result of information obtained during the onsite investigation, I will let you know ASAP. Additionally, I have already gotten some documents included in the information received by the Agency. As required, I will be requesting documents directly from other witnesses. All documents should be sent to me at the following address:

301 Beech Street
Fort Washington, MD 20744

If you have any questions, please contact me at 301-292-8175 or via email bjbritto@comcast.net.

Thank You.

**EXHIBIT** 2
**Page** 66 **of** 94 **Pages**

000140



Funk & Wagnalls

NEW
COMPREHENSIVE
INTERNATIONAL
DICTIONARY

ENGLISH LANGUAGE



GATE VALVE
Cross-section.
*a.* Screw.
*b.* Gate closed.

**vam-pire** (vam'pīr)
*n.* 1 A living corpse that rises from its grave at night to feed upon the living, usually by sucking the blood: a widespread folk belief originating in primitive cannibalism but developed primarily in Slavic folklore. It is not a demon or a ghost, but the physical body of one who has died; it cannot be exorcised, but must be disinterred and either burned or fastened in the grave with a stake through its heart. Belief in vampires still exists in Slavic Europe, Hungary, Greece, and Iceland. Bram Stoker's *Dracula* is a famous treatment of the subject. 2 A man or woman who preys upon persons of the opposite sex: especially, a woman who brings her lover to a state of poverty or degradation. 3 A large bat (genera *Desmodus* and *Diphyila*) of South or Central America, which drinks the blood of horses, cattle, and, sometimes, men: more fully-true vampire. 4 An insectivorous or frugivorous bat (genera *Phyllostomus* and *Vampyrum*) formerly supposed to suck blood: a false vampire. [< F < G *vampir* <Slavic] — vam-pir'ic (-pir'ik), vam-pir'ish (-pīr'ish) *adj.*



ALBINO VAMPIRE
(Bats vary from 2 to 18 inches in body length)

**vam-pir-ism** (vam'pī-riz'əm, -pə-) *n.* 1 Belief in vampires. See VAMPIRE (def. 1). 2 The act or practice of a vampire: bloodsucking. 3 The practice of extortion or of preying upon others.

**van** (van) *n.* 1 A large covered wagon or vehicle, for removing furniture, household goods, etc.: a caravan. 2 *Brit.* A closed railway car for luggage, etc.; also, a vehicle, open or covered, used for carrying light goods. [Short for CARAVAN]

**van** (van) *n.* 1 An advance guard, as of an army, or foremost division of a fleet. 2 The leaders of a movement; those at the front of any line or unit. [Short for VANGUARD]

**van** (van) *n.* A fan or winnowing machine: hence, a wing. [Dial. var. of FAN]

**van** (van) *prep. Dutch* Of: from: used with Dutch family names, originally designating where the family came from or received its name.

**Van** (van) Singular of VANIR.

**Van** (van) A town on the eastern shore of Lake Van (1,453 square miles) in eastern Turkey in Asia.

**va-na-date** (van'ə-dāt) *n. Chem.* A salt or ester of vanadic acid. Also **va-na-di-ate** (va-nā'dē-āt).

**va-nad-ic** (va-nad'ik) *adj. Chem.* Of, pertaining to, or derived from vanadium, especially in its higher valence.

**vanadic acid** *Chem.* Any of several acids known only in their salts, as *meta*-vanadic acid, a yellow compound, $HVO_3$, used as a pigment and a substitute for gold bronze.

**va-nad-i-nite** (va-nad'ə-nīt) *n.* A native vanadate and chloride of lead, found in opaque prismatic crystals of red and yellow color. [< VANAD(IUM) + -IN + -ITE']

**va-na-di-um** (va-nā'dē-əm) *n.* A rare, silver-white metallic element (symbol V) of the phosphorus group, difficult to extract from the vanadates and minerals in which it is found. It is useful in an alloy steel to increase tensile strength. See ELEMENT. [< NL < ON *Vanadis,* a name of the Norse goddess Freya]

**vanadium steel** Steel containing from .1 to .25 percent of vanadium to increase its tensile strength.

**van-a-dous** (van'ə-dəs) *adj. Chem.* Of, pertaining to, or derived from vanadium, especially in its lower valence. Also **va-na-di-ous** (va-nā'dē-əs).

**Van Allen radiation** A high-intensity radiation consisting of charged atomic particles circling the earth in an inner and outer belt conforming to the earth's magnetic field.

**Van-brugh** (van-broō', van'brə), Sir John, 1664–1726. English playwright and architect.

**Van Bu-ren** (van byoor'ən), Martin, 1782–1862. president of the United States 1837–41.

**Van-cou-ver** (van-koō'vər) 1 A port of SW British Columbia opposite Vancouver Island, the largest island off the western coast of North America, comprising part of British Columbia: 12,408 square miles. 2 A city of SW Washington on the Columbia River.

**Van-cou-ver** (van-koō'vər), George, 1757?–1798. English navigator.

**Vancouver, Mount** A peak on the Yukon-Alaska border in the St. Elias Mountains: 15,700 feet.

**van-dal** (van'dəl) *n.* A ruthless plunderer; wilful destroyer of what is beautiful or artistic. — *adj.* Being a vandal; barbarous. [<VAN-DAL] — **van-dal-ic** (van-dal'ik) *adj.*

**Van-dal** (van'dəl) *n.* One of a Germanic people from a region between the Vistula and Oder rivers, south of the Baltic, who invaded the western Roman Empire in the fifth century. At the beginning of the fifth century, they ravaged Gaul and overran Spain and North Africa. In 455 they pillaged the city of Rome, destroying many artistic and literary treasures. Their kingdom, established in North Africa with Carthage as its capital, was overthrown in 534 by the Romans under Belisarius. — **Van-dal-ic** (van-dal'ik) *adj.* — **Van'dal-ism** *n.*

**van-dal-ism** (van'dəl-iz'əm) *n.* Hostility to or wilful destruction of artistic works, or of property in general.

**Van-den-berg** (van'dən-bûrg), **Arthur Hendrick,** 1884–1951. U.S. statesman. — Hoyt, 1899–1954. U.S. Air Force general.

**Van-der-bilt** (van'dər-bilt), **Cornelius,** 1794–1877. U.S. capitalist: called "Commodore Vanderbilt."

**Van Die-men Gulf** (van dē'mən) An arm of the Timor Sea between Northern Territory and Melville Island, Australia: 90 miles long, 50 miles wide. [after Anthony *Van Diemen,* 1593–1645, Dutch admiral]

**Van Die-men's Land** (van dē'mənz) The former name for TASMANIA.

**Van Do-ren** (van dôr'ən, dō'rən), **Carl,** 1885–1950. U.S. writer and editor. — **Mark,** 1894–1972. U.S. poet, writer, and critic; brother of preceding.

**Van Dyck** (van dīk'), **Anthony,** 1599–1641. Flemish painter. Also **Van-dyke'.**

**Van-dyke** (van-dīk') *adj.* Of or pertaining to Anthony Van Dyck (or Vandyke), or to his style; also, of or pertaining to the dress or fashions represented in the paintings of Van Dyck. — *n.* 1 A painting by Van Dyck. 2 A Vandyke cape, collar, or beard.

**Van Dyke** (van dīk'), **Henry,** 1852–1933. U.S. clergyman, educator, and author.

**Vandyke beard** A peaked or pointed beard resembling those depicted in Van Dyck's paintings.

**Vandyke brown** A deep-brown pigment, a kind of bog-earth or peat color used by the painter Van Dyck; any of the various brown pigments, as those resembling burnt umber.

**Vandyke collar** A broad, deep collar or cape of fine linen and lace resembling those represented in portraits by Van Dyck. Also **Vandyke cape.**

**vane** (vān) *n.* 1 A thin plate, pivoted out of center, on a vertical rod, to indicate the direction of the wind: a weathercock; also **wind vane.** 2 A slender flag or streamer used for the same purpose. 3 An arm or blade, as of a windmill, propeller, projectile, etc. 4 *Ornithol.*



WINDMILL VANES

The web of a feather. 5 The target on a leveling rod. 6 The sight on a quadrant, compass, or similar instrument, by which the direction of the object viewed is determined. 7 One of the plates or strips of metal fixed in the tail of a bomb, guided missile, or the like, to provide stability or guidance. 8 *Obs.* A flag; pennon. ✦ Homophones: *vain, vein.* [Dial. var. of *fane* a small flag, OE *fana* a flag] — **vaned** *adj.*

**Vane** (vān), **Sir Henry,** 1613–62. English

000142

**unprofitable** transaction. — **un-prof′it-a-ble-ness** n. — **un-prof′it-a-bly** adv.

**un-pro-nounce-a-ble** (un′prə-noun′sə-bəl) adj. 1 Not easy to pronounce, especially properly. 2 Not fit to be mentioned.

**un-pro-vid-ed** (un′prə-vī′did) adj. 1 Not furnished or provided: with with, formerly with of: to be unprovided with suitable raiment. 2 Not fittingly prepared; not ready: unprovided for a sudden change. — **un′pro-vid′ed-ly** adv.

**un-qual-i-fied** (un-kwol′ə-fīd) adj. 1 Being without the proper qualifications; unfit. 2 Having failed to qualify; lacking legal power or authority. 3 Without limitation or restrictions: absolute; entire: unqualified approval. — **un-qual′i-fied′ly** adv. — **un-qual′i-fied′ness** n.

**un-ques-tion-a-ble** (un-kwes′chən-ə-bəl) adj. Too certain or sure to admit of question; being beyond a doubt; indisputable. See synonyms under INCONTESTABLE, NOTORIOUS. — **un-ques′tion-a-bly** adv.

**un-ques-tioned** (un-kwes′chənd) adj. 1 Not called in question; undoubted. 2 Not to be frustrated or opposed; indisputable. 3 Not interrogated.

**un-qui-et** (un-kwī′ət) adj. 1 Not at rest; disturbed; restless, in mind or physically. 2 Causing unrest or discomfort. — **un-qui′et-ly** adv. — **un-qui′et-ness** n.

**un-quote** (un-kwōt′) v.t. & v.i. -quot-ed, -quot-ing To close (a quotation).

**un-rav-el** (un-rav′əl) v. -eled or -elled, -el-ing or -el-ling v.t. 1 To separate the threads of, as a tangled skein or knitted article. 2 To free from entanglement; unfold; explain, as a mystery or a plot. — v.i. 3 To become unraveled. See synonyms under INTERPRET.

**un-read** (un-red′) adj. 1 Not informed by reading; ignorant. 2 Not yet read.

**un-read-y** (un-red′ē) adj. 1 Being without readiness or alertness; not apt or quick to see or appreciate. 2 Not in a condition to act effectively; unprepared. — **un-read′i-ly** adv. — **un-read′i-ness** n.

**un-re-al** (un-rē′əl, -rēl′) adj. Having no reality, actual existence, or substance; having no genuineness; insincere; artificial; also, fanciful; visionary. — **un-re-al′i-ty** (un′rē-al′ə-tē) n. — **un-re′al-ly** adv.

**un-rea-son** (un-rē′zən) n. Lack or absence of reason; irrationality; also, absurdity; nonsense.

**un-rea-son-a-ble** (un-rē′zən-ə-bəl) adj. 1 Acting without or contrary to reason. 2 Not according to reason; irrational. 3 Exceeding what is reasonable; immoderate; exorbitant. See synonyms under ABSURD, IMMODERATE. — **un-rea′son-a-ble-ness** n. — **un-rea′son-a-bly** adv.

**un-rea-son-ing** (un-rē′zən-ing) adj. So intolerant, or so unaccompanied by reason or control, as to be obstinate, blind, or wild. — **un-rea′son-ing-ly** adv.

**un-reck-on-a-ble** (un-rek′ən-ə-bəl) adj. That cannot be reckoned or computed; unlimited.

**un-reel** (un-rēl′) v.t. & v.i. To unwind, as from a reel.

**un-reeve** (un-rēv′) v. -reeved or -rove (for pp. also -rov-en), -reev-ing Naut. v.t. 1 To take out or withdraw (a rope) from a block, thimble, deadeye, etc. — v.i. 2 To become unreeved. 3 To unreeve a rope.

**un-re-flec-tive** (un′ri-flek′tiv) adj. Not given to reflection; not thoughtful.

**un-re-gen-er-ate** (un′ri-jen′ər-it) adj. Not having been changed spiritually by regeneration; remaining unreconciled to God; loosely, sinful. Also **un′re-gen′er-at′ed** (-ā′tid). — **un′re-gen′er-a-cy** (-ə-sē) n. — **un′re-gen′er-ate-ly** adv.

**un-re-lent-ing** (un′ri-len′ting) adj. 1 Continuing to be severe; pitiless; inexorable. 2 Not diminishing, as in not changing, in pace, effort, speed, etc. — **un′re-lent′ing-ly** adv.

**un-re-li-a-ble** (un′ri-lī′ə-bəl) adj. That cannot be relied upon; not dependable. — **un′re-li′a-bil′i-ty**, **un′re-li′a-ble-ness** n. — **un′re-li′a-ble-ly** adv.

**un-re-li-gious** (un′ri-lij′əs) adj. 1 Irreligious; hostile to religion. 2 Having no religion; not connected with religion.

**un-re-mit-ting** (un′ri-mit′ing) adj. Incessant; not relaxing. — **un′re-mit′ting-ly** adv. — **un′re-mit′ting-ness** n.

**un-re-proved** (un′ri-prōōvd′) adj. 1 Not censured or blamed; not reproved. 2 Not liable to reproof; above reproach.

**un-re-serve** (un′ri-zûrv′) n. Absence of reserve; freedom of style or manner.

**un-re-served** (un′ri-zûrvd′) adj. 1 Given or done without reserve. 2 Having no reserve of manner; informal; open; frank. See synonyms under CANDID, IMPLICIT. — **un-re-serv′ed-ly** (un′ri-zûr′vid-lē) adv. — **un-re-serv′ed-ness** n.

**un-re-spec-tive** (un′ri-spek′tiv) adj. Obs. 1 Undiscriminating. 2 Inattentive; heedless. 3 Common; not restricted.

**un-res-pit-ed** (un-res′pit-id) adj. 1 Not postponed; not respited, as from a sentence of the law. 2 Obs. Having no intermission.

**un-re-spon-sive** (un′ri-spon′siv) adj. Showing no reaction or response; unsympathetic. — **un′re-spon′sive-ly** adv. — **un′re-spon′sive-ness** n.

**un-rest** (un-rest′) n. 1 Restlessness, especially of the mind. 2 Trouble; turmoil: used with regard to public or political conditions and suggesting premonitions of revolt.

**un-re-strained** (un′ri-strānd′) adj. Not restrained; free; not controlled. — **un-re-strain-ed-ly** (un′ri-strā′nid-lē) adv.

**un-rid-dle** (un-rid′l) v.t. -dled, -dling To solve, as a mystery.

**un-ri-fled** [1] (un-rī′fəld) adj. Smooth-bored, as a gun.

**un-ri-fled** [2] (un-rī′fəld) adj. Not rifled, seized, or plundered.

**un-rig** (un-rig′) v.t. -rigged, -rig-ging Naut. To strip of rigging.

**un-right-eous** (un-rī′chəs) adj. 1 Not righteous; wicked; sinful. 2 Contrary to the law of right; unjust. See synonyms under SINFUL. — **un-right′eous-ly** adv. — **un-right′eous-ness** n.

**un-rip** (un-rip′) v.t. -ripped, -rip-ping To open by ripping; rip or cut open.

**un-ripe** (un-rīp′) adj. 1 Not arrived at maturity; not ripe; immature. 2 Premature. 3 Not ready; not prepared. [OE. untimely] — **un-ripe′ness** n.

**un-ri-valed** (un-rī′vəld) adj. Having no rival or competitor; unequaled; matchless. Also **un-ri′valled.**

**un-roll** (un-rōl′) v.t. 1 To spread or open (something rolled up). 2 To exhibit to view. 3 Rare To remove from a roll or register. — v.i. 4 To become unrolled.

**un-root** (un-rōōt′, -rŏŏt′) v.t. To uproot.

**un-ruf-fled** (un-ruf′əld) adj. 1 Not disturbed or agitated emotionally; calm. 2 Not ruffled or made rough physically.

**un-ru-ly** (un-rōō′lē) adj. Disposed to resist rule or discipline; intractable; ungovernable. See synonyms under RESTIVE. — **un-ru′li-ness** n.

**un-sad-dle** (un-sad′l) v.t. -dled, -dling 1 To remove a saddle from. 2 To remove from the saddle; unhorse.

**un-said** (un-sed′) adj. Not said, not spoken.

**un-sat-u-rat-ed** (un-sach′ə-rā′tid) adj. 1 Not short of saturation, as a solution. 2 Chem. Not combined to the greatest possible extent; capable of uniting with certain other elements or compounds to form additional compounds.

**un-sa-vor-y** (un-sā′vər-ē) adj. 1 Having a disagreeable taste or odor. 2 Suggesting something disagreeable, offensive, or unclean;

also, morally bad; an unsavory reputation. 3 Obs. Having no savor; tasteless; odorless. Also Brit. **un-sa′voury.** — **un-sa′vor-y-ness** n.

**un-say** (un-sā′) v.t. -said, -say-ing To retract (something said).

**un-scathed** (un-skāthd′) adj. Uninjured.

**un-scram-ble** (un-skram′bəl) v.t. -bled, -bling Colloq. To resolve the confused, scrambled, or disordered condition of.

**un-screw** (un-skrōō′) v.t. 1 To remove the screw or screws from. 2 To remove or detach by withdrawing screws, or by turning. — v.t. 3 To permit of being unscrewed.

**un-scru-pu-lous** (un-skrōō′pyə-ləs) adj. Not scrupulous; having no scruples; unprincipled. — **un-scru′pu-lous-ly** adv. — **un-scru′pu-lous-ness** n.

**un-seal** (un-sēl′) v.t. 1 To break or remove the seal of. 2 To open (that which has been sealed or closed).

**un-seam** (un-sēm′) v.t. To open the seam or seams of.

**un-search-a-ble** (un-sûr′chə-bəl) adj. That cannot be searched or explored; hidden; mysterious. — **un-search′a-bly** adv.

**un-sea-son-a-ble** (un-sē′zən-ə-bəl) adj. Not being in the proper season or not being in time; inappropriate; ill-timed. — **un-sea′son-a-ble-ness** n. — **un-sea′son-a-bly** adv.

**un-sea-soned** (un-sē′zənd) adj. 1 Not seasoned; not flavored. 2 Immature; unripe; not properly aged. 3 Not habituated. — **un-sea′soned-ness** n.

**un-seat** (un-sēt′) v.t. 1 To remove from the seat or fixed position. 2 To unhorse. 3 To deprive of office or rank; depose.

**un-seem-ly** (un-sēm′lē) adj. -li-er, -li-est Unbecoming; indecent; not handsome. — adv. In an unseemly fashion. — **un-seem′li-ness** n.

**un-seen** (un-sēn′) adj. Not seen; not evident; invisible; not previously seen or prepared, as a passage for translation.

**un-set-tle** (un-set′l) v. -tled, -tling v.t. 1 To move from a fixed or settled condition. 2 To confuse; disturb. — v.t. 3 To become unsteady or unfixed. See synonyms under DISPLACE.

**un-sex** (un-seks′) v.t. 1 To deprive of the distinctive qualities of a sex; especially, to render unfeminine or unwomanly. 2 To castrate.

**un-shack-le** (un-shak′əl) v.t. -led, -ling To unfetter; free from shackles. — **un-shack′led** adj.

**un-shap-en** (un-shā′pən) adj. Not shapely; perfectly formed; badly shaped. Also misshapen.

**un-sheathe** (un-shēth′) v.t. -sheathed, -sheathing To take from or as from a scabbard or sheath; bare.

**un-ship** (un-ship′) v.t. -shipped, -ship-ping 1 To unload from a ship or other vessel; also, to dismiss from a ship. 2 To remove from the place where it is fixed or fitted, as a rudder or oar.

**un-sick-er** (un-sik′ər) adj. Scot. Insecure; reliable; undependable. — **un-sick′er-ly** adv. — **un-sick′er-ness** n.

**un-sight-ed** (un-sī′tid) adj. 1 Not sighted or in view. 2 Having no sight, as a cannon. 3 Not aimed with the assistance of a sight as a shot.

**un-sight-ly** (un-sīt′lē) adj. -li-er, -li-est Offensive to the sight; ugly. — **un-sight′li-ness** n.

**un-sight** unseen Sight unseen: former use.

**un-skaithed** (un-skāthd′) adj. Scot. Unscathed.

**un-skil-ful** 1 Lacking or evincing skilfulness; awkward. 2 Obs. Lacking in discernment; ignorant. Also **un-skill′ful.** — **un-skil′ful-ly** adv. — **un-skil′ful-ness** n.

EXHIBIT
Page ___ of ___ Pages
0001

| | | | | | |
|---|---|---|---|---|---|
| unsoldierly | unspeculative | unsquared | unsterilized | unsuggestive | unsustained |
| unsolicited | unspelled | unsquared | unstick | unsuited | unswayed |
| unsolicitous | unspent | unstack | unstigmatized | unsullied | unsweetened |
| unsolid | unspilled | unstainable | unstinted | unsunk | unswept |
| unsoluble | unspiritual | unstained | unstitched | unsunned | unswerving |
| unsolvable | unspirituality | unstamped | unstopped | unsupportable | unsworn |
| unsolved | unspiritually | unstandardized | unstrapped | unsupported | unsymmetrical |
| unsophistication | unspirituallness | unstarched | unstripped | unsupportedly | unsympathetic |
| unsorted | unspiritual | unstarred | unstuffed | unsuppressed | unsympathizing |
| unsought | unspoilt | unstatesmanlike | unsting | unsure | unsystematic |
| unsounded | unspoken | unsteadfast | unsubdued | unsurmountable | unsystematized |
| unsoured | unsportsmanlike | unsteadily | unsubmissive | unsurpassable | untack |
| | | unsteadiness | unsubscribed | unsurpassed | untactful |
| | | | unsubstantiated | unsusceptible | untainted |
| | | | | | untakes |

explication                                    448                              Expressionism

explicare < ex- out + plicare fold] — ex′pli-ca′tor n.

ex·pli·ca·tion (eks′pli-kā′shən) n. 1 Explanation, especially of a passage in any text, or definition, as of a word, by unfolding what is implied in it. 2 The act or process of explicating. 3 A detailed description.

ex·pli·ca·tive (eks′pli-kā′tiv) adj. 1 Serving to unfold or explain. 2 Analytic. Also ex·pli·ca·to·ry (-tôr′ē, -tō′rē).

ex·plic·it (ik-splis′it) adj. 1 Plainly expressed, or that plainly expresses. 2 Having no disguised meaning or reservation; definite; open; unreserved. 3 Logic Brought out definitely in words; not merely implied: opposed to implicit. [< L explicitus var. of explicatus. See EXPLICATE.] — ex·plic′it·ly adv. — ex·plic′it·ness n.

Synonym: express. Both explicit and express are opposed to what is merely implicit or implied. See IMPLICIT. That which is explicit is unfolded, so that it may not be obscure, doubtful, or ambiguous; that which is express is uttered or stated so decidedly that it may not be forgotten nor overlooked. An explicit statement is too clear to be misunderstood; an express command is too emphatic to be disregarded. Compare CLEAR, PLAIN, PRECISE. Antonyms: ambiguous, doubtful, implicit, implied, indefinite, indeterminate, uncertain.

ex·plode (ik-splōd′) v. ·plod·ed, ·plod·ing v.t. 1 To cause to expand violently or pass suddenly from a solid to a gaseous state: to explode gunpowder. 2 To cause to burst or blow up violently and with noise: to explode a bomb. 3 To disprove utterly; refute: to explode a theory. 4 Phonet. To pronounce with an explosion. 5 Obs. To drive from the stage, as an actor. — v.i. 6 To be exploded, as gunpowder. 7 To burst into pieces or fragments; blow up. 8 To make a noise as if bursting: to explode with laughter. [< L explodere, orig. drive off the stage, hiss < ex- out + plaudere clap] — ex·plod′er n.

ex·plo·dent (ik-splōd′ənt) n. Phonet. A plosive.

ex·ploit (eks′ploit, ik-sploit′) n. A deed or act, especially one marked by heroism, daring, skill, or brilliancy. See synonyms under ACT. — v.t. (ik-sploit′) 1 To use for one's own advantage; take advantage of. Rulers often exploit the people. 2 To put to use; make use of: to exploit water power. [< OF esploit < L explicitum, neut. sing. of explicitus. See EXPLICIT.] — ex·ploit′a·ble adj.

ex·ploi·ta·tion (eks′ploi·tā′shən) n. 1 The act of exploiting. 2 Selfish employment for one's own use or advantage.

ex·ploi·ta·tive (ik-sploit′ta-tiv) adj. Tending or serving to exploit.

ex·ploit·er (ik-sploit′ər) v.t. To turn to one's use or advantage illegitimately; exploit. — n. One who exploits.

ex·plo·ra·tion (eks′plə-rā′shən) n. 1 The act of exploring; especially, geographical research in unknown regions. 2 The examination of internal organs or parts. [< L exploratio, -onis < explorare. See EXPLORE.]

ex·plor·a·to·ry (ik-splôr′ə-tôr′ē, ik-splō′rə-tō′rē) adj. Of, for, or relating to exploration. Also ex·plor′a·tive.

ex·plore (ik-splôr′, -splōr′) v. ·plored, ·plor·ing v.t. 1 To search through or travel in or over, as new lands, for discovery. 2 To look into carefully; scrutinize. 3 Med. To examine: to explore a wound with a probe. 4 To make explorations. See synonyms under EXAMINE. [< L explorare investigate < ex- out + plorare cry out]

ex·plor·er (ik-splôr′ər, -splō′rər) n. 1 One who explores; especially, one who travels in a new or strange region. 2 Any device with which to explore or examine; a probe.

Ex·plor·er The first U.S. artificial satellite, launched from Cape Canaveral, Fla., Jan. 31, 1958; maximum height about 1900 miles; weight, 30.8 lbs.; orbital velocity, 18,000 mph.

ex·plo·sion (ik-splō′zhən) n. 1 The act of exploding; rapid combustion or other similar process, usually causing a loud report. 2 The power stroke of an internal-combustion engine. 3 Physiol. The sudden discharge of a neural cell or group of cells. 4 A sudden and violent outbreak of physical forces or of

explosion. 3 Phonet. Plosive. — n. 1 Physics Any substance or mixture of substances which, on impact or by ignition, reacts by a violent rearrangement of its molecules accompanied by the sudden expansion of gases and the liberation of relatively large amounts of thermal energy. 2 Phonet. A plosive consonant. — ex·plo′sive·ly adv. — ex·plo′sive·ness n.

explosive D Dunnite.

ex·po·nent (ik-spō′nənt) n. 1 One who or that which explains, interprets, or expounds. 2 Logic An illustrative example of a general proposition. 3 Math. Any number or symbol placed as a superscript to the right of a quantity to indicate a power or the reciprocal or root of a power: thus, $3^2 = 3 \times 3$; $3^{-2} = 1/3^2$; $3^{\frac{1}{2}} = \sqrt{3}$. 4 Any person or thing that represents the character or principles of something: Franklin was the exponent of American principles in France. [< L exponens, -entis, ppr. of exponere indicate < ex- out + ponere place] — ex·po·nen·tial (eks′pō-nen′shəl) adj. — ex′po·nen′tial·ly adv.

ex·po·ni·ble (ik-spō′nə-bəl) adj. Needing explanation, as in logic, when propositions must be restated to be intelligible. — n.′ An exponible statement.

ex·port (ik-spôrt′, -spōrt′, eks′pôrt, -pōrt) v.t. To carry or send, as merchandise or raw materials, to other countries for sale or trade. — n. (eks′pôrt, -pōrt) 1 The act of exporting; exportation. 2 That which is exported; especially, merchandise sent from one country to another: usually in the plural. — adj. Of or pertaining to exports or exportation. [< L exportare < ex- out + portare carry] — ex·port′a·ble adj. — ex·port′a·bil′i·ty n. — ex·port′er n.

ex·por·ta·tion (ek′spôr·tā′shən, -spōr-) n. 1 The act or practice of exporting. 2 An export commodity.

ex·pose (ik-spōz′) v.t. ·posed, ·pos·ing 1 To lay open, as to harm, attack, ridicule, censure, etc. 2 To leave open to the action of a force or influence. 3 To present to view; show; display: The dress exposed her shoulders. 4 To cause to be known; make public, as a conspiracy or crime. 5 To lay open or make known the crimes, faults, etc., of (a person): to expose a traitor. 6 To abandon so as to cause the death of; to expose an unwanted child. 7 Phot. To admit light to (a sensitized film or plate). 8 In the Roman Catholic Church, to show for adoration or worship, as the Host. See synonyms under DISCOVER. [< MF exposer < ex- out + poser. See POSE¹.] — ex·po′sal n. — ex·pos′er n.

ex·po·sé (ek′spō-zā′) n. 1 An undesirable or embarrassing disclosure or exposure. 2 A revelation or disclosure of something to the public, as corruption, political graft, social injustice, etc. — adj. Given to exposing discreditable things: an exposé magazine. [< F. pp. of exposer. See EXPOSE.]

ex·posed (ik-spōzd′) adj. 1 In plain view. 2 Uncovered; open to or unprotected from, as the elements.

ex·po·si·tion (eks′pə-zish′ən) n. 1 A public exhibition of arts, products, achievements, etc., of a specific region, country, or group, as a world's fair. 2 An explanation; commentary. 3 Rhetorical analysis. 4 The dramatic composition that unfolds the plot. 5 In the Roman Catholic Church, the rite in which the blessed sacrament is held for adoration. 6 Music The initial presentation or statement of the themes of a movement; especially, in a fugue, the introduction of the several parts or voices. See synonyms under DEFINITION. [< OF < L expositio, -onis < ponere. See EXPONENT.]

ex·pos·i·tor (ik-spoz′ə-tər) n. One who expounds.

ex·pos·i·to·ry (ik-spoz′ə-tôr′ē, -tō′rē) adj. Conveying, containing, or pertaining to exposition. Also ex·pos′i·tive.

ex post fac·to (eks pōst fak′tō) Arising or enacted after the fact but retroacting upon it; retroactive; retrospective. [< L]

ex·pos·tu·late (ik-spos′chə-lāt) v.i. ·lat·ed, ·lat·ing To reason earnestly with a person, against some action: usually with with. [< L expostulatus, pp. of expostulare < ex- out + postulare

ex·pos·tu·la·to·ry (ik-spos′chə-lə-tôr′ē, adj. Conveying, containing, or pertaining expostulation.

ex·po·sure (ik-spō′zhər) n. 1 The act or process of exposing, or the state of being exposed in any sense: disclosure of the hitherto truth, usually discreditable, about a person or situation. 2 An open situation or position in relation to the sun, elements, or points of the compass; outlook; aspect: The house has a southern exposure. 3 In ancient Greece and Rome, the practice of abandoning sickly or deformed (and often female) infants. 4 Phot. The act of submitting a sensitized plate or film to the action of actinic rays. 5 That portion of a rock mass exposed to view. 6 Law Offensive public display of one's person.

exposure meter Phot. An instrument that shows the correct film exposure required for best results.

ex·pound (ik-spound′) v.t. 1 To set forth in detail; state; declare, as a doctrine or opinion. 2 To explain the meaning or significance of; interpret. See synonyms under EXPLAIN. [< OF exponre < L exponere. See EXPONENT.] — ex·pound′er n.

ex·press (ik-spres′) v.t. 1 To put (thought or opinion) into spoken or written words; to make apparent; reveal: His actions express anger. 2 To represent in art, as to depict by symbols: The rose expresses love. 4 Math. To represent by a figure, letter, etc. 5 U.S. To send by express; send post; squeeze out, as juice or oil. 7 To force out by or as by pressure; to send or cause to be sent by express; to age. — to express oneself 1 To make known one's thoughts. 2 To give expression to imagination or emotions, especially in activity. See synonyms under SPEAK. — adj. 1 Set forth distinctly; explicit; plain. 2 Specially prepared; adapted to a purpose: There was express provision for strangers. 3 Done, traveling, or carried at high speed or in haste: an express train, resembling an original: an express likeness. 5 Of or pertaining to an express. See synonyms under EXPLICIT. — adv. 1 By express; speed; not stopping at local stations: train runs express. — n. 1 A system of transportation for trunks, small parcels, etc., by organized corporations. 2 The baggage, parcels, etc., sent by this system. 3 Means of rapid transmission. 4 A dispatch; special communication or speed. 5 A messenger bearing dispatches; courier. 6 An express rifle. 7 A fast train. [< OF expresser < L ex- out + premere press]

ex·press·age (ik-spres′ij) n. 1 The transportation of goods by special system; charge for carrying by express.

express company A business corporation that operates a system for the rapid transit of trunks, packages, and other articles.

ex·press·er (ik-spres′ər) n. 1 One or anything by express. 2 One who or anything that presses out a juice or the like.

ex·press·i·ble (ik-spres′ə-bəl) adj. Capable of being expressed. — ex·press′i·bly adv.

ex·pres·sion (ik-spresh′ən) n. 1 The act or mode of uttering or representing, as in language, gesture, etc. 2 Any act or effect of pressing out, as a juice or the like. 3 That which is uttered or expressed; a word, a phrase, or other utterance. 4 A saying; any embodiment or representation of a movement; as a common expression among doctors: a forward aspect; especially, the expression of the face as indicating the feelings, emotions, etc.; the faculty of having proper expression; the effective utterance of thought; expressiveness. 6 The development of character and sentiment in music, as by shadings, nuances, variations, etc. 7 A pressing out. 8 Math. A group of algebraic symbols representing a statement. Also Obs. DICTION, LANGUAGE. — synonyms under AIR, DICTION, LANGUAGE. [< F < L expressio, -onis < ex- out + premere press] — ex·press′ive·ly

Ex·pres·sion·ism n. 1 A movement in the arts, originating about the time of World War I as its object the free expression

EXHIBIT
Page 4D of Ten Pages
49-0

Case 1:05-cv-01459-CKK    Document 30-2    Filed 09/09/2008    Page 71 of 94

of coupling; also, the state of being coupled together. **2** Sexual intercourse.

**copulative conjunction** *Gram.* A coordinate conjunction, as *and*.

**cop·y** (kop′ē) *n., pl.* **cop·ies** 1 A reproduction or imitation; duplicate. **2** A single printed pamphlet, book, etc., of an edition or issue. **3** A pattern given for imitation. **4** Manuscript or other matter to be reproduced in type. **5** In journalism, someone or something that is newsworthy: He is good *copy*. — **certified copy** A copy attested to by an officer having charge of the original. — *v.* **cop·ied, cop·y·ing** *v.t.* 1 To make a copy of; transcribe; reproduce; make in imitation, as in writing or painting. **2** To follow as a model; imitate, as in actions or opinions. — *v.i.* 3 To make a copy or reproduction. **4** To admit of being copied: That page *copies* well. 5 To do in imitation. [ < F *copie* < Med.L *copia* transcript < L, supply, abundance]

**cop·y·book** (kop′ē·book′) *n.* A book containing copies to be imitated in penmanship; a writing book.

**cop·y·boy** (kop′ē·boi′) *n.* An errand boy in a newspaper office who delivers copy to the editor, composing room, etc.

**cop·y·cat** (kop′ē·kat′) *n. Colloq.* An imitator: a child's term of derision.

**cop·y·desk** (kop′ē·desk′) *n.* A desk in a newspaper office where copy is edited and prepared for the typesetters.

**cop·y·graph** (kop′ē·graf, -gräf) *n.* A hectograph.

**cop·y·hold** (kop′ē·hōld′) *n. Law* A tenure of lands evidenced by a copy of the court roll. **cop·y·hold** (kop′ē·hōld′) *v.t. Colloq.* To act as copyholder.

**cop·y·hold·er** (kop′ē·hōl′dər) *n.* 1 One who or that which holds copy; specifically, one who holds and reads copy so that a proofreader may detect errors in printed matter. **2** In English law, one who holds land by tenure of copyhold.

**copy·ing ink** An ink containing sugar, glycerin, or some similarly acting substance, for use in any writing or printing to be reproduced in the copying press.

**copying paper** An unsized paper used in the copying press.

**copying press** A press for duplicating writing or printing done with copying ink.

**cop·y·ist** (kop′ē·ist) *n.* 1 One whose business it is to copy. **2** An imitator.

**cop·y·read·er** (kop′ē·rē′dər) *n.* A person in an editorial office, or by assignment elsewhere, who edits work intended for publication.

**cop·y·right** (kop′ē·rīt′) *n.* The exclusive statutory right of authors, composers, playwrights, artists, publishers, or distributors to publish and dispose of their works for a limited time; in the United States, for 28 years, with privilege of one renewal for an additional 28 years. The common-law property rights in unpublished works continue in effect until publication with or without copyright. — *v.t.* To secure copyright for, as a book or work of art. — **cop′y·right′a·ble** *adj.* — **cop′y·right′er** *n.*

**cop·y·writ·er** (kop′ē·rī′tər) *n.* One who writes copy for advertisements, including radio and television commercials.

**coque·li·co** (kōk′li·kō) *n.* 1 The English wild poppy (*Papaver rhoeas*). **2** The reddish-orange color of this flower. [ < F ]

**Coque·lin** (kôk·lan′), **Benoît-Constant**, 1841–1909, French actor.

**co·quet** (kō·ket′) *v.* **co·quet·ted, co·quet·ting** *v.i.* 1 To flirt; play the coquette; trifle in love: said of women. **2** To act in a trifling, undecided manner; dally. — *v.t.* 3 *Obs.* To flirt with. [ < F *coqueter* < *coquet*, dim. of *coq* a cock; with. ref. to its strutting]

**co·quet·ry** (kō′kə·trē, kō·ket′rē) *n., pl.* **·ries** 1 Trifling in love, as a coquette; flirting. **2** The quality of being coquettish.

**co·quette** (kō·ket′) *n.* A woman or girl who ~~coquets~~ to attract men's attention and admiration merely for the gratification of vanity; flirt. Also **co·quet**. [ < F, fem. dim. of *coq* a cock. See COQUET.] — **co·quet′tish** *adj.* — **co·quet′tish·ly** *adv.* — **co·quet′tish·ness** *n.*

**co·quil·lage** (kō·kē·yäzh′) *n.* A design made of or imitating shells, prevalent in the decorative arts of the rococo period. [ < F < *coquille* shell]

shelled, oval nut of the Brazilian palm *Attalea funifera*. [ < Sp. *coquillo*, dim. of *coco* coconut]

**co·quille** (kō·kēl′) *n.* 1 Any of various dishes, usually of sea food, baked in a shell. **2** Chili (*n. def. 4*). [ < F, shell]

**co·qui·na** (kō·kē′nə) *n.* A soft, highly porous, limestone rock composed of fragments of marine shells: used as building material. [ < Sp. ]

**co·qui·to** (kō·kē′tō) *n., pl.* **-tos** 1 A tall, massive feather palm of Chile (*Jubaea spectabilis*), bearing a dense crown of foliage. **2** Its small, edible nut. [ < Sp., dim. of *coco* coconut] **cor–** Assimilated var. of COM–.

**Co·ra** (kôr′ə, kō′rə) A feminine personal name. [ < Gk., maiden]

**cor·a·cii·form** (kôr′ə·si′ə·fôrm) *adj.* Designating an order of non-passerine birds (*Coraciiformes*), including the rollers, kingfishers, hornbills, etc. [ < NL < Gk. *korax, korakis* raven + -FORM]

**cor·a·cle** (kôr′ə·kəl, kor′-) *n.* A small fishing boat of hide or oilcloth on a wicker frame. [ < Welsh *corwgl* < *corwg* boat]


FRENCH CORACLE

**cor·a·coid** (kôr′ə·koid, kor′-) *adj.* 1 *Zool.* Designating the posterior inferior process of the shoulder girdle, a separate bone in many animals, as birds, reptiles, and monotremes, that unites with the scapula to form the glenoid cavity. **2** Shaped like a raven's beak. — *n.* 1 The coracoid process. **2** The chief bone of the shoulder girdle of a teleost fish. [ < Gk. *korakoeidēs* < *korax, korakis* raven + *eidos* form]

**cor·al** (kôr′əl, kor′-) *n.* 1 The calcareous skeleton secreted in or by the tissues of various, usually compound marine coelenterates and deposited in various forms and colors. **2** These skeletons collectively. **3** An animal of this type. **4** A yellowish-red color. 5 An object, as a toy or a jewel, made of coral. **6** Lobster or crab roe: so called from its appearance when cooked. — *adj.* 1 Consisting of or like coral. **2** Colored like coral. [ < OF < L *corallum* < Gk. *korallion*]



TYPES OF CORAL
*a.* Reef coral.   *c.* Bud coral.
*b.* Mushroom coral.   *d.* Red coral.
*e.* Brain coral.

**cor·al·ber·ry** (kôr′əl·ber′ē, kor′-) *n., pl.* **·ries** A bushy American shrub (*Symphoricarpos orbiculatus*) with dark berries somewhat resembling currants.

**cor·al·li–** *combining form* Coral: *coralliferous*. Also, before vowels, **corall–**. [ < Gk. *korallion* coral]

**cor·al·lif·er·ous** (kôr′ə·lif′ər·əs, kor′-) *adj.* Producing or containing coral. [ < CORALLI– + -FEROUS]

**cor·al·line** (kôr′ə·lin, -līn, kor′-) *adj.* 1 Of, pertaining to, producing, or like coral. **2** Pinkish-red. — *n.* 1 A calcareous, coral-like seaweed. **2** A coral or coral-like animal.

**cor·al·lite** (kôr′ə·līt, kor′-) *n.* 1 An individual skeleton of a coral polyp in a compound coral. **2** Fossil coral. — **cor′al·lit′ic** (-lit′ik) *adj.*

**cor·al·loid** (kôr′ə·loid, kor′-) *adj.* Coral-shaped; especially, branching like coral: also **cor·al·loi′dal.** — *n.* A polyzoan.

**co·ral·lum** (kə·ral′əm) *n., pl.* **-ra·la** (-kə·ral′ə) Coral, either as a compound mass or as the skeleton of a polyp. [L, var. of *coralium* CORAL]

**coral reef** A reef, often of great extent, formed by the gradual deposit of innumerable coral skeletons, found chiefly in tropical waters.

**cor·al·root** (kôr′əl·root′, -root′, kor′-) *n.* Any one of a small genus (*Corallorhiza*) of brownish, leafless orchids with much-branched coral-like rootstocks.

**Coral Sea** A SW area of the Pacific Ocean, east of Australia and New Guinea; scene of Japanese naval defeat by U.S. forces in World War II, 1942.

**coral snake** Any of a genus (*Micrurus*) of venomous snakes of tropical America and the southern United States, noted for their brilliant red, black, and yellow rings; especially, *M. lemniscus* of South America and the harlequin snake (*M. fulvius*) of Mexico and the southern United States.

**co·ram pop·u·lo** (kō′ram pop′yə·lō) *Latin* In the presence of the people; publicly.

**cor an·glais** (kôr än·gle′) *French* 1 The English horn. **2** A reed organ stop resembling the oboe in sound.

**cor·ant** (kə·rant′), **co·ran·to** (kə·ran′tō, -ran′-) See COURANT.

**Cor·an·tyn** (kôr′ən·tin, kor′-) See CORENTYN.

**cor·ban** (kôr′bən, kôr·bän′) *n.* An offering to God, as in fulfillment of a vow. *Mark* vii 11. [ < Hebrew *qorbān*]

**cor·beil** (kôr′bəl) *n.* 1 *Obs.* A basket. **2** *Archit.* A sculptured basket of fruit or flowers. [ < F *corbeille* < L *corbicula*, dim. of *corbis* basket]

**cor·bel** (kôr′bəl, -bel) *n. Archit.* A projection from the face of a wall to support an overhanging weight; corbeling. **b** A short timber placed lengthwise upon a wall, etc., under a girder to increase its bearing. — *v.t.* **cor·beled** or **-belled, cor·bel·ing** or **-bel·ling** 1 To support by corbels. **2** To make in the form of corbels. [ < OF < LL *corvellum*, dim. of *corvus* crow; from its shape]

**cor·bel** (kôr′bəl, -bel) *n. Archit.* A piece serving as a cushion for a capital, as in a Corinthian column, that rests on the astragal. [ < OF < LL *corbis* basket]

**cor·bel·ing** (kôr′bəl·ing) *n. Archit.* An arrangement of stones or bricks in building a wall in which successive courses project beyond those below them. Also **cor·bel·ling.**

**cor·bel·steps** (kôr′bəl·steps′) See CORBIE-STEPS.

**cor·bie** (kôr′bē) *n. Scot.* A crow; raven. Also **cor′by.**

**corbie crow** *Scot.* The carrion crow.

**cor·bie–steps** (kôr′bē·steps′) *n. pl. Scot.* Steps in the top of a gable wall, from the eaves to the apex of the roof, such as only a crow or cat could use: often called *crowsteps.*

**Cor·co·va·do** (*Pg.* kôr′kə·vä′thō, *Sp.* kôr′kə·vä′thō) 1 A peak overlooking Rio de Janeiro, Brazil; 2,310 feet. **2** A volcano in southern Chile; 7,550 feet.

**Cor·cy·ra** (kôr·si′rə) Ancient name of CORFU.

**cord** (kôrd) *n.* 1 A string of several strands. **2** A measure for wood; in the United States a pile 4 × 4 × 8 feet, equal to 128 cubic feet or 3.62 cubic meters. **3** A wale on the surface of cloth. **b** A ridge forming a ribbed fabric giving a raised effect. **4** A corded fabric. **5** *Pl. U.S.* Corduroy trousers. **6** *Anat.* A cordlike structure; the spinal *cord.* **7** *Often pl.* Any feeling that draws or restrains. 6 When a rope used by a hangman. — *v.t.* 1 To bind or ~~cord~~; furnish with cords. 2 To pile (wood) by the *cord.* — Homophone: *chord.* [ < F *corde* < L *chorda* < Gk. *chordē*] — **cord′er** *n.*

**cord·age** (kôr′dij) *n.* 1 Ropes and cords, collectively; especially, ropes in the rigging of a ship. **2** The amount in cords, as of wood, on a given area of land.

**cor·date** (kôr′dāt) *adj.* Heart-shaped: a *cordate* leaf. [ < L *cordatus* < *cor* heart] — **cor′date·ly** *adv.*

**Cor·day** (kôr·dā′), **Charlotte**, 1768–93, French patriot; assassinated Marat; full name, *Marie Anne Charlotte Corday d'Armont.*

**cord·ed** (kôr′did) *adj.* 1 Bound or fastened with cords or rope. **2** Striped or ribbed, as with cords: a corded fabric. **3** Piled in measure: *corded* firewood. **4** With the twisted or felted into strings or curls, as of dogs. 5 *Obs.* Made of cord or rope.

**Cord·ed** (kôr′did) *adj. Anthropol.* Designating a style of pottery decoration produced by the application of cords to the wet surface of the clay.

**Corded people** A Neolithic people of central Europe who were named after their pottery artifacts.

...es n *syn* HEROISM, gallantry, prowess, valiance,
...raior
...alrousness, chivalry; manliness
...iardliness
...illanimity, pusillanimousness
...*adj syn* PRECIOUS 1, costly, inestimable, invalu-
...priceless
...r, expensive; appreciated, prized, treasured, valued;
...d, esteemed, respected
...of great value
...heap, inexpensive, trashy; unmarketable, unsalable;
...rthy
...alueless, worthless
...n *vb syn* ESTIMATE 1, appraise, assay, assess, evalu-
...ate, set (at), survey, value
...tion n 1 *syn* ESTIMATE 1, appraisal, appraisement,
...sment, estimation, evaluation
...judgment, opinion, rating
... WORTH 1, account, value
...charge, cost, price
...n 1 *syn* WORTH 1, account, valuation
...appraisal, assessment; charge, cost, expense, price
... QUALITY 2, caliber, merit, stature, virtue, worth
...*vb* 1 *syn* ESTIMATE 1, appraise, assay, assess, evalu-
...ate, set (at), survey, valuate
...compute, figure, gauge, reckon
...place a value (or price) on
...*syn* APPRECIATE 1, apprize, cherish, esteem, prize, trea-
...care (for); revere, reverence, venerate
...not set much by
...eless *adj syn* WORTHLESS 1, draffy, drossy, good-for-
...thing, inutile, ‖no-account, no-good, nothing, unworthy
...valuable
...re n *syn* FAUCET, cock, gate, hydrant, petcock, spigot,
...opcock, tap
...shutoff
...moose *vb syn* GET OUT 1, begone, clear out, decamp,
...ghtail, kite, scram, skedaddle, skiddoo, take off
...p *vb syn* MEND 2, do up, fix, overhaul, patch, rebuild,
...econdition, reconstruct, repair, revamp
...brush up, fix up, touch up; furbish, refurbish
...p (up) *vb syn* CONTRIVE 2, concoct, cook (up), devise,
...ream up, formulate, frame, hatch (up), invent, make up
...p is *syn* FLIRT, coquette
...charmer, enchantress, enticer, femme fatale, gold dig-
...ger, inveigler, seductress, siren, temptress
...ndal n one who willfully destroys or mars something
...valuable <*vandals* had knocked off the head of the sta-
tue>
...*syn* defacer, despoiler, destroyer, ruinator, ruiner, wrecker
...*rel* hoodlum, hooligan, lout, ruffian; devastator, ravager,
...spoiler, spoliator; looter, pillager, plunderer, iconoclast
...ndalize *vb* to destroy or deface (as public or private prop-
...erty) willfully or maliciously <youths *vandalized* the
... shop>
...*syn* ‖trash, wreck
...*rel* ‖rip off; destroy, tear up
...anish *vb* to pass from view or out of existence <the moon
... *vanished* behind a cloud>
...*syn* clear, disappear, evanesce, evanish, evaporate, fade
...*rel* dematerialize, dissolve, melt (away); die
...*idiom* do the vanishing act, vanish from sight, vanish into
... thin air, vanish like a dream

*con* arise, break out (*or* through), come (forth *or* out),
emerge, issue, loom (up), materialize, show (up)
*ant* appear

**vanished** *adj syn* EXTINCT 2, bygone, dead, defunct, de-
parted, gone, lost
*rel* expired, passed away; annihilated, no more, perished

**vanity** n *syn* CONCEIT 2, amour propre, conceitedness, nar-
cissism, self-admiration, self-conceit, self-esteem, self-love,
vainglory, vainness
*rel* autotheism, self-worship

**vanquish** *vb syn* CONQUER 1, bear down, beat down, crush,
defeat, overpower, reduce, subdue, subjugate
*rel* surmount; overturn, subvert; humble, trample

**vanquisher** n *syn* VICTOR 1, conqueror, defeater, master,
subduer, subjugator
*rel* champ, champion
*con* loser

**vanquishment** n *syn* DEFEAT 1, beating, debacle, defea-
sance, drubbing, licking, overthrow, rout, shellacking,
trouncing
*rel* mastery, subdual, subjugation

**vantage** n *syn* ADVANTAGE 3, allowance, bulge, ‖dead-
wood, draw, edge, handicap, head start, odds, start
*ant* disadvantage

**vapid** *adj syn* INSIPID 3, driveling, flat, inane, innocuous,
jejune, milk-and-water, namby-pamby, sapless, wishy-
washy
*rel* flavorless, milk-toast, tasteless, weak; dull, unimagina-
tive, uninteresting
*idiom* neither hot nor cold, neither one thing nor the
other
*con* brisk, lively, tangy, zesty; crisp, forceful, incisive,
trenchant; expressive, meaningful, pregnant, significant,
telling

**vaporous** *adj syn* HAZY, cloudy, foggy, misty, mushy,
vague, vapory
2 *syn* AIRY 3, aerial, ethereal, vapory
*rel* unsubstantial, wispy; illusory, unreal

**vapory** *adj* 1 *syn* HAZY, cloudy, foggy, misty, mushy,
vague, vaporous
2 *syn* AIRY 3, aerial, ethereal, vaporous
*rel* gaseous

**variable** *adj* 1 *syn* CHANGEABLE 1, changeful, fluid, mo-
bile, mutable, protean, unsettled, unstable, unsteady,
weathery
*rel* fitful, spasmodic; irregular, unequal, ununi-
form
*con* unchanging, unvarying; immutable, stable, unmoving;
equable, equal, uniform
*ant* constant, invariable
2 *syn* MUTABLE 2, changeable, inconstant, shifty, slippery,
uncertain, unstable, unsteady
3 *syn* INCONSTANT 1, capricious, changeable, fickle, mer-
curial, temperamental, ticklish, uncertain, unstable, volatile

| | |
|---|---|
| *syn* synonym(s) | *rel* related word(s) |
| *idiom* idiomatic equivalent(s) | *con* contrasted word(s) |
| *ant* antonym(s) | * vulgar |

‖ use limited; if in doubt, see a dictionary
The first word in a synonym list when printed in SMALL
CAPITALS shows where there is more information about the
group. For a more efficient use of this book see Explanatory
Notes.

EXHIBIT
Page 11 of 94 Pages

# WEBSTER'S II

## New Riverside
## University
## Dictionary

The U.S. Government

**va·line** n. [VAL(ERIC ACID) + -INE.] A crystalline amino acid, $C_5H_{11}NO_2$, required for normal human growth.

**va·lise** (və-lēs') n. [Fr. < L. *valigia*.] A small piece of hand luggage. [Fr.: a trademark for the tranquilizing drug diazepam]

**Val·kyr·ie** (văl-kîr'ē, -krē) n. [ON *Valkyria*, the chooser of the slain. Any of Odin's handmaidens who chose the heroes to be slain in battle and then conducted their souls to Valhalla.

**val·late** (văl'āt') adj. [Llat. *vallatus* < L. *vallare*, to surround with a rampart < *vallum*, rampart < *vallus*, stake.] 1. Having a raised rim. 2. Of or relating to military defense; RAMPART. 2. The art or process of erecting earth fortifications. —**val·la·to·ry** (văl'ə-tôr'ē,

**val·lec·u·la** (və-lĕk'yə-lə, vo-) n., pl. **-lae** (-lē') [Llat., dim. of Lat. *vallis*, valley.] Biol. A shallow groove, depression, or furrow. —**val·lec·u·late** (-lĭt, -lāt') adj.

**val·ley** (văl'ē) n., pl. **-leys** [ME *valey* < OFr. *valee* < Lat. *valles*.] 1. An elongated lowland between ranges of mountains, hills, or other elevated land, often having a river or stream running along the bottom. 2. An extensive area of land drained or irrigated by a river system. 3. A depression resembling a valley, as the point at which the two slopes of a roof meet.

**val·o·ni·a** (və-lō'nē-ə, -lōn'yə) n. [Ital. *vallonia* < Mod. Gk. *balania*, acorn < Gk. *balanos*.] An extract from the dried acorn cups of the oak tree, Quercus aegilops of eastern Europe and Asia, used chiefly in tanning and dyeing.

**val·or** n. [ME *valour* < OFr. < Med. Lat. *valor* < Lat. *valēre*.] Courage; bravery.

**val·or·ize** (văl'ə-rīz') vt. **-ized, -iz·ing, -iz·es** [Port. *valorizar* < Med. Lat. —see VALOR.] To establish and maintain the price (of a commodity) by government action. —**val·or·i·za·tion** n.

**val·or·ous** (văl'ər-əs) adj. Valiant. —**val·or·ous·ly** adv. —**val·or·ous·ness** n.

**Val·sal·va** n. Chiefly Brit. var. of VALOR.

**val·u·a·ble** (văl'yōo-ə-bəl, val'yə-) adj. 1. Of high monetary or material worth <*valuable jewelry*> 2. Of great importance, utility, or service <*valuable data*> 3. Having admirable or estimable characteristics <*a valuable colleague*> —n. often **-bles.** A personal possession having high monetary or material value. —**val·u·a·ble·ness** n. —**val·u·a·bly** adv.

**val·u·ate** (văl'yōo-āt') vt. **-at·ed, -at·ing, -ates.** [Back-formation < VALUATION.] To set a value for; APPRAISE.

**val·u·a·tion** (văl'yōo-ā'shən) n. 1. An act or process of assessing value; APPRAISAL. 2. Assessed value or price. 3. An estimation of worth or character. —**val·u·a·tion·al** adj.

**val·u·a·tor** (văl'yōo-ā'tər) n. One who estimates values; APPRAISER.

**val·ue** (văl'yōo) n. [ME *value* < OFr. *value* < *valoir*, to be worth < Lat. *valēre*.] 1. An amount regarded as a suitable equivalent for something else, esp. a fair price or return for goods or services. 2. Money or material worth <*the fluctuating value of silver*> 3. Usefulness or importance to the possessor <*the value of education*> 4. A principle, standard, or quality regarded as worthwhile or desirable <*traditional moral values*> 5. Precise meaning or import, as of a term. 6. Math. An assigned or calculated quantity. 7. Mus. Relative duration of a tone or rest. 8. The relative darkness or lightness of a color. 9. The sound quality of a diphthong. 10. One of a series of specified values <*a range stamp of new issues*> —vt. **-ued, -u·ing, -ues.** 1. To estimate the worth or value of; APPRAISE. 2. To regard highly; ESTEEM <*valued my colleagues' opinions*> 3. To rate as relative estimate of worth or desirability; EVALUATE <*money over all else*> 4. To assign a value to (e.g., a unit of currency)

**value-add·ed tax** (văl'yōo-ăd'ĭd) n. A tax on the estimated market value added to a product or material at each stage of its manufacture or distribution, ultimately passed on to the consumer.

**val·ued** (văl'yōod) adj. Highly esteemed.

**value pol·i·cy** n. An insurance policy requiring the insurer to pay the full face value of the policy in the event of total loss, without reference to the actual value of the lost property.

**value judg·ment** n. A judgment that assigns a value, as to an action.

**value·less** (văl'yōo-lĭs) adj. Having no value; WORTHLESS.

**valve** (vălv) n. [ME *valve* < Lat. *valva.*] 1. Anat. A membranous structure in a hollow organ or passage, as in an artery or vein, that opens or prevents the return flow of a bodily fluid. 2. a. A device that regulates the flow of gases, liquids, or loose materials through a structure, as a pipe, or through an aperture by opening, closing, or obstructing a port or passageway. b. The movable control element of such a device. c. *Mus.* A device in a brass wind instrument that allows change in pitch by a rapid varying of the air column in a tube. 3. *Biol.* a. One of the paired hinged shells of many mollusks and of brachiopods. b. A similar paired part, as of the cell wall of a diatom. 4. *Bot.* a. One of the sections into which a seed pod or other dehiscent fruit splits. b. A lidlike covering of an anther. 5. *Chiefly Brit.* An electron tube or vacuum tube. 6. *Archaic.* Either half of a double or folding door. —vt. **valved, valv·ing, valves.** 1. To equip with a valve. 2. To control by a valve.

**valve-in-head engine** (vălv'ĭn-hĕd') n. An internal-combustion engine having the inlet and exhaust valves in the cylinder head.

**val·vu·la** (văl'vyə-lə) n. var. of VALVULE.

**val·vu·lar** (văl'vyə-lər) adj. Relating to, having, or operating by means of valves or valvelike parts.

**val·vule** (văl'vyōol') also **val·vu·la** (văl'vyə-lə) n., pl. **-vules** also **-vu·lae** (-vyə-lē'). A small valve or valvelike structure.

**val·vu·li·tis** (văl'vyə-lī'tĭs) n. Inflammation of a valve, esp. of a cardiac valve.

**vam·brace** (văm'brās') n. [ME *vambras* < AN *vauntbras* < OFr. *avantbras* : *avaunt*, before + *bras*, arm.] Armor for protecting the forearm. —**vam'braced' adj.**

**va·moose** (và-mōōs', vă-) vi. **-moosed, -moos·ing, -moos·es.** [< Sp. *vamos*, let's go < Lat. *vadamus*, 1st person pl. subjunctive of *vadere*, to go.] *Slang.* To leave hurriedly.

**vamp¹** (vămp) n. [ME *vampe*, sock < OFr. *avantpie* : *avant*, before < Lat. *abante*, from before) + *pie*, foot (< Lat. *pes*).] 1. The part of a shoe or boot covering the instep and occas. extending over the toe. 2. An improvised musical accompaniment. —vt. **vamped, vamp·ing, vamps.** —vt. 1. To provide (a shoe or boot) with a new vamp. 2. To patch up (something old). 3. *Mus.* To improvise (e.g., an accompaniment) for a solo. —vi. *Mus.* To improvise a vamp. —**vamp'er** n.

**vamp²** (vămp) n. [Short for VAMPIRE.] *Informal.* An unscrupulous woman who seduces or exploits men. —vt. **vamped, vamp·ing, vamps.** To seduce or exploit (a man) in the manner of a vamp. —vi. To play the vamp. —**vamp'ish adj.**

**vam·pire** (văm'pīr') n. [Fr. < G. *Vampir*, of Slav. orig.] 1. A reanimated corpse held to rise from the grave at night to suck the blood of sleeping persons. 2. One who preys on others, as: a. An extortionist. b. A woman who uses sexuality to exploit men. 3. a. Any of various tropical American bats of the family Desmodontidae that feed on the blood of living mammals. b. Any of various other bats, as those of the family Megadermatidae, erroneously believed to feed on blood. —**vam·pir·ic** (văm-pîr'ĭk) adj.

**vam·pir·ism** (văm'pīr-ĭz'əm) n. 1. Belief in vampires. 2. The practice or actions of a vampire.

**van¹** (văn) n. [Short for CARAVAN.] 1. A covered or enclosed truck for transporting goods or livestock. 2. *Chiefly Brit.* A closed railroad car for carrying baggage or freight.

**van²** (văn) n. [Short for VANGUARD.] The vanguard; forefront.

**van³** (văn) n. [ME < OE *fann* and OFr. *van*, both < Lat. *vannus*.] 1. A wing. 2. *Archaic.* A winnowing device, as a fan.

**va·na·dic acid** (və-nād'ĭk, -nād'ĭk) n. 1. An acid containing a vanadate group, esp. $HVO_3$, $H_3VO_4$, or $H_4V_2O_7$, not existing in a pure state. 2. Vanadium pentoxide.

**va·na·di·nite** (və-nād'n-īt', -nād'-, văn'ə-dī'nīt') n. [VANAD(IUM) + -IN + -ITE.] A deep ruby-red or yellow to brown vanadium and lead ore, essentially $Pb_5(VO_4)_3Cl$.

**va·na·di·um** (və-nā'dē-əm) n. [< ON *Vanadis*, the goddess Freya.] *Symbol* V A bright white soft ductile metallic element, used in rust-resistant high-speed tools, as a carbon stabilizer in some steels, and as a catalyst; atomic number 23; atomic weight 50.942.

**vanadium pentoxide** n. A yellow to red crystalline powder, $V_2O_5$, used as a catalyst in various organic reactions and as a starting material for other vanadium salts.

**vanadium steel** n. Steel alloyed with vanadium for added strength, hardness, and high-temperature stability.

**Van Al·len belt** (văn ăl'ən) n. [After James A. *Van Allen* (b. 1914).] Either of two zones of high-intensity particulate radiation trapped in the earth's magnetic field and surrounding the planet, beginning at an altitude of approx. 800 kilometers and extending several tens of thousands of kilometers into space.

**van·co·my·cin** (văng'kə-mī'sĭn, văn'kə-) n. [*vanco-* (of unknown orig.) + -MYCIN.] An antibiotic produced by the bacterium Streptomyces orientalis that is effective against staphylococci and spirochetes.

**Van·dal** (văn'dl) n. [Lat. *Vandalus*, of Germanic orig.] 1. A member of a Germanic people that overran Gaul, Spain, and northern Africa in the 4th and 5th cent. A.D. and sacked Rome in A.D. 455. 2. **vandal.** One who willfully or maliciously defaces or destroys public or private property. —**Van·dal·ic** (văn-dăl'ĭk) adj.

**van·dal·ism** (văn'dl-ĭz'əm) n. Willful or malicious destruction of public or private property. —**van·dal·is·tic** adj.

EXHIBIT 1
Page 74 of 94



United States          Food Safety          Washington, D.C.
Department of          and Inspection       20250
Agriculture            Service

MAR 2 4 2003


TO:          Mr. Eugene Casole
             Compliance Specialist
             Evaluation and Enforcement Division

FROM:        Mr. Scott C. Safian
             Director
             Evaluation and Enforcement Division

SUBJECT:     Conduct


This is in regard to your recent conduct at meetings on March 4 and March 5, 2003.
During these meetings you made inappropriate outbursts and comments, and acted in an
unprofessional manner. All Division employees are expected to conduct themselves in a
professional manner. I would not expect to see this behavior repeated.

If you would like to discuss this matter further, I am happy to meet with you. Otherwise,
consider this as notice of my expectations.


EXHIBIT __1__
Page __75__ of __94__ Pages


000149

**Casole, Eugene**

From:          Casole, Eugene
S              Wednesday, April 09, 2003 11:07 AM
To:            Van Blargan, Richard; Hicks, Ron
Cc:            Collins, Linda
Subject:       Conduct

I would like to advise you of something. Yesterday Mr. Safian asked to meet with me. The meeting lasted only several minutes. He provided me with what appears to be a letter of reprimand/caution for misconduct, which he describes as "inappropriate outbursts and comments," and stated that I "acted in an unprofessional manner." According to Mr. Safian, these incidents occurred on March 4 and 5, 2003.

I have an excellent recollection of what occurred on both of these dates. In regards to March 4th, there was first a conference call and then a meeting regarding Phoenix Poultry and George Oppenheimer. If you are not aware of this particular case, it is an administrative case where the Agency tried to operationally and financially divest Mr. Oppenheimer. Because the Order was poorly crafted, operationally and financially divesting Mr. Oppenheimer has been difficult.

Before I explain what occurred at the conference call and meeting, it's important that I provide you some background information. Approximately two months ago, Mr. Safian asked if we knew if Mr. Oppenheimer had physically departed from Phoenix Poultry. I told him that I had no idea. Mr. Safian appeared to be annoyed that I didn't know the whereabouts of Mr. Oppenheimer. I tried to explain to Mr. Safian that Mr. Sworen was the acting RIM, very seasoned and capable, was very much aware of th Order, and really didn't need me to tell him when he should do the review. Because Mr. Safian in. ed, I telephoned Mr. Sworen and asked him to do the review as soon as possible. Mr. Sworen then delegated that task to Mr. Fleming. Subsequently, Mr. Fleming advised me that he believed that Mr. Oppenheimer had not operationally and financially divested himself from the firm. He later provided us with a case file. The PCP was terrible—it didn't follow the standard protocol for reviewing consent orders. The case file was even worse. It was not informative, containing irrelevant information, and was disorganized. It had no value. Because Mr. Langley was left acting for Mr. Bossler, I advised him of this. Mr. Langley agreed with my assessment. When Mr. Sworen visited WEC, Mr. Langley and I had a meeting with Mr. Sworen. Mr. Sworen, however, didn't agree with our assessment. He pointed to two little words on the continuation sheet of the PCP and stated that because those words were there, Mr. Fleming had completed the PCP properly. I went back to locate these two little words that Mr. Sworen had placed such emphasis on, but I couldn't locate them.

As a result of this review and the possibility that irregularities existed, Mr. Sworen schedule a conference call on March 4th. In attendance were Messrs. Safian and Langley and me. Messrs. Sworen and Fleming were on the conference call. Mr. Fleming briefed us on a number of issues, including that he recently received an updated application from Phoenix Poultry. Mr. Safian then asked if I had a copy. When I told him that I didn't, he pointed his finger at me and stated, "You're not on top of it." Really? I think not, and as I explained to Mr. Safian, I don't believe my duties require me to predict the future or to prompt our field employees to do the obvious—share information.

000150

EXHIBIT L

I   o took the opportunity to advise Mr. Safian that part of the problem we were having with Mr. Oppenheimer was because he "muddied the water," when we met with respondents Oppenheimer and Levine in Albany, New York, last November. Please refer to my "Allegations of Employment Reprisal" that I provided to USDA's Office of Civil Rights.

1

The meeting became a very heated discussion, particularly when Mr. Safian insisted that I oversee this investigation. As I explained to Mr. Safian, I did my job as a case reviewer. I don't do i⎯stigations. I don't tell RIMs how to do their jobs. Mr. Safian doesn't understand this. He does nc. understand compliance work.

In regards, to the March 5th incident, this was an EED staff meeting. Very briefly, Mr. Safian mentioned that he had selected Ms. Vella Kaye Holmes for a new staff officer position with EED. He then told us some things about Ms. Holmes, including that she had a lot of experience, and had written the La Grou case and received a lot of acclaim from Under Secretary Murano for doing so.

Let me first say that this was an in-house meeting consisting only of co-workers. I asked Mr. Safian that if Ms. Holmes was so experienced, why hadn't I read any of her cases—I have been in Washington for eight years. I know all the compliance officers, those that can write and those that can't write cases. I then asked Mr. Safian if she was a seasoned compliance officer. Mr. Safian said yes and then turned his head. I then asked him if he could justify that selection—yes/no? He never answered me. If my questions, as his letter suggests, were in appropriate, he should have advised me of this when I asked my first question, and then I would have ceased. I'm sorry, but I am a very inquisitive person. I never accept things on face value. I also explained to Mr. Safian yesterday, with the little time that he gave me, that every person in that conference room has been an applicant at one time or another and has a vested interest in knowing that the director will always be impartial, fair, and will always pick the most qualified person. I was stunned and upset when Mr. Safian allegedly stated that I was trying to poison people against him.

The last issue I want to bring to your attention has to do with Mr. Safian's inappropriate conduct. On January 22, 2003, during an EED staff meeting, Mr. Safian used offensive language. He was upset t  his staff meeting wasn't starting on time because several people were arriving a couple of minutes late. He said, "I'm tired of this 'f......' crap." That was totally uncalled for. There were women in that meeting. Some people said that he used the 'f' word twice. Many people heard him use this language, including Ms.'s Razzak and Lewis and Messrs. Busch, Ogundipe, and others. I was so stunned by the incident that I reported it to my EEO counselor, Linda Collins, OCR.

Very briefly, I am requesting some fairness. Mr. Safian's position is that my comments/remarks and conduct were inappropriate. As such, he issued a letter of reprimand/caution to me. In light of what I related to you, I am requesting that you investigate these incidents, either through your office or HRD, and then take appropriate personnel action.

EXHIBIT 1
Page 77 of 94 Pages



| United States Department of Agriculture | Food Safety and Inspection Service | Office of Management – Labor and Employee Relations Division 14th and Independence Ave. SW Room 3175-S Washington, DC 20250 202-720-5657 |

FOR OFFICIAL USE ONLY                                    June 26, 2003

TO:         Eugene Casole
            Evaluation and Enforcement Division
            Program Evaluation, Enforcement & Review
            USDA, Food Safety & Inspection Service
            Washington, D.C.

THROUGH:    Scott C. Safian, Director
            Evaluation and Enforcement Division
            USDA, Food Safety & Inspection Service
            Washington, D.C.


This will serve as an Official Reprimand based on the following:

**REASON:  IMPROPER CONDUCT**

**SPECIFICATION 1:**

On May 21, 2003 during a meeting with Salem Packing Company plant management officials, and FSIS personnel, you told Tony Bonaccurso, a member of plant management, that when you were an inspector you shut down his cousin's establishment. You also made the comment that it was common knowledge that packing plant personnel may not have the education or ability to understand or prepare the required written documents needed to comply with the requirements of the Consent Order.

During the same meeting, while assault, intimidation, and interference with inspection personnel were being discussed, you directed your focus and comment toward Tony Bonaccurso, saying that Tony had a problem with this in the past. You also made a statement to Tony Bonaccurso, to the effect of, at your age you should not even be here, you should be in Florida.

**BACKGROUND:**

EXHIBIT 1
Page 78 of 94 Pages

You attended and presented at a Consent Order meeting at Salem Packing Company, Inc. on May 21, 2003 during which you made remarks that may have been construed as offensive, unprofessional and inappropriate to some of the meeting attendees. You are a Compliance Specialist (Enforcement), GS-1801-13, assigned to Washington, D.C. and you have been employed with the Agency since July 19, 1986. Compliance Specialists operate with a certain level of independence. The Agency is dependent on these positions to ensure that plants are

000152

adhering to regulatory requirements and that FSIS employees are supervised and cared for properly. Subsequently, these positions must be able to function effectively with little direct oversight.

Offensive and discriminatory remarks cannot and will not be tolerated. Conduct such as that described above is contrary to the expectations of USDA, Food Safety and Inspection Service (FSIS) representatives. It is especially so since unprofessional comments are potentially offensive and only serve to create an adverse image of the FSIS, USDA, and the Federal government since you are a Federal employee.

I considered that given your length of service with the Agency you should have known that your conduct was improper. Your actions may have impaired the confidence of the public in the integrity of yourself, FSIS, and USDA. As a compliance officer, you are held to a high standard since you must assist in maintaining the proper conduct of those who work with you. Foremost, by treating them with dignity and respect, and by leading by example.

The FSIS Equal Employment Opportunity Policy Statement states, in part:

> The Agency will not tolerate discriminatory actions in the workplace. It is imperative that employees uphold this policy, regardless of personal opinions. Doing less is unacceptable and impedes the attainment of our vision to be "an employer of choice."

Your actions strike at the very core of the Agency policy and expectations of employee conduct. As an employee and a supervisor of this Agency, you are responsible for adhering to these basic principles. You are implored to exercise care in future interactions with agency personnel or as in this case, the public, and to avoid making remarks that may be viewed by others as offensive or discriminatory.

**The Standards of Ethical Conduct for Employees of the Executive Branch, Subpart A - General Provisions, #2635.101 Basic obligation of public service, states:**

"(a)    Public service is a public trust. Each employee has a responsibility to the United States Government and its citizens to place loyalty to the Constitution, laws and ethical principles above private gain. To ensure that every citizen can have complete confidence in the integrity of the Federal Government, each employee shall respect and adhere to the principles of ethical conduct set forth in this section, as well as the implementing standards contained in this part and in supplemental agency regulations.

(b)    General principles. The following general principles apply to every employee and may form the basis for the standards contained in this part. Where a situation is not covered by the standards set forth in this part, employees shall apply the principles set forth in this section in determining whether their conduct is proper.

(1)    Public service is a public trust, requiring employees to place loyalty to the Constitution, the laws and ethical principles above private gain. . .

EXHIBIT 1
Page 79 of 94 Pages

(7)    Employees shall not use public office for private gain. . .

(12)   Employees shall satisfy in good faith their obligations as citizens, including all just financial obligations. . .

(14)   Employees shall endeavor to avoid any actions creating the appearance that they are violating the law or the ethical standards set forth in this part. Whether particular circumstances create an appearance that the law or these standards have been violated shall be determined from the perspective of a reasonable person with knowledge of the relevant facts."

FSIS Directive 4735.3, Employee Responsibilities and Conduct, contains Agency policy regarding conduct standards of Agency employees. Part Two, Misconduct and Discipline, Subpart 1, Section A states:

"The maintenance of unusually high standards of honesty, integrity, impartiality, and conduct by Government employees…is essential to assure the proper performance of the Government business and the maintenance of confidence by citizens in their Government. The confidence of citizens in their Government is influenced not only by the manner in which employees serve the public, but also in the way they conduct themselves in the eyes of the public. The avoidance of misconduct…on the part of Government employees…is indispensable to the maintenance of these standards."

Letters of reprimand will be maintained in the employee's OPF for a period of not to exceed two (2) years.

## RIGHTS:

You have the right to (1) file a grievance or (2) file a discrimination complaint concerning this decision.

If you choose to file a grievance, you must do so under the Administrative Grievance System procedure set forth in FSIS Directive 4771.1. You should address your grievance to:

Administrator, Food Safety and Inspection Service
Attention: Director, Labor and Employee Relations Division
USDA, FSIS, LERD
1400 Independence Ave S.W., Room 3175-S
Washington, DC 20250

To be considered, your grievance must (1) be in writing, (2) set forth specifically the reasons for your grievance, and (3) be submitted at any time after your receipt of this decision, but no later than **fifteen (15) calendar days** after the effective date of this action.

EXHIBIT 1
Page 80 of 94 Pages

You have the right to be represented and advised by a representative of your own choosing in presenting your grievance, or you may represent yourself. You and your representative, if otherwise in active duty status, will be allowed a reasonable amount of official time to present your grievance.

If you believe this action was based on discrimination because of race, color, religion, sex, age, national origin, marital status, or physical/mental disability, you may file a complaint of discrimination through the USDA's discrimination complaint process.

Should you decide to file a complaint, you must contact the Agency's Civil Rights Division, at 800-269-6912, within **forty-five (45) calendar days** of the effective date of this action. They will assign a counselor who will attempt to resolve the complaint and/or give notice of how to file a formal complaint.

Any questions concerning the contents of this letter, your rights, or the procedures involved, should be directed to me at the above letterhead address and telephone number.

Sincerely,

*Marcelle Castillo*

Marcelle Castillo
Senior Employee Relations Specialist
Employee Relations Branch

cc:   Scott C. Safian, Director, Evaluation and Enforcement Division
      Robinn A. Reed, Branch Chief, Employee Relations
      Kristie D. Kelm, Supervisory Employee Relations Specialist
      Representative Copy
      Receipt Acknowledgement Copy
      File Copy

**I received the original of this notice on** _____.
                                               **Date**

_____              _____
**Signature of Employee**              **Signature of Witness**

**EXHIBIT** _L_
**Page** _81_ **of** _94_ **Pages**

000155

**Casole, Eugene**

---

| | |
|---|---|
| **From:** | Safian, Scott |
| **Sent:** | Tuesday, December 09, 2003 8:53 PM |
| **To:** | Casole, Eugene |
| **Cc:** | Bossler, Wayne; Van Blargan, Richard; Hicks, Ron |
| **Subject:** | Re: Today |

Thank you, Eugene. I can speak with you about your approach and demeanor on the conference call. Your email on the Las Colinas matter raises a similar concern.

With regard to Mr. Sworen's remarks, they are being appropriately addressed.

Thank you, again.
--------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)


-----Original Message-----
From: Casole, Eugene <Eugene.Casole@fsis.usda.gov>
To: Safian, Scott <Scott.Safian@fsis.usda.gov>
CC: Bossler, Wayne <Wayne.Bossler@fsis.usda.gov>; Van Blargan, Richard
<Richard.VanBlargan@fsis.usda.gov>; Hicks, Ron <Ron.Hicks@fsis.usda.gov>
Sent: Tue Dec 09 09:14:21 2003
Subject: RE: Today

Really?  I don't believe I said anything wrong or inappropriate.  I certainly didn't use profanity like me Mr. Sworen.  I'll remind you, sir, that when I reminded Mr. Sworen of my conversation with him during the week of October 9th & 13, 2003 that the ethics training and bi-annual stipulation was due on October 19 & 10/21/03, he elected to wait until Mr. Kain returned from annual leave to approach management at Salem Packing.  When I told him th    e should have sent Mr. Geraci to follow up, he got mad.  The irony is that Mr. Kain th    uses these two stipulations as violations in his case file.  Some how that doesn't sound right to me.  When I told Mr. Sworen that I had a problem with this, Mr. Sworen stated, "I don't give a shit about your problem."  I think you and Mr. Van Blargan should talk to Mr. Sworen about his use of profanity in the work place.  I would also remind you, sir, that the Philadelphia Compliance office sent in a case file, alleging about six (6) violations or breaches of the Order, when the fact is that this case file got through a Supervisory Compliance Officer and Regional Manager and you may have only one breach of the Order, the ethics training stipulation, which is pretty insignificant.


-----Original Message-----
From: Safian, Scott
Sent: Tuesday, December 09, 2003 8:35 AM
To: Sworen, John; Bossler, Wayne; Casole, Eugene
Subject: Today

Thanks for everyone taking time today. It was helpful. We do need to keep the conversation on the right track and tone. Their were inappropriate remarks on both sides. In the end we got what we needed and think we have good direction. We need to keep working together and with FO.  I did not have Larry or Mike's email so John you can pass to them.
--------------------------
Sent from my BlackBerry Wireless Handheld (www.BlackBerry.net)


EXHIBIT 1
Page 82 of 94 Pages



**Office of Management's Monthly Newsletter**

# The Beacon

U.S. Department of Agriculture
Food Safety and Inspection Service
Office of Management
William P. Milton, Jr., Assistant Administrator
Yvonne Davis, Acting Human Capital Officer

Outlook Public Folders/Newsletters/OM
E-mail: Beacon@fsis.usda.gov

---

**bea·con** (bē′ken) *noun*
A signaling or guiding device, such as a lighthouse, located on a coast. A source of guidance or inspiration.

---

## LEADERSHIP CORNER

**William P. (Billy) Milton, Jr., Assistant Administrator for Office of Management**
*By Kathleen Bean, Workforce Transition Management Staff; Telephone: 202-720-2137*

In early October of 2003, Dr. Garry McKee, FSIS Administrator, announced his selection of Mr. William P. (Billy) Milton, Jr., as Assistant Administrator for the Office of Management (OM). The OM vision is "to provide an administrative support structure that is recognized and utilized as a model within the Federal Government." In this new role, Billy (as he wishes to be called) is positioned to transform this vision into reality.

"We are making progress," Billy said. "The Agency's Human Resources Division (HRD) received a Human Capital Showcase Award from the Office of Management and Budget and the Office of Personnel Management." The FSIS Workplace Violence Prevention Program is recognized as one of the best in government, he said. "We are often asked to discuss our program with other Federal and State agencies," he said.

FSIS employees first came to know Billy's leadership skills while he served as the Director for the Labor and Employee Relations Division (LERD) in OM. He is proud of his work providing leadership and coordination to programs such as negotiating and administering labor agreements, disciplinary and adverse actions; preventing workplace violence; overseeing conflict of interest, ethics, and misconduct investigations; and mediation. He is similarly proud of the Voluntary Dispute Intervention Program (VDIP) developed in LERD. "The Department is using the FSIS VDIP program as a model for other mission areas," he said.

This Assistant Administrator will not rest complacent, however. OM has seven strategic objectives for Fiscal Years 2004-2008: establish a results-oriented

environment, improve communications, improve OM service delivery; establish comprehensive management of information technology; structure and deploy the workforce plan; improve fiscal management and budgeting processes; design human capital plan improvements and integrate human capital initiatives. Billy said that he believes his role is to support the OM

**In This Issue:**

**Leadership Corner:** William P. (Billy) Milton, Jr., Assistant Administrator for Office of Management ... 1

**Recognition** ... 2
Dr. McKee Presents Excellence Awards
OFO Presents Merit Awards

**Learning** ... 3
CFL Offers Self-Study Canning Technology Course
E-Mentoring
Externship Exposes Students to Food Safety Careers

**FSIS Career Path** ... 4
PHS Commissioned Corps: Civil Service Can Join In
FSIS Interview Policy: To BE or Not to BE!

**Workforce of the Future** ... 5
Steering Committee Kicks Off Fall Meeting
Steering Committee Recommendations and Outcome

**Ethics and Professionalism** ... 7
Acceptance of Gifts
Travel Overtime for Exempt Employees
Professionalism Motto and Logo Design Competition

**Financial Planning** ... 10
New Rates on Savings Bonds
Life Insurance: New Premiums for Upper Age Bands

**Emergency Preparedness** ... 10
Introducing Food Security and Emergency Preparedness
Accident Reporting Procedures for GOVs

**FSIS Family** ... 12
Reminder about Leave Transfer Recipients
Retirements

**Issuances and Forms** ... 12
New T&A Spreadsheet for FY 2004 Available
Recent Agency Issuances
Focus on: The New Work Assignment System ... 14

**Message from the Editors** ... 15

000157

**EXHIBIT 2**
Page 82 of 94 Pages

directors as they lead their divisions in reaching these ᵔls.

"I am interested in developing best-in-class services, and customer service is a priority," Billy said. "For example, a reorganization of the Civil Rights Division (CRD) will enable us to more effectively address challenges in discrimination cases and integrate Equal Employment Opportunity (EEO) activities with VDIP," he said. Now, CRD does not mediate EEO complaints unless requested. The reorganization will provide CRD personnel with extended training in a number of disciplines, including VDIP and mediation skills, Billy said. "We plan to share resources more effectively so that we can reach out to a maximum number of employees."

OM is also exploring the use of merit pay, pay banding, and innovative performance measurement systems, Billy said. "We also plan to expand our diversity agenda, increasing the number of disabled employees in FSIS and enhancing assistance to all FSIS programs," he said.

Addressing challenges and integrating activities throughout OM will be this Assistant Administrator's focus. For example, the Administrative Services Division, which manages space for the Agency, is working closely with HRD, CRD and WTMS to enhance customer service on office openings, closings, and ᵔᵔᵔcations. In addition to ensuring that FSIS is in compliance with Department and Government-wide rules for space management, ASD hopes to identify cost savings that can be diverted to critical Agency needs such as training and education.

"It is in the Agency's best interest," Billy said, "to strengthen our commitment to training and education. We must work in concert with all other programs to achieve this goal." Billy noted that OM has put into place an effective mentoring system and will work to use whatever means available to contribute to the career development of our staff.

Improved professionalism will "get the job done," Billy said. And when the job is done in an excellent manner, he believes it should be rewarded. Within the past 9 months, significant employee contributions in OM were recognized with spot awards, extra effort awards, and performance awards – 90 in all.

The words of his colleagues present an encapsulated view of the talents and skills of our new Assistant Administrator. "Billy's level of energy and passion for his work with people, dollars, space, resources, technical expertise, information technology, and administrative services, distinguishes him from others," commented Yvonne Davis, OM, Acting Human Capital Officer.

ᵔher associate, Ms. Cheryl Dunham, Chief, Labor

Relations Branch, LERD, says, "Billy is amazing! He inspires and motivates me."

*In coming months, watch for Beacon interviews with other FSIS leaders, including the Chief Financial Officer, the Human Capital Officer, and the Chief Information Officer.*

## RECOGNITION

### Dr. McKee Presents Excellence Awards
*(Reprinted courtesy of FSIS News and Notes)*

On October 9, Administrator Garry McKee presented the first annual Administrator's Excellence Awards. Honored at the ceremony for outstanding performance during Fiscal Year 2003 were: Yvonne Davis, Emilio Esteban, Keith Gilmore, Gloria Giesner, David Goldman, Steve Hawkins, Paul Haynes, William James, Karlease Kelly, Tracy Legall, Lewis Leny, Stephen McDermott, Karen Messmore, Billy Milton, Karen Morris, Ron Niemeyer, Virginia Olson, Herb Ostach, Cathy Pentz, Jane Roth, Sharin Sachs, Chris Salisbury, Danielle Schor, Mary Sirk, Felix Spinelli, Wanda Sullivan, John Sworen, Armia Tawadrous, Jonathan Theodule, Lori Thomas, Robert Tynan, Katina Weems, and Giovanna Wiggington. Congratulations!

### OFO Presents Merit Awards for Excellence
*By Anna Pierce, Human Resources Division*
*Telephone: 202-720-8966*

The Office of Field Operations (OFO) in October honored more than 50 employees for their outstanding contributions and leadership. The recipients, who include both bargaining and non-bargaining unit employees, have truly proven their dedication and conscientiousness to the FSIS mission. The employees recognized have been instrumental in helping the Agency become a premier public health agency.

**Outstanding Leadership – Supervisors, Managers, and Assistant Managers:** OFO Assistant Administrator William Smith recognized Abdullah Amin, Joseph Kitzman, Alan Knox, Louis Leny, Haroon Mian, John Snyder, and Dawn Sprouls for managerial and supervisory leadership. These employees demonstrated effective leadership, creativity, and effectiveness when giving direction to their subordinates and have high standards in their own personal performance. They lead their employees and set standards that foster pride in public service and helps to establish teamwork.

**Organizational Team Excellence.** OFO also recognized three groups of employees for their effective delivery of OFO functions, superior contributions to management effectiveness, and creative implementation

EXHIBIT 2
Page 84 of 94 Pages



| United States Department of Agriculture | Food Safety and Inspection Service | Washington, D.C. 20250 |

FEB - 9 2004

FOR OFFICIAL USE ONLY

Mr. Eugene Casole
Compliance Specialist
Congressional Quarterly Building
1255 22nd Street, NW
Washington, DC 20037

Dear Mr. Casole:

This letter directs your detail assignment from your present duty station Washington, DC, to Omaha, Nebraska. You will retain your current position title, grade and step during this detail. Since this detail is not within commuting distance of your current Maryland residence, you will receive payment of appropriate authorized transportation and per-diem expenses associated with this detailed assignment. This detail is effective February 17, 2004 and extends through March 12, 2004. You will report to Mr. Donald Smart, Director, Program Review Staff, or his designee, for the duration of this detail assignment.

To ensure that this Agency's public health regulatory mission is effectively and efficiently carried out, it is vitally important that the Office of Program Evaluation, Enforcement and Review (OPEER) personnel perform their duties professionally at all times and maintain an impartial and professional relationship with other OPEER and Agency employees. Of equal importance is that OPEER personnel contribute to and maintain a harmonious work environment conducive to the efficient and effective conduct of the government's business. Failure to maintain such a relationship and environment has serious repercussions, including an adverse effect upon Agency employees, public confidence in the integrity of our employees and our Agency's programs.

At your present duty station, you reportedly engaged in improper conduct by making unsolicited, inappropriate, and unsubstantiated remarks to another OPEER employee while on duty. Therefore, I have requested the Labor and Employees Relations Division (LERD) to conduct a full independent investigation into these allegations and any other reported misconduct activities at the Congressional Quarterly building. The LERD investigation is scheduled to begin on February 23, 2004.

Accordingly, pending the results of the LERD investigation, it is in the best interests of the Agency to direct your detail assignment as specified. An AD-202 Travel Authorization covering

**EXHIBIT** 1
Page 85 of 94 Pages

FOR OFFICIAL USE ONLY

000159

FOR OFFICIAL USE ONLY

the period of the detail assignment is enclosed.  Failure to report for duty in Omaha may result in appropriate disciplinary action or, if warranted, action being initiated to remove you from the service.

Sincerely,

Richard T. Van Blargan
Deputy Assistant Administrator
Office of Program Evaluation, Enforcement and Review

Enclosure: AD-202 Travel Authorization

EXHIBIT 1
Page 86 of 94 Pages

# TRAVEL AUTHORIZATION/ADVANCE
See Privacy Act Notice on Reverse

Note: Traveler is liable for the value of the tickets issued until all tickets or coupons are properly accounted for on the Travel Voucher.

## 1. ACTION CODE (Indicate one type only)

| | |
|---|---|
| E | E = Establish   C = Cancel<br>A = Amend   V = Advance Only (Complete Sections A, E, and F Only) |

| | 2. AUTHORIZATION DATE ▶ | MONTH | DAY | YEAR |
|---|---|---|---|---|
| | | 02 | 09 | 04 |

## SECTION A - IDENTIFICATION

| 1. AUTHORIZATION NO. | 4. SOCIAL SECURITY NO. | 5. NAME (LAST) | (FIRST) | (Middle Initial) | 6. AGENCY CODE |
|---|---|---|---|---|---|
| 731100296 | | CASOLE | EUGENE | | 37 |

| 7. AGENCY OON | 9. ESTIMATED DATES OF TRAVEL EXPENSES | | | | | | 10. TYPE TRAVEL (Indicate one type only) | 11. GOVERNMENT CREDIT CARD HOLDER |
|---|---|---|---|---|---|---|---|---|
| AG37351000 | FROM | | | THRU | | | DM = Domestic   GR = Escorted Group | |
| 8. TRAVELER OON | Month | Day | Year | Month | Day | Year | FG = Foreign   OC = Outside Cont. U.S. | -Y   Y = Yes |
| | 02 | 17 | 04 | 03 | 12 | 04 | FT = Foreign Transfer   TS = Transfer of Station | N = No |
| | | | | | | DM | RT = Return Travel   OT = Outside CONUS ToS | |

| 12. TRAINING DOCUMENT NO. (For Purpose of Travel Code J Only) | 13. OFFICIAL DUTY STATION CITY AND STATE | 14. RESIDENT CITY AND STATE (if other than official station) |
|---|---|---|
| | WASHINGTON, DC | ANNAPOLIS, MARYLAND |

## SECTION B - EMPLOYMENT STATUS (Check the appropriate employment status block.)

| ✓ 15. PAYROLLED BY NFC | 16. NOT PAYROLLED BY NFC | 17. NEW HIRE | 18. SPECIAL APPOINTEE | 19. NONGOVERNMENT |
|---|---|---|---|---|

## SECTION C - ITINERARY AND ESTIMATED EXPENDITURES

| 20. FROM | | 21. TO | | | | | 23. AUTHORIZED EXPENDITURES | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| CITY | ST | CNTY CD | CITY CD | CITY, COUNTY or REGION | ST | Subsistence Codes | CODE | LODGING | M and IE | RATE | NO. DAYS | ESTIMATED AMOUNT |
| WASHINGTON | DC | | | OMAHA | NE | | P | $63.00 | $43.00 | $106.00 | 25 | $2,650.00 |
| | | | | | | P = Per Diem | | | | x | | |
| | | | | | | A = Actual Subsistence | | | | x | | |
| | | | | | | S = Special Rate | | | | x | | |
| | | | | | | | | | | x | | |

22. PURPOSE OF TRAVEL (Give explanation)   DETAIL

| | | |
|---|---|---|
| TOTAL SUBSISTENCE | | $2,650.00 |
| ✓ POV: Rate .375 | Rate | |
| | Rate | |
| | Rate | |
| ✓ Other (Specify) PHONE/TAXI | | $250.00 |
| Unaccompanied Baggage | | |
| Car Rental | | |
| ✓ Common Carrier Tickets | | |
| Transportation Mode   Method of Purchase | | $600.00 |
| Use of Non-contract Airline   [Insert Code] | | |
| Excess Fare | | |
| Excess Baggage | | |
| GSA Auto | | |
| 24. TOTAL EST. EXPENDITURES AUTHORIZED ▶ | | $3,500.00 |

## SECTION D - ACCOUNTING CLASSIFICATION

25. Distribute Total Estimated Expenditures from Section C to the applicable Purpose of Travel Code and Accounting Classification line.

| PURPOSE OF TRAVEL CODES | | |
|---|---|---|
| 1 = Site visit | 6 = Relocation | 11 = Pre-employment |
| 2 = Information meeting | 7 = Entitlement/Home leave | 12 = First post of duty |
| 3 = Training attendance | 8 = Special mission travel | 13 = Rest & Recuperation |
| 4 = Speech or presentation | 9 = Emergency travel | 14 = Educational |
| 5 = Conference attendance | 10 = Other travel | 15 = Informal training |

| PURPOSE CODE | ACCOUNTING CLASSIFICATION | PERCENTAGE |
|---|---|---|
| | 3110014 | 100 % |
| | | |
| | | |
| | | |
| | THESE PERCENTAGES MUST EQUAL | 100 % |

## SECTION E - TRAVEL ADVANCE

### 26. ADVANCE REQUEST METHOD
(Select one method only)
- C = Check or DD/EFT
- T = Travelers Checks
- I = Imprest Fund
- E = Emergency (Wire)
- W = Wire Confirmation
- S = Embassy Issued Advance
- L = Embassy Collect. Advance

### 32. ADVANCE MAILING ADDRESS OPTIONS

| | SALARY ADDRESS | T&A CONTACT POINT | SPECIAL ADDRESS (Required for new hires, special appointees, and nonGovernment travelers) | | | FOREIGN ADDRESS | TRAVEL EFT ACCOUNT |
|---|---|---|---|---|---|---|---|
| 1. (35) | | | | | | | |
| 2. (35) | | | | | | | |
| 3. City (20) | | | State (2) | | Zip Code (9) ▶ | | |

| 27. AMOUNT OF ADVANCE APPLIED FOR | 33. IMPREST FUND CASHIER | | |
|---|---|---|---|
| | SOCIAL SECURITY NO. | SIGNATURE | EXHIBIT 2 |
| 28. BALANCE FROM PREVIOUS ADVANCE | | | Page 87 of 94 Pages |
| 29. TOTAL ADVANCE AMOUNT | 34. ADVANCE RECEIVED (Cash or Travelers Checks) | | |
| | DATE RECEIVED   Month   Day   Year | APPLICANT'S SIGNATURE | |

| 30. APPLICANT'S SIGNATURE | 31. DATE APPLIED FOR   Month   Day   Year | SEE PRIVACY ACT STATEMENT ON REVERSE |
|---|---|---|

## SECTION F - AGENCY APPROVAL

| 35. APPROVING OFFICER'S NAME & TITLE (Last,First,Middle Initial) (Type or Print) | AGENCY CODE | 36. SOCIAL SECURITY NO. | 37. DATE APPROVED   Month   Day   Year | 38. PHONE (Area Code & No.) |
|---|---|---|---|---|
| Richard T. Van Blargan, Dep., Asst. Adm, OPEER | 37 | | 02  09  04 | (202) 720-8609 |
| 39. APPROVING OFFICER'S SIGNATURE | | 40. CONTACT PERSON'S NAME | | 41. PHONE (Area Code & No.) |
| | | WANDA SULLIVAN | | (202) 720-8609 |

Upon completion and approval, submit original to:
USDA - National Finance Center, P.O. Box 60,000, New Orleans, LA 70160

PART 1 - NFC   Designed on FormFlow Software.   FORM AD-202 (USDA) (Rev. 11/96)
Exception to SF 1038 approved by GSA 11/20/96

000161

Casole, Eugene

| | |
|---|---|
| From: | Akinola, Judy |
| Sent: | Friday, February 13, 2004 1:44 PM |
| To: | Gabriel, Michael; Hickman, Martin; Watts, Vanessa; Akincla, Judy; Bossler, Wayne; Brogdon, Roslyn; Busch, Frank; Casole, Eugene: Cobb, Bonnie; Donna Sellers; Figarella, Miguel; Hazel, Gary; Holmes, Vella; Kelley, Glenda; Langley, David; Lebron, Maxine; Lewis, Eleanor; Lockard, Betty; Long, Michelle; Miletta. Elaine; Neris, Valerie; Ogundipe, AJ; Safian, Scott; Siller, Manfred; Torres, Carlos; Uptain, Leonard; Voll, Rita |
| Subject: | Mandatory Meeting |

To:        All OPEER Employee's
           Quarterly Congressional Building


There will be a mandatory meeting of all available OPEER personnel working in the
Quarterly Congressional building, 2nd floor conference room, on Wednesday, February 18,
2004. Because of space limitations there will be two sessions. The first session will
begin at 10:30 AM and end at 11:20 AM, for employees whose last name begins with the
letter A thru K. The second session will begin at 11:30 AM and end at 12:20 PM. For those
employee's whose last name begins with the letter L thru Z. Employee's scheduled for the
second session are expected to make appropriate adjustments to their lunch schedule in
order that they may be in attendance and apologize for any inconvenience this may cause.

As stated above this meeting is mandatory and all OPEER employees, on duty, at the QC
building on Wednesday February 18, 2004, are expected to attend one of the two sessions.
Mr. Ron Hicks; Mr. Richard Van Blargan; Ms. Robin Reed; Ms. Cynthia Mercado; Mr. Scott
Safian; and Mr. Zygmunt Sala will be in attendance at each of the two sessions. We look
forward to a productive and informative meeting.

EXHIBIT 2
Page 88 of 94 Pages

**Casole, Eugene**

Fr        Casole, Eugene
Se        Monday, March 29, 2004 9:20 AM
To:       'sjsilverberg@erols.com'
Cc:       Reed, Robinn; Cantres, Luz; Bossler, Wayne
Subject:  RE: Meeting

Please telephone Ms. Robinn Reed, Director, LERD, HRD (Personnel), Ms. Cantres' supervisor, at (202) 720-5657 and advise her that Ms. Cantres has repeatedly been advised not to contact me, but to deal with my attorney. In addition, I, and my supervisor do not like the tone of Ms. Cantres' recent message to me—it appears threatening to me. This is inexcusable behavior.

-----Original Message-----
**From:** Cantres, Luz
**Sent:** Monday, March 29, 2004 7:46 AM
**To:** Casole, Eugene
**Cc:** Bossler, Wayne
**Subject:** RE: Meeting

I suggest we talk…I am not obligated to speak with your attorney and will not do so. As I explained to you on the phone last week, you are obligated to meet with me and provide a statement. I will call you.

Luz Cantres
Employee Relations Specialist - Philadelphia
701 Market Street, Suite **4100B**, Philadelphia, PA 19106
Luz.Cantres@fsis.usda.gov
215-597-4219 Ext. 125
800-637-6681 Ext. 125
215-597-4316 Fax

-----Original Message-----
**From:** Casole, Eugene
**Sent:** Monday, March 29, 2004 7:27 AM
**To:** 'sjsilverberg@erols.com'
**Cc:** Bossler, Wayne; Cantres, Luz
**Subject:** FW: Meeting

I have spoken with my immediate supervisor, Mr. Wayne Bossler about this issue, and he agrees that we gave Ms. Cantres enough notice on Friday, and that I should be interviewed here because this is my duty station. Please coordinate with Ms. Cantres to arrange an appointment to discuss the issue.

-----Original Message-----
**From:** Cantres, Luz
**Sent:** Monday, March 29, 2004 6:47 AM
**To:** Casole, Eugene
**Subject:** RE: Meeting

That is not an option, we need to meet in Philadelphia.

EXHIBIT 1
Page 89 of 94 Pages

Luz Cantres
Employee Relations Specialist - Philadelphia
701 Market Street, Suite **4100B**, Philadelphia, PA 19106
Luz.Cantres@fsis.usda.gov
215-597-4219 Ext. 125

000163

1

800-637-6681 Ext. 125
215-597-4316 Fax

-----Original Message-----
**From:** Casole, Eugene
**Sent:** Friday, March 26, 2004 1:24 PM
**To:** Cantres, Luz
**Cc:** 'sjsilverberg@erols.com'
**Subject:** RE: Meeting

I'm sorry for the inconvenience, but my attorney is with another client at this time—I just tried calling him. I hope he returns your telephone call right away. Essentially, there is a small problem—we want to have the meeting in Washington, at my attorney's office—that is what he was going to telephone you about.

-----Original Message-----
**From:** Cantres, Luz
**Sent:** Friday, March 26, 2004 12:55 PM
**To:** Casole, Eugene
**Subject:** Meeting

Good afternoon. Your attorney did leave me a message but has not returned my call of earlier today so I'm going to leave you the meeting information and I expect that there will be no problem with you meeting me.

We will meet on Monday (03/29) as agreed in the William Green Federal Building – 600 Arch Street, Philadelphia – at 10:00 a.m. The meeting will take place in conference room 2C on the second floor. Entering the building will be easier if you have your Federal ID with you, but basically everyone goes through the same procedure.

See you on Monday. Have a great day.

Luz Cantres
Employee Relations Specialist - Philadelphia
701 Market Street, Suite **4100B**, Philadelphia, PA 19106
Luz.Cantres@fsis.usda.gov
215-597-4219 Ext. 125
800-637-6681 Ext. 125
215-597-4316 Fax

EXHIBIT 1
Page 90 of 94 Pages

000164

2



United States
Department of
Agriculture

Food Safety
and Inspection
Service

Washington, D.C.
20250

MAR 3 1 2004

FOR OFFICIAL USE ONLY

Mr. Eugene Casole
Compliance Specialist
Congressional Quarterly Building
1255 22nd Street, NW
Washington, DC 20037

Dear Mr. Casole:

In my letter to you dated February 9, 2004, I advised you of a full independent Labor and
Employees Relations Division (LERD) investigation into allegations of reported misconduct
activities among OPEER employees located at the Congressional Quarterly Building. The
LERD investigation was initiated on February 23, 2004 and required all OPEER employees in
the Congressional Quarterly Building to be interviewed and cooperate in the conduct of the
investigation.

As a result of your directed detail assignment to Omaha, Nebraska, LERD investigators were
unable to interview you at that time. Therefore, Luz Cantres, LERD, Employee Relations
Specialist, Philadelphia Field Office has scheduled you to be interviewed at 9:00 AM, on
Monday, April 5, 2004 at the William Green Federal Building, Conference Room C, 2nd Floor,
600 Arch Street, Philadelphia, Pennsylvania.

In this regard, I have instructed Mr. Scott Safian, Director, EED to make you available, at
reasonable government expense, to be interviewed by Ms. Cantres at the above mentioned
destination and specified time. As a Federal employee you are required to participate and
cooperate in the conduct of this investigation, not entitled to legal representation in this instance
and strongly encourage you to do so. Failure to report at the above mentioned destination and
specified time may result in appropriate disciplinary action being taken against you.

Sincerely,

Richard T. Van Blargan
Deputy Assistant Administrator
Office of Program Evaluation, Enforcement and Review

EXHIBIT 1
Page 91 of 94 Pages

FOR OFFICIAL USE ONLY

000165

Cc:    Ronald Hicks
       Luz Cantres
       Scott Safian

EXHIBIT 1
Page 92 of 94 Pages

000166

RECEIVED
7/30/04

*Hand-delivered*

July 30, 2004

Ms. Kristie Kelm, Chief
Employee Relations Branch
USDA, FSIS, Employee Relations Branch
1400 Independence Avenue, S.W., Room 3175-S
Washington, D.C. 20250

Ms. Kelm:

Per our conference call on July 28, 2004, with you, Messrs. Scott Safian, Director,
Evaluation and Enforcement Division (EED) and Wayne Bossler, Program Manager,
EED, and I, regarding your office's July 7, 2004, proposal to suspend letter, I will have to
decline for the following reasons:

1.  As previously stated, the fact that your office has completed its investigation,
    assessed the investigative findings, and referred to USDA Guide for Disciplinary
    Penalties and determined the appropriate disciplinary action based on the
    evidence collected, tells me that your office has determined guilt. Page three of
    your proposal letter specifically states this: "The evidence and material upon
    which this proposal is based are enclosed (referring to the case file)." The notion
    that your office would afford me a fair and impartial oral conference or genuinely
    consider any additional written submittal refuting your evidence at this time is
    neither realistic nor attainable.

2.  Further and more importantly is the fact that I have named your office in my
    November 25, 2003, EEO Complaint. The complaint reads, in part, "...I believe
    and allege that this personnel action against me was clearly an additional act of
    reprisal which was coordinated and done knowingly, intentionally, willfully, with
    malice and forethought, and perpetrated by Messrs. Scott C. Safian, Richard T.
    Van Blargan, and Ronald F. Hicks, in collusion with FSIS Personnel officials, in
    direct response to my February 24, 2003, EEO complaint." Moreover, in my
    Complainant's Rebuttal Affidavit, I stated, in part: "...I have taken an
    administrative action against FSIS. It's inconceivable that an office or program,
    like Personnel, wouldn't assist in any manner, shape or form another office or
    program within the same Agency if the latter office or program was in litigation
    with an EEO Complainant or other party. The notion that Personnel wouldn't



EXHIBIT 2
Page 23 of 94 Pages

000167

assist OPEER in whatever way possible, regarding my issue, is absolutely ridiculous."

As you can see, I have serious and valid issues.

Thank you,

Eugene Casole

cc: S.J. Silverberg, Esquire

EXHIBIT 2
Page 94 of 94 Pages

000168